UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SIONYX, LLC and PRESIDENT AND FELLOWS OF HARVARD COLLEGE,<br><br>    Plaintiffs,<br><br>    v.<br><br>HAMAMATSU PHOTONICS K.K.;<br>HAMAMATSU CORPORATION;<br>OCEAN OPTICS, INC.; and<br>DOES 1 THROUGH 10,<br><br>    Defendants. | Civil Action No.<br>15-13488-FDS |

**MEMORANDUM AND ORDER ON PLAINTIFFS' MOTION TO DEEM SERVICE OF PROCESS COMPLETE AND MOTION FOR A PRELIMINARY INJUNCTION**

**SAYLOR, J.**

    This is a patent-ownership dispute between a Massachusetts technology company and a Japanese optical-device manufacturer. Plaintiffs SiOnyx, LLC and the President and Fellows of Harvard College have brought suit against Hamamatsu Photonics K.K. ("HPK"), a Japanese corporation; HPK's North American subsidiary Hamamatsu Corporation ("HC"), a New Jersey corporation; Ocean Optics, Inc., and ten unnamed inventors. The amended complaint asserts claims for correction of patent inventorship pursuant to 35 U.S.C. § 256 for seven patents, patent infringement pursuant to 35 U.S.C. § 271, and breach of contract.

    Plaintiffs have not completed service on HPK in compliance with Fed. R. Civ. P. 4(f)(1) and the Hague Service Convention. They have, however, served HC, which has apprised HPK of the litigation, and which appeared before the Court during the preliminary-injunction hearing.

Plaintiffs contend that HC is HPK's "managing or general agent" under Mass. R. Civ. P. 4(d)(2) and that service on HC is sufficient to effect service on HPK.[1]  Accordingly, plaintiffs have moved for an order finding that they have completed valid service of process on HPK (the "service motion").  Plaintiffs have also moved for a preliminary injunction seeking to enjoin HPK and HC from enforcing the seven disputed patents during the pendency of this litigation.

For the following reasons, plaintiffs' service motion will be denied, and they will be directed to serve HPK in accordance with Fed. R. Civ. P. 4(f)(1) and the Hague Service Convention.  Pending completion of service, the Court does not have personal jurisdiction over HPK, and plaintiffs' motion for a preliminary injunction as to HPK will be denied without prejudice.

## I. Background

The following factual summary is drawn from exhibits attached to the amended complaint and plaintiffs' motion for a preliminary injunction, as well as from exhibits and testimony admitted during the four-day hearing on that motion.

### A. Factual Background

#### 1. The Parties

Eric Mazur, a professor at Harvard University, and James Carey, who was then a Ph.D. candidate at Harvard, together invented several improvements to optoelectronic devices.  (Saylor Decl. ¶ 2; Am. Compl. ¶¶ 9, 11, 18).  Those improvements involve laser-processing techniques to create a black-silicon texture in semiconductor-imaging devices, as well as the positioning of that texture opposite to the light-incident side.  (Saylor Decl. ¶ 2).  The improvements increase a photodetector's sensitivity to light having longer wavelengths (near-infrared light).  (*Compare*

---

[1] In the alternative, plaintiffs move pursuant to Fed. R. Civ. P. 4(f)(3) and Mass. R. Civ. P. 4(d)(2) for an order appointing HC's counsel as an agent authorized to accept service on behalf of HPK.

Am. Compl. Ex. 17, *with id.* Ex. 18). Carey and Mazur co-founded SiOnyx in 2006 to further develop and commercialize their technology. (Saylor Decl. ¶ 3). They hired Stephen Saylor to be the President and CEO of SiOnyx. (*Id.* ¶ 1).[2]

Hamamatsu Photonics K.K. ("HPK") is a Japanese corporation and a developer and manufacturer of optical devices, including photodetectors. (Am. Compl. ¶ 54). HPK owns Photonics Management Corporation ("PMC"), a holding company, which owns all of the stock of Hamamatsu Corporation ("HC"). (Tr. 3-110:19-22; 3-111:8-16).[3]

HC is a New Jersey corporation headquartered in Bridgewater, New Jersey. (Am. Compl. ¶ 4).[4] No HC employees sit on the board of HPK. (Tr. 3-113:4-7). HC is the marketer and sales distributor of HPK products in North America. (Tr. 3-111:10-12). Although HC occasionally customizes HPK products in its American offices, it "does not develop, design, or engage in large-scale manufacturing in the United States." (Tr. 3-114:22-115:5). HC purchases products from HPK, at prices set by HPK, and then has the authority to set its own resale price. (Kaufman Decl. ¶ 6). HC uses HPK's marketing materials and website, which are created and maintained in Japan. (Tr. 3-115:5-118:18; 3-130:10-22; 3-135:15-24; 3-138:24-139:3). The marketing materials and website direct United States customers to purchase HPK products from HC. (*Id.*).

### 2.     The Mutual Non-Disclosure Agreement

In late 2006, SiOnyx and HPK entered into a joint-development project to test the application of SiOnyx's technology to HPK's devices. As part of that project, the parties signed

---

[2] Stephen Saylor is no relation to the undersigned district judge.

[3] Citations to the transcript of the four-day preliminary-injunction hearing appear as "Tr. [Day]-[Page]:[Line]-[Line]."

[4] HC has an office in Boston, Massachusetts. (Am. Compl. ¶ 5).

a mutual non-disclosure agreement. (Saylor Decl. ¶ 4; Am. Compl. Ex. 10) (stating that the limited purpose of agreement was to "evaluat[e] applications and joint[] development opportunities of pulsed laser process doped photonic devices"). The agreement was signed by Saylor, on behalf of SiOnyx, and David Leinwand as "General Counsel, PMC," on behalf of HPK. (Am. Compl. Ex. 10 at ¶ 10).[5]

The agreement stated in part as follows:

> The receiving party receiving confidential information from the disclosing party agrees that it shall: (a) maintain all confidential information in strict confidence, except that the receiving party may disclose or permit the disclosure of any confidential information to its directors, officers, employees, consultants, and advisors who are obligated to maintain the confidential information and who need to know such confidential information solely for the purposes set forth in this agreement.

(*Id.* ¶ 2). However, the non-disclosure agreement did not apply to the extent that

> the receiving party can demonstrate that certain confidential information: (a) was in the public domain prior to the time of its disclosure under this agreement; (b) entered the public domain after the time of its disclosure under this agreement through means other than an unauthorized disclosure resulting from an act or omission by the receiving party; [or] (c) was independently developed or discovered by the receiving party without use of the confidential information . . . .

(*Id.* ¶ 3). The agreement provided that the "disclosing party" would maintain ownership of "all patent, copyright, trademark, trade secret, and other intellectual property rights in, or arising from, such confidential information." (*Id.* ¶ 5). It is also provided that "[t]he receiving party agrees that any breach of its obligations under this agreement will cause irreparable harm to the disclosing party; therefore, the disclosing party shall have, in addition to any remedies available at law, the right to obtain equitable relief to enforce this agreement." (*Id.* ¶ 9).

Under the non-disclosure agreement, the parties worked together for more than a year to

---

[5] Leinwand is also the secretary of HC, although he did not sign the agreement in that capacity. (Leinwand Aff. ¶ 1; Docket No. 25-2).

test SiOnyx's laser-processing technology with HPK's devices. (Saylor Decl. ¶ 8). SiOnyx suggested experimental conditions and device architectures, conducted laser processing on wafers sent by HPK from Japan, and then returned the wafers to HPK for testing. (Am. Compl. Exs. 11, 13, 14-16). As demonstrated by an e-mail sent by an HPK employee to Saylor on March 1, 2007, HPK was particularly interested in SiOnyx's technology that involved increasing a device's sensitivity to near-infrared light:

> The main reason why I [am] interested in your technology was how to improve our [backside-thinned charged coupled device]. But I feel we need a lot of tests to understand the feasibility. Our [backside-thinned charged coupled devices] were designed for mainly to improve UV sensitivity, but poor [near-infrared sensitivity]. It's good if possible to increase [near-infrared] sensitivity with your technology.

(Am. Compl. Ex. 16). Saylor, who was excited about HPK's interest and the possibility to commercialize SiOnyx's technology, forwarded the e-mail to Carey with the message "check this out!" (*Id.*; Tr. 2-13:15-23; 2-87:6-9).

In November 2007, after HPK tested the devices that utilized SiOnyx's laser-etching and suggested architectures (placing the irregular asperity on the surface of the photodiode opposite to the surface upon which light is incident); the results showed significantly improved sensitivity to near-infrared light. (Tr. 2-19:7-20:21; Am. Compl. Ex. 18 at 15). Nevertheless, in January 2008, HPK terminated its relationship with SiOnyx, stating that it wanted to develop its own technology because it doubted that SiOnyx's "black silicon technology will greatly contribute." (Am. Compl. Ex. 11).

### 3. The Disputed Patents

In February 2009, HPK notified SiOnyx that it would be introducing a "silicon photodiode with higher [near-infrared light] sensitivity" at the Hamamatsu Photon Fair. (Am. Compl. Ex. 21). HPK attached a diagram of the device and stated, "we do not think we are

infringing any of your [intellectual property] or originality, or breaching any obligation of confidentiality." (*Id.*). Saylor responded, in relevant part,

> [b]oth Harvard and SiOnyx expect [HPK] will respect the IP rights covering SiOnyx and Harvard's own work. . . . While the diagram provided in your e-mail is insufficient for our understanding, it looks very similar to the work product of our collaboration. Should [HPK] wish to provide SiOnyx detailed specifications and English translation versions of the presentation materials planned for the Photon Fair, we may be able to comment on your conclusion that your laser processed [near-infrared light] enhanced silicon photodiode does not utilize SiOnyx [intellectual property] or violate any provisions of our prior agreement.

(*Id.*).

Unbeknown to plaintiffs, HPK began filing patent applications for a "photodiode manufacturing method" and various photodiode components in February 2010. (Saylor Decl. ¶ 9; *See, e.g.*, Pl. Mot. Ex. 1 ('087 patent)). From October 2013 through November 2015, HPK was granted seven patents. According to plaintiffs, all of those patents derive, at least in part, from SiOnyx's confidential information. (*See* Pl. Mot. Exs. 1-7).[6] The named inventors of the patents are HPK employees, some of whom worked with SiOnyx under the mutual non-disclosure agreement. (*Id.*; Saylor Decl. ¶ 9). HPK owns the seven patents as a result of assignment from the named inventors. HC has a non-exclusive license to those patents without enforcement rights. (Pl. Mot. Exs. 1-7; *See* Tr. 1-29:9-20).[7]

Plaintiffs may have become aware of HPK's patent applications in 2013, as demonstrated by citations to those patents in unrelated applications made by plaintiffs to the PTO. (Def. Exs. 4, 6). However, Saylor and Carey testified that they did not personally learn of the disputed

---

[6] The seven patents are United States Patent Nos. 8,564,087; 8,742,528; 8,916,945; 8,629,485; 8,884,226; 8,994,135; and 9,190,551.

[7] In their post-hearing brief, plaintiffs requested relief concerning an additional patent, United States Patent No. 9,293,499, which appears to have been granted on March 22, 2016. (Pl. Ex. 51). The '499 patent is not listed in the amended complaint or in plaintiffs' motion for a preliminary injunction. Accordingly, at least until plaintiffs file a second amended complaint, that patent is not a part of this case.

patents until a SiOnyx customer alerted them in 2015. (Tr. 1-55:12-56:15; 1-89:15-21; 3-89:24-90:10). After learning of HPK's patents, the customer terminated its joint-development agreement with SiOnyx for custom-image sensors. (Saylor Decl. ¶ 10). The customer had concerns that HPK might assert the disputed patents against products that incorporate SiOnyx's technology. (*Id.*). In addition to losing the value of that contract, Saylor and Carey testified that SiOnyx has lost business, market share, market position, goodwill, and financing opportunities. (Tr. 1-56:16-57:1; 1-55:12-56:15; 3-82:21-84:10).

It is sufficient for present purposes to summarize the patents as all involving, in some fashion, a photodiode, photodiode components, or a photodiode manufacturing method. Five of the seven disputed patents claim the placement of an "irregular asperity" on the surface opposite to the light-incident surface in a photodiode, and the two others claim the use of laser-etching to create an irregular asperity at that location. (*See* Pl. Mot. Exs. 1-3, 5, 7; Pl. Mot. Exs. 4, 6). Carey testified at length that he taught HPK the claimed laser treatment and placement, and documentary correspondence between the parties generally supports that testimony.[8] Furthermore, the PTO concluded that the positioning of the irregular asperity was novel over the prior art. (*See, e.g.*, Pl. Mot. Ex. 12 at 7, Ex. 18 at 11, Exs. 50, 57-58, 63-67, 88-90, 98).

B.  **Procedural Background**

On October 1, 2015, plaintiffs filed the original complaint in this action under seal. It also sent an unredacted copy to HPK in Japan. HPK informed Leinwand and HC employee

---

[8] Carey provided nearly seven hours of testimony, during which he described SiOnyx's confidential laser-etching process and device architectures, in addition to steps that the company took to protect the confidentiality of that technology. (*See, e.g.*, Tr. 2-20:10-22:7). He also described when, how, and with whom SiOnyx's proposed device architectures and physical samples were shared during the agreement with HPK. (*See, e.g.*, Tr. 2-14:8-15:20; 2-17:13-19; 2-18:19-19:6; 2-50:17-51:10). That testimony was supported by exhibits showing contemporaneous correspondence between the parties about the technology. (*See* Am. Compl. Exs. 14-18, 26; Pl. Mot. Exs. 23, 49). Finally, Carey thoroughly described how SiOnyx's technology was disclosed in each of the seven patents that were awarded to HPK. (*See* Tr. 2-57:14-83:2).

7

Kenneth Kaufman that it had received the complaint. (Leinwand Aff. ¶ 3; Tr. 3-122:12-15). At some point, HC engaged United States counsel for itself and HPK.

On December 17, 2015, plaintiffs filed a sealed amended complaint. On February 26, 2016, plaintiffs served HC's counsel, who also represents HPK, with an unredacted version. (Tr. 3-137:6-17). The 114-page amended complaint asserts claims for (1) correction of patent inventorship for each patent pursuant to 35 U.S.C. § 256 (Counts One through Fourteen); (2) declaratory judgment (Count Fifteen); (3) breach of contract and unjust enrichment (Counts Sixteen and Seventeen); and (4) patent infringement for three of the patents pursuant to 35 U.S.C. § 271 (Counts Eighteen through Twenty).

HC does not contest that it has been properly served in its own capacity. Plaintiffs concede that they have not served HPK with either of the complaints in accordance with Fed. R. Civ. P. 4(f)(1) and the Hague Service Convention.[9] Rather, they have moved for an order deeming service of process on HPK to be complete on the grounds that (1) they have properly served HC and (2) HC is HPK's "managing or general agent" under Mass. R. Civ. P. 4(d)(2). Plaintiffs have also moved for a temporary restraining order and preliminary injunction to enjoin HPK and HC from enforcing the seven disputed patents during the pendency of the litigation. The Court held a four-day evidentiary hearing on that motion, during which Saylor, Carey, Kaufman, and an expert witness for HC testified.

## II. Analysis

As explained below, the Court cannot directly enjoin HPK without personal jurisdiction over it, and it cannot obtain that jurisdiction unless service on HPK has been completed.

---

[9] Plaintiffs also concede that Japan is a signatory to the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents ("Hague Service Convention").

Accordingly, the Court must address the service of process issue before turning to plaintiffs' motion for injunctive relief.

### A.  Service of Process

A party serving an individual or corporation abroad must comply with Fed. R. Civ. P. 4(f)(1) and, for parties residing in signatory nations, the Hague Service Convention. However, state law governs whether a document must be served abroad. *See Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 705-06 (1988). Plaintiffs contend that HC is HPK's "managing or general agent" within the meaning of Mass. R. Civ. P. 4(d)(2). They contend that because they have properly served HC, HPK has been served with valid process, and compliance with the Hague Service Convention is unnecessary. Defendants contend that HC is merely a sales distributor that has no power to bind HPK, and that therefore plaintiffs must serve HPK in compliance with Fed. R. Civ. P. 4(f)(1) and the Hague Service Convention.

### 1.  Legal Standard

Fed. R. Civ. P. 4(f) governs the service of individuals outside the United States. That rule states:

> Unless federal law provides otherwise, an individual . . . may be served at a place not within any judicial district of the United States:
>
> (1) by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents;
>
> (2) if there is no internationally agreed means, or if an international agreement allows but does not specify other means, by a method that is reasonably calculated to give notice:
>
> > (A) as prescribed by the foreign country's law for service in that country in an action in its courts of general jurisdiction;
> >
> > (B) as the foreign authority directs in response to a letter rogatory or letter of request; or

>> (C) unless prohibited by the foreign country's law, by:
>>
>>> (i) delivering a copy of the summons and of the complaint to the individual personally; or
>>>
>>> (ii) using any form of mail that the clerk addresses and sends to the individual and that requires a signed receipt; or
>
> (3) by other means not prohibited by international agreement, as the court orders.

*Id.* Service of process of foreign corporations may be completed using the same methods for individuals outlined in Rule 4(f)(1) and 4(f)(3), among other provisions. Fed. R. Civ. P. 4(h).

However, the Hague Service Convention applies only where there is "occasion to transmit . . . a document . . . *abroad*." Hague Service Convention art. 1 (emphasis added). Accordingly, as the Supreme Court has recognized, "the Due Process Clause does not require an official transmittal of documents abroad every time there is service on a foreign national." *Schlunk*, 486 U.S. at 707. Rather, it is well-established that the determination whether service must be completed "abroad" depends on state law, although subject to due-process constraints. *See, e.g.*, *Golub v. Isuzu Motors*, 924 F. Supp. 324, 326 (D. Mass. 1996) (explaining that a document must be transmitted abroad and in compliance with the Hague Service Convention "if the internal law of the forum state defines the applicable method of serving process as requiring the transmittal of documents abroad." (citing *Schlunk*, 486 U.S. at 699)); *accord Heffernan v. Robeco Inv. Mgmt., Inc.*, 2007 WL 3244422, at *9 (Mass. Super. Oct. 25, 2007).

In Massachusetts, the means of service is governed by Mass. Gen. Laws ch. 223, §§ 37 and 38, and Mass. R. Civ. P. 4(d) and (e). Section 38 of Chapter 223 provides that any non-insurance "foreign corporation" that is "engaged in or soliciting business in [Massachusetts], permanently or temporarily," may be served in accordance with Mass. Gen. Laws ch. 223, § 37, which governs service on domestic corporations. Section 37 provides for service "upon the

10

president, treasurer, clerk, resident agent appointed pursuant to [Mass. Gen. Laws ch. 156D, § 49], cashier, secretary, agent or other officer in charge of its business, or, if no such officer is found within the county, upon any member of the corporation." Mass. R. Civ. P. 4 implements those statutory provisions. Under Rule 4, a domestic corporation or foreign corporation that is subject to suit within Massachusetts (under ch. 223, § 38) may be served by delivering a copy of the summons and complaint

> to an officer, to a *managing or general agent*, or to the person in charge of the business at the principal place of business thereof within the Commonwealth, if any; or by delivering such copies to any other agent authorized by appointment or by law to receive service of process.

Mass. R. Civ. P. 4(d)(2) (emphasis added). Otherwise, service must be completed in accordance with Mass. R. Civ. P. 4(e), which provides for various methods of service outside Massachusetts.

### 2. **Analysis**

The parties have cited, and the Court is aware of, only one (unreported) Massachusetts case that attempts to explicate the term "managing or general agent" in Mass. R. Civ. P. 4(d)(2). In *Heffernan*, a Netherlands-based corporation that was sued in the Superior Court in an employment case moved to dismiss the lawsuit for insufficient service of process under Fed. R. Civ. P. 12(b)(5). *Heffernan*, 2007 WL 3244422, at *8. The plaintiff served defendant's wholly-owned American subsidiary, which it contended was the defendant's "managing or general agent" under Rule 4(d)(2). The court, recognizing that there was no Massachusetts authority addressing the term "managing or general agent," looked to other "federal cases [that] . . . addressed the equivalent issue under the federal rules . . . ." *Id.* at *10; *see Furukawa Elec. Co. of N. Am. v. Yangtze Optical Fibre and Cable Co.,* 2005 WL 3071244, at *2 (D. Mass. Nov. 16, 2005); *Sankaran v. Club Mediterranee, S.A.*, 1998 WL 433780, at *5 (S.D.N.Y. July 31, 1998); *Mirrow v. Club Med, Inc.*, 118 F.R.D. 418, 419 (E.D. Pa. 1986). However, it noted

11

that "[t]he only clear rule that emerges from these cases is that the question is fact specific."

*Heffernan*, 2007 WL 3244422, at *10.

>   In explaining a "managing or general agent" relationship, the court further explained that
>
>   [a] mere parent-subsidiary relationship is not sufficient, but corporate separateness alone does not preclude an agency relationship for this purpose. The question is whether, under the particular facts presented, there is a sufficiently close relationship between a United States entity and a foreign entity such that service upon the United States agent is sufficient to provide notice to the foreign defendant.
>
>   Relevant factors include whether the resident entity performs all the functions for the foreign entity that the foreign entity would if it were doing business in the state by its own officials, the extent of common ownership and common officers, and generally the extent to which the foreign entity operates in the forum through the resident entity. Where the resident is a sales representative, it is also pertinent whether the representative has authority to establish prices, terms or conditions of contracts or orders.

*Id.* (citations and internal quotation marks omitted). Applying those factors to the facts before it, the court concluded:

>   Here, the facts . . . establish a close relationship between [the foreign parent] and [the domestic subsidiary]. [The parent] used [the subsidiary] and its Boston-based employees to sell [the parent's] product in North America. [The parent] was closely involved in the sales process, and retained authority to set terms for sales, but it encouraged [the subsidiary's] personnel to use its name, and maintained close involvement in [the subsidiary's] operations. [The subsidiary] announced to its customers that its audit department reports effectively to [the parent], and [the parent] announced on its website that it manages its investment products from Boston—that is, through [the subsidiary]. These facts, the Court concludes, suffice to make [the subsidiary] [the parent's] "managing or general agent" for purposes of Rule 4(d)(2). I[t] follows that service on [the parent] by service on [the subsidiary] was proper under that rule.

*Id.*

Applying those factors to the facts in this case, the outcome is far from obvious. Some factors suggest that HC has a sufficiently close relationship with HPK such that it could be considered the parent's managing or general agent. For example, as in *Heffernan*, HC is

12

essentially HPK's domestic sales arm. Furthermore, David Leinwand, who is the general counsel of PMC and secretary of HC, signed the non-disclosure agreement with SiOnyx on behalf of HPK. (Am. Compl. Ex. 10 at ¶ 10). In addition, HC learned of the litigation from HPK, and HPK provided HC with various prior-art references, which defendants' counsel used to cross-examine Carey during the preliminary-injunction hearing. (*See* Tr. 3-122:12-15; 3-130:2-5; 3-134:16-35:10). Moreover, HPK directed Kaufman, an HC employee, to express "regrets" to Professor Mazur and "apologize for any friction," during which he acted as HPK's "U.S. representative." (*See* Tr. 3-122:12-123:19; 3-124:11-125:2; 3-127:11-18; 3-128:19-130:1). In 2015, Kaufman also met with Saylor as an "agent" of HPK for "information-gathering purposes," but he was not "empowered to make any . . . agreement with [him]." (Tr. 3-124:11-127:18). Finally, Kaufman called HPK employees five to ten times before and after the first day of the preliminary-injunction hearing to discuss the litigation. (Tr. 3-131:9-132:19).

However, there is also substantial evidence to the contrary. HC conducts no research and minimal manufacturing; it is essentially a sales subsidiary focused on distributing HPK products. By contrast, HPK researches, develops, designs, and manufactures products that are sold internationally. (Tr. 3-114:5-115:9; 3-119:17-19; 3-130:23-131:8). Accordingly, HC does not appear to "perform[] all the functions for [HPK] that [HPK] would if it were doing business in [Massachusetts] by its own officials." *Heffernan*, 2007 WL 3244422, at *10. HC is a subsidiary of PMC, which is a holding company owned by HPK. No HC employees are officers of HPK; although Leinwand is secretary of HC and general counsel of PMC, he appears to hold no position in HPK. (Tr. 3-110:17-25; 3-113:4-7). HC is the sales representative of HPK, but it has no authority to bind HPK to prices, contracts, or orders. (Kaufman Decl. ¶ 6). Rather, HC purchases products from HPK, at prices set by HPK, and then resells the products to its own

customers at its own prices. (*Id.*). Furthermore, it appears that plaintiffs communicated exclusively with HPK employees during the course of the technology exchange and joint-development agreement, not HC employees.

Plaintiffs contend that HPK's actual notice of the lawsuit is sufficient, and cite *Heffernan* for the proposition that "there is a sufficiently close relationship between [HC, the] United States entity and [HPK, the] foreign entity such that service upon [HC] is *sufficient to provide notice* to [HPK]." (Pl. Mem. 8) (emphasis added) (citing 2007 WL 3244422, at *10). That argument takes the language of *Heffernan* out of context. Surely, if actual notice were sufficient, every domestic subsidiary would be a managing or general agent of its foreign parent. Even the smallest, most disconnected of subsidiaries would likely send an e-mail to the parent to provide notice of a lawsuit. However, as the court in *Heffernan* noted, "[a] mere parent-subsidiary relationship is not sufficient, but corporate separateness alone does not preclude an agency relationship for this purpose." 2007 WL 3244422, at *10. Indeed, a mere notice requirement would make the other factors discussed in *Heffernan*—such as overlap of officers, business functions, and pricing power—irrelevant. It would also make the protections afforded by the Hague Service Convention effectively unattainable for corporate defendants in Massachusetts courts.

After careful consideration of the testimony and exhibits, and on the narrow set of facts presented here, the Court concludes that HC is not HPK's "managing or general agent" within the meaning of Mass. R. Civ. P. 4(d)(2). Accordingly, plaintiffs have not served HPK through its service on HC.

Furthermore, the Court declines to appoint HC's counsel as an agent to accept service of process for HPK pursuant to Fed. R. Civ. P. 4(f)(3). As one court in this district has explained in

denying a similar request:

> While China is a party to the Hague Convention, [plaintiffs] have not attempted to make service on [defendant] pursuant to the Convention. The First Circuit . . . has cautioned that "strict adherence to the Civil Rules is the better practice." *Aoude v. Mobil Oil Corp.*, 862 F.2d 890, 895 (1st Cir. 1988). A canvas of the cases in this circuit regarding service of process demonstrates great deference to the Hague Convention as "the 'law of the land' under the supremacy clause of the Constitution." *Cooper v. Makita, U.S.A., Inc.*, 117 F.R.D. 16, 17 (D. Me. 1987); *see also Ballard v. Tyco Int'l, Ltd.*, 2005 WL 1863492, *2 (D.N.H. Aug. 4, 2005) ("The Hague Convention provides a mechanism through which a plaintiff can effect service that will give appropriate notice to the party being sued and will not be objectionable to the nation in which that defendant is served."); *Golub v. Isuzu Motors*, 924 F. Supp. 324, 328 (D. Mass. 1996) (requiring plaintiff to proceed under the Hague Convention where there is a "reasonable prospect that the plaintiff will ultimately be able to serve the defendant properly"); *Borschow Hosp. & Med. Supplies, Inc. v. Burdick-Siemens Corp.*, 143 F.R.D. 472, 478 (D.P.R. 1992) (discussing the duty of serving documents in a manner consistent with the Hague Convention). Plaintiffs have not demonstrated that they had good cause to circumvent compliance with the Hague Convention; they simply complain that making service under the Convention is burdensome and expensive. This is not a sufficient reason to excuse compliance with the Convention. *See Trask v. Service Merch. Co., Inc.*, 135 F.R.D. 17, 22 (D. Mass. 1991) ("[T]he absence of at least a good faith attempt to comply with the Hague Convention prohibits this court from applying the liberal standards of Fed. R. Civ. P. 4 in analyzing the propriety of service . . . .").

*Furukawa Elec. Co. of N. Am.*, 2005 WL 3071244, at *3. Accordingly, the Court will provide plaintiffs an opportunity to cure the defect in service, but will order that they serve HPK in accordance with Fed. R. Civ. P. 4(f)(1) and the Hague Service Convention.

    **B.**     <u>**Preliminary Injunction**</u>

Plaintiffs have moved for a preliminary injunction under two distinct theories seeking to enjoin HPK and HC from enforcing the seven disputed patents during this litigation. First, they contend that there is a strong likelihood that they will succeed on their breach of contract claim because HPK misappropriated and disclosed SiOnyx's confidential technology in applying for the disputed patents. Second, they contend that there is at least a reasonable likelihood that they will prevail on their correction-of-inventorship claims.

**1.    Legal Standard**

To issue a preliminary injunction under Fed. R. Civ. P. 65, a district court must find that the moving party has established (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm absent interim relief, (3) that the balance of equities weighs in his favor, and (4) that a preliminary injunction is in the public interest. *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). The Federal Circuit applies the same four factors. *See Momenta Pharms., Inc. v. Amphastar Pharms., Inc.*, 686 F.3d 1348, 1352 (Fed. Cir. 2012). Out of these factors, the likelihood of success on the merits "normally weighs heaviest on the decisional scales." *Coquico, Inc. v. Rodriguez-Miranda*, 562 F.3d 62, 66 (1st Cir. 2009); *see also New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002) ("The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity."). Furthermore, "[t]he burden of demonstrating that a denial of interim relief is likely to cause irreparable harm rests squarely upon the movant." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004). To obtain the more "extraordinary relief of a temporary restraining order," *Imasuen v. Winn Prop. Mgmt.*, 2013 WL 6859094, at *3 (D. Mass. Dec. 26, 2013), a party must allege "immediate and irreparable" injury or loss that will occur before the adverse party can be heard in opposition. Fed. R. Civ. P. 65(b)(1)(A).

The Court may accept as true "well-pleaded allegations [in the complaint] and uncontroverted affidavits." *Rohm & Haas Elec. Materials, LLC v. Elec. Circuits*, 759 F. Supp. 2d 110, 114 n.2 (D. Mass. 2010). "The Court may also rely on otherwise inadmissible evidence, including hearsay, in deciding a motion for preliminary injunction." *Bos. Taxi Owners Ass'n,*

*Inc. v. City of Bos.*, 84 F. Supp. 3d 72, 78 (D. Mass. 2015) (citing *Asseo v. Pan Am. Grain Co., Inc.*, 805 F.2d 23, 26 (1st Cir. 1986)).

### 2. Analysis

It is well-established that a Court must have personal jurisdiction over a named party in order to enjoin that party, even preliminarily. *See Pablo Star Ltd. v. Welsh Gov't*, — F. Supp. 3d —, 2016 WL 1056590, at *10 (S.D.N.Y. Mar. 16, 2016) ("The cardinal principle that the district court is powerless to proceed in the absence of personal jurisdiction applies with no less force when the court is presented with a motion for a preliminary injunction." (internal quotation marks omitted)); *Klatib v. Alliance Bankshares Corp.*, 846 F. Supp. 2d 18, 25 (D.D.C. 2012) ("Simply put, the district court has no power to grant an interlocutory or final injunction against a party over whom it has not acquired valid [personal] jurisdiction, and an order granting an interlocutory injunction in such circumstances is erroneous as a matter of law." (internal quotation marks and alterations omitted)); *Vasquez v. Bailey*, 2011 WL 2436546, at *3 (D.R.I. May 13, 2011) ("Accordingly, the [m]otions should be denied without reaching their merits because the Court lacks [personal] jurisdiction over the persons against whom [p]laintiff seeks the issuance of a TRO and preliminary injunction."); *see also Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 110 (1969) ("The consistent constitutional rule has been that a court has no power to adjudicate a personal claim or obligation unless it has jurisdiction over the person of the defendant."); *United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1084 (1st Cir. 1992) (vacating preliminary injunction where district court did not have personal jurisdiction over defendant).

It is also well-established that for a court to exercise personal jurisdiction over a defendant, service of process must be either properly completed or waived. *See United Elec.,*

*Radio & Mach. Workers of Am.*, 960 F.2d at 1085 ("[T]hough personal jurisdiction and service of process are distinguishable, they are inextricably intertwined, since service of process constitutes the vehicle by which the court obtains jurisdiction . . . a federal court cannot acquire personal jurisdiction over a defendant unless the defendant is properly served with process."); *Farm Credit Bank of Jardines Bacata, Ltd. v. Diaz-Marquez*, 878 F.2d 1555, 1559 (1st Cir. 1989) ("In the ordinary course, the district court acquires jurisdiction over a defendant only by service of process."); *Vasquez*, 2011 WL 2436546, at *2 (noting that "[a]lthough plaintiff may have served the defendants with copies" of the motions for a preliminary injunction, "[n]one of these defendants have been served [with the complaint]," and "[t]herefore, the court lacks jurisdiction to issue . . . an injunction against any of them").

For the reasons explained above, HPK has not been properly served with process, and it has not waived service. Therefore, the Court does not yet have personal jurisdiction over HPK, and absent such jurisdiction, the Court cannot enjoin HPK directly.[10]

There remains the question whether the Court can enjoin HC, over which it clearly has jurisdiction. Plaintiffs are correct that the Court can enjoin not only parties, but also "other persons who are in active concert or participation with [parties and parties' officers, agents, servants, employees, and attorneys]." Fed. R. Civ. P. 65(d)(2)(C). Based on that rule, plaintiffs contend that the Court can enjoin both HC (as a properly served party) and HPK (as a party who is in active concert with HC). There is no dispute that HC has been served, and as a wholly-owned subsidiary, HC is likely to act in active concert with HPK.

However, the relief that plaintiffs seek is a preliminary order enjoining the *enforcement* of the seven disputed patents. Plaintiffs do not, for example, seek an order enjoining *sales* of

---

[10] Plaintiffs' contention that Fed. R. Civ. P. 65 allows courts to enjoin defendants upon mere "notice" of the motion is incorrect. The Court must have jurisdiction over HPK to issue a preliminary injunction.

HPK products in the United States that embody the (allegedly stolen) technology. But it does not appear that HC has any enforcement rights in those patents. HPK, not HC, is the assignee of the patents. (Pl. Mot. Exs. 1-7). Indeed, plaintiffs have not introduced any evidence demonstrating that HC is anything more than a non-exclusive licensee. (Tr. 1-25:2-7). Therefore, plaintiffs have not met their burden of demonstrating that they face irreparable harm *from HC*, the party they are seeking to enjoin. HC is without the legal or contractual right to enforce the disputed patents. If HPK were to grant that authority to HC (which might, of course, change the jurisdictional calculus), preliminary injunctive relief might be available.

In short, the Court cannot enjoin HPK as being in active concert with HC unless plaintiffs are entitled to a preliminary injunction against HC. Plaintiffs are not entitled to such an injunction against HC, a party that apparently cannot sue to enforce HPK's patent rights. Plaintiffs' motion for a preliminary injunction against HC and HPK will therefore be denied without prejudice to its renewal upon completing valid service on HPK.

### III.    Conclusion

For the foregoing reasons, plaintiffs' motion to deem service of process complete is DENIED, and plaintiffs are hereby ORDERED to complete service on Hamamatsu Photonics K.K. in accordance with Fed. R. Civ. P. 4(f)(1) and the Hague Service Convention within 120 days of this Order. That deadline may be extended for good cause shown. Plaintiffs' motion for a preliminary injunction and temporary restraining order is DENIED without prejudice to its renewal.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
Dated: July 26, 2016                                United States District Judge