1                    UNITED STATES DISTRICT COURT

2                     DISTRICT OF MASSACHUSETTS

3

4

   SIONYX, LLC and PRESIDENT AND      )

5  FELLOWS OF HARVARD COLLEGE,        )

                      Plaintiffs      )   Civil Action

6                                     )

   vs.                                )   No. 15-13488-FDS

7                                     )

   HAMAMATSU PHOTONICS K.K.,          )

8  HAMAMATSU CORPORATION,             )

   OCEAN OPTICS INC., and             )

9  DOES 1-10,                         )

                      Defendants

10

11

   BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV

12

13

                        MARKMAN HEARING

14

15

16

17        John Joseph Moakley Unit ed States Courthouse

                     Courtroom No. 2

18                   1 Courthouse Way

                     Boston, MA 02210

19

20                    June 22, 2017

                       9:00 a.m.

21

22

23            Valerie A. O'Hara, FCRR, RPR

                 Official Court Reporter

24      John Joseph Moakley United States Courthouse

              1 Courthouse Way, Room 3204

25                 Boston, MA 02210

              E-mail: vaohara@gmail.com

1   APPEARANCES:

2   For The Plaintiffs:

3        Pepper Hamilton LLP, by WILLIAM D. BELANGER, ESQ. and
    GWENDOLYN E. TAWRESEY, ATTORNEY, 125 High Street, 19th Floor,
4   High Street Tower, Boston, Massachusetts 02110;

5   For the Defendant:

6        Panitch, Schwarze, Belisario & Nadel, LLP, by JOHN D.
    SIMMONS, ESQ. and STEPHEN E. MURRAY, ESQ., One Commerce Square,
7   2005 Market Street, Suite 2200, Philadelphia, Pennsylvania
    19103;

8
         Stevenson, McKenna & Callanan LLP, by ALAN E. McKENNA,
9   ESQ., Suite 2400, 350 Lincoln Street, Hingham, Massachusetts
    02043.

10
    ALSO PRESENT:
11
    David Leinwand, in-house counsel
12  Dr. Ken Kaufmann

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              PROCEEDINGS

2              THE CLERK:  All rise.  Thank you.  You may be seated.

3    Court is now in session in the matter of SiOnyx, et al. vs.

4    Hamamatsu Photonics K.K., Civil Action 15-13488.

5              Would counsel please identify themselves for the

6    record.

7              MR. BELANGER:  Good morning, your Honor,

8    William Belanger with Pepper Hamilton for the plaintiffs,

9    SiOnyx and Harvard.

09:02AM 10              THE COURT:  All right.  Good morning.

11              MS. TAWRESEY:  Gwendolyn Tawresey also with Pepper

12    Hamilton also for plaintiffs.

13              THE COURT:  Good morning.

14              MR. McKENNA:  Good morning, your Honor, Alan McKenna

15    on behalf of the defendants.

16              MR. SIMMONS:  Good morning, your Honor, John Simmons

17    on behalf of the defendants.

18              THE COURT:  Good morning.

19              MR. MURRAY:  Good morning, your Honor, Steven Murray

09:02AM 20    on behalf of the defendants.

21              THE COURT:  All right.  Good morning.  This is the

22    Markman Hearing in this case.  I've reviewed the parties'

23    filings, including the joint statement.  In terms of schedule,

24    basically I have all day today.  I'm not encouraging you to

25    take it, but I have all day.  I will want to take a break at

1   about 10:30 of about 5 or 10 minutes, another one at about

2   noon, 5 or 10 minutes, and we'll go on, and if we are on after

3   lunch, I will resume at two.  I have time off and on tomorrow,

4   but let's see if we can't get this done more quickly than that.

5          Who gets the floor?  Mr. Belanger.

6          MR. BELANGER:  Thank you, your Honor.  And just as a

7   matter of process, we exchanged our first presentation would be

8   a tutorial from our expert.  We exchanged slides last night.

9   We understand that counsel had some objections to certain of

09:03AM 10   the slides.

11          THE COURT:  Okay.

12          MR. BELANGER:  I'm not sure if you want to hear

13   argument on that now or as it comes up in the course of the

14   tutorial.

15          THE COURT:  Why don't you hum me a few bars.

16   Mr. Simmons.

17          MR. SIMMONS:  Well, your Honor, we actually had a meet

18   and confer yesterday.  We expressed our concerns about several

19   of the slides we thought went beyond just the tutorial, it went

09:04AM 20   into the actual, What is the invention?  They revised most of

21   the slides.  I think they understand our concern that we don't

22   want to hear in the tutorial that they think this is the

23   invention or this is Harvard's part of it, so the slides that

24   we saw, they've withdrawn most of those features.

25          We didn't see anything that was objectionable, per se,

1    so we would like to caution the tutorial is supposed to be

2    background, and we think it should be not adversarial by the

3    experts.  We don't have an objection at this point.

4         THE COURT:  Why don't we just go forward.  Of course,

5    part of the problem, unlike a jury trial I have to see this to

6    rule on it if there is something objectionable, so if you find

7    something objectionable, why don't you just object, and we'll

8    deal with it at that point.

9         MR. BELANGER:  Thank you, your Honor.  So we'll call

09:04AM 10   Mr. Guidash.

11        THE COURT:  All right.  I don't know if he's a witness

12   that we need to swear in.

13        MR. BELANGER:  We're not intending this to be

14   evidence, your Honor.

15        THE COURT:  Yes.

16        MR. BELANGER:  It's just offered as background.

17        THE COURT:  Why don't we use this chair over here or

18   is he going to speak from the podium?  What's your pleasure?

19        MR. BELANGER:  Mr. Guidash, if you could introduce

09:06AM 20   yourself to the Court, please.

21        MR. GUIDASH:  Certainly.  Good morning, everyone.  My

22   name is Michael Guidash.

23        THE COURT:  I'm sorry, it's Guidash?

24        THE WITNESS:  Guidash, that's correct.

25        MR. BELANGER:  Could you tell the Court a little bit

1    about your educational background.

2            MR. GUIDASH:  Certainly.  I have a B.S. in electrical

3    engineering from the University of Delaware in 1981, M.S. in

4    electrical engineering from the University or Rochester

5    Institute of Technology in 1991 specializing in semiconductor

6    devices and physics.

7            MR. BELANGER:  Could you tell the Judge a little bit

8    about your work history.

9            MR. GUIDASH:  Certainly.  I started my career at Kodak

09:06AM 10   in 1981 working in semiconductor wafer fabrication of

11   rudimentary image sensors for film cameras.  That was

12   short-lived and spent a total of approximately 31 years working

13   on CMOS and CCD image sensors.  I started the CMOS image sensor

14   program at Kodak, was the key technologist in research and

15   development and product development.

16           Kodak closed its image sensor business in 2009, and

17   since that time, I have started my own image sensor consulting

18   company where I continue to do research and development in the

19   field of image sensors for many applications for several

09:07AM 20   clients, mostly in Silicon Valley.

21           MR. BELANGER:  And do you have any patents?

22           MR. GUIDASH:  Yes, during my career, I presently have

23   88 issued patents in the field of image sensors, and I also

24   have 22 technical publications in the field of image sensors,

25   and I'm a member of the technical program committee of the

1    International Image Sensor IEEE group.

2         THE COURT:  As an aside, when I was a lawyer, I did a

3    lot of work for Polaroid.  Kodak at least still exists.

4    Polaroid doesn't exist anymore, so your invention changed

5    things.

6         MR. BELANGER:  Your Honor, just as a matter of

7    process, because it's not intended as evidence, I wouldn't

8    offer him as an expert unless you thought that was appropriate.

9         THE COURT:  I don't think so.

09:08AM 10         MR. BELANGER:  Thank you.

11         Mr. Guidash, have you prepared a demonstration for

12    today?

13         MR. GUIDASH:  Yes, I have.

14         MR. BELANGER:  And could you please proceed with that

15    demonstration.

16         MR. GUIDASH:  Certainly.  What I would like to do

17    before going through the slides is just as a sort of background

18    have some show and tell elements.  We are talking about

19    photodiodes and silicon, so I thought it would be important for

09:09AM 20    everyone to understand and see that silicon devices start with

21    a silicon wafer, which I have in my hand.

22         This is a single crystal silicon, and it goes through

23    processing to build up the photodiode and image sensor device

24    we're going to talk about today.  I'll come back to this wafer

25    in a moment, and I can pass these around if anyone would like

1        to see them.

2              THE COURT:  Sure.

3              MR. GUIDASH:  This particular one is a single large

4        photodiode.  You can see it's in a package, and it's used to --

5        it's a large photodiode, so it's used to measure, for example,

6        the amount of light that is present when you're doing testing

7        of lighting.  It can be used as an optical detector from a

8        laser to detect the laser frequency and things of that nature,

9        so it's a very large single photodiode.

09:10AM 10             That very large single photodiode, this happens to be

11       an image sensor that's also in a package.  This is comprised of

12       an array of 1.3 million very small photodiodes and is typically

13       used in like a digital camera to capture the incident image

14       from whatever the camera is looking at, so this would be an

15       array of 1.3 millions photodiodes plus the circuitry to read

16       the signal from those photodiodes out.

17             And, further, this is a camera that contains an image

18       sensor, so it's a camera that has no film, a so-called digital

19       camera, and it can capture the incident image by means of the

09:11AM 20       photodiode array, and as you can see, it doesn't do it by

21       itself, it goes into a unit that has a lens, has the image

22       sensor, and then it will have controlled electronics and image

23       processing inside to spit out the final image.

24             The one last thing I wanted to show was we'll talk

25       about it in the slides, but I think it's important to see in

1   general is the effect of light transmitting through silicon and

2   the dependence on its thickness.

3        This happens to be a wafer, a silicon wafer that's

4   about seven and a half to ten microns thick, and as you can

5   see, this is a flashlight from a cell phone, which is white

6   light, which contains all colors of visible spectrum to make

7   light.  If I hold this up to the back of the wafer, what you

8   see coming through looks primarily red.

9        The reason for that is blue and green light is getting

09:13AM 10   absorbed by the silicon, but this is thin enough that the red

11   light just passes through, so you can directly see red light

12   through this image sensor, even though it looks opaque to the

13   naked eye.

14        So that's it for the I'll call it the background for

15   the slides.

16        THE COURT:  Okay.

17        MR. GUIDASH:  Because we're talking about a

18   photodiode, which is silicon-based, I thought it was important

19   first to discuss the basic background of light.  Light is

09:13AM 20   comprised of photons, which are quanta of electromagnetic

21   radiation.

22        If you look at the graph on the bottom of the slide,

23   it is a -- mine just disappeared -- it shows the

24   electromagnetic radiation spectrum, which goes from very short

25   wavelengths, such as gamma rays, to very long wavelengths, such

1    as radio waves.

2         The image sensors and photodiodes we're discussing

3    today are primarily dealing with what would be referred to as

4    light, which is the visible spectrum plus the infrared

5    spectrum.

6         It's important to note that the energy of a photon is

7    inversely proportional to its wavelength, so a photon that is

8    blue light, so 400 to 450 nanometers has higher energy than

9    that of red light, which is in the range of 650 to 750

09:15AM 10   nanometers.

11        Next we'll discuss just some of the basics of the

12   silicon material, so all integrated circuits, most of the

13   integrated circuits are made on silicon wafers.  Those silicon

14   wafers are comprised of silicon crystal that has been grown and

15   then sawn to make these wafers, and the idea is to make this as

16   perfect a crystal structure as possible.

17        Silicon is an atom that has four valence electrons, so

18   when you create a silicon molecule, you have a single silicon

19   atom that's bonded to four adjacent silicon atoms to create the

09:15AM 20   silicon crystal.

21        So next I want to discuss how light and silicon

22   interact.  If the energy of a photon -- first, let's describe a

23   silicon.  Silicon is what's typically called a semiconductor.

24   Materials can be broadly classified into three different

25   things, a conductor, an insulator or a semiconductor.  All of

1    those materials have a valence band and a conduction band in

2    terms of their energy diagrams.

3          A conductor, the valence band and conduction band have

4    no gap between them so that electrons can be conducted freely

5    without additional energy being added to the material.

6          An insulator, which would be -- and conductor would be

7    something like copper, a piece of metal.  An insulator,

8    something like a piece of plastic, has a very large gap between

9    the valence band and the conduction band, so electricity cannot

09:17AM 10    flow.  The conduction cannot take place unless a super large

11    amount of energy is applied to cause an electron to go from the

12    valence band to the conduction band, so it's an insulator.  It

13    prevents the flow of electricity.

14          A semiconductor is something that's in between.  It

15    has a smaller bandgap.  The bandgap is small enough that if

16    light is incident onto the silicon, it can impart energy.  That

17    that energy is absorbed, and a free electron now can be excited

18    or jump from the conduction band -- from the valence band to

19    the conduction band.  It leaves behind a free, what's referred

09:17AM 20    to as a hole, which is a space where the electron used to

21    reside.

22          You can think of those particles as the whole is a

23    positively-charged conducting particle, and the electron is a

24    negatively-charged conducting particle.  They can now

25    contribute to electrical current.

1          If the wavelength -- if we go back one.  In order for

2     that to happen, the wavelength has to have enough energy, the

3     energy absorbed to be equal or greater than the bandgap, so if

4     a long wavelength light, such as 1100 nanometers near infrared

5     at that point does not have enough energy to produce this

6     electron whole pair, and light will just pass through the

7     silicon without being absorbed.

8          So next let's discuss the physical nature of where the

9     photon gets absorbed, so photons, as I mentioned, that have

09:18AM 10     energy greater than the bandgap will create an electron whole

11     pair, but depending upon the wavelength of the photon, the

12     electron whole pair gets generated at a different depth in the

13     silicon, so if there's a surface of the wafer and light is

14     incident on that surface, blue light, which has a shorter

15     wavelength will get absorbed very close to the surface in a

16     shallow region.

17          Longer wavelengths are absorbed deeper, and you can

18     see from the graph on this page, that shows the absorption

19     length or the depth vs. wavelength in the visible spectrum from

09:19AM 20     300 to 1,000 nanometers, 1100 nanometers, so the wafer that we

21     just looked at was about seven and a half to 10 microns thick,

22     and what you see is at 600 nanometers, that's the absorption

23     depth for that light, so anything longer than 600 nanometers is

24     going to be transmitted through that piece of silicon, so the

25     wavelengths that were beyond 600, so 700, 800 nanometers, which

1    are red, pass directly through the silicon, and they're not

2    absorbed.

3            So this graph here shows you that if you want to have

4    a sensor that is sensitive to longer wavelengths, it has to be

5    very thick, so, for example, if we want to detect 1,000

6    nanometers, the wafer has to be or the silicon that's detecting

7    has to be 100 microns thick, and there are some problems with

8    building thick silicon, and we'll discuss those in comparison

9    to thin silicon, what the benefits and tradeoffs are.

09:20AM 10            So now we just talked about silicon, now we want to

11    talk about the actual detector that's built in the silicon,

12    which is typically a p-n junction, so first we'll talk about

13    what is p and n and how a silicon wafer is doped.

14            So p and n type regions are creating by adding

15    impurities into the silicon and specifically to make a p-type

16    region, you'll add boron, for example, which has three valence

17    electrons instead of four.

18            What that will do is create an excess of holes in the

19    material that can now make that intrinsic silicon into

09:21AM 20    something that can conduct.  And n-type region can be created

21    by a similar manner by putting in, for example, phosphorus,

22    which is an atom that has five valence electrons, which creates

23    an excess of free electrons to turn that into an n-type region.

24            The typical way of doing that is by implantation.  The

25    implantation will cause crystal damage to the crystal lattice,

1    and the ions that are implanted don't go into their proper

2    place in the crystal lattice, so that damage has to be healed

3    by a process called annealing, which is basically heating to

4    provide thermal energy so that the crystal lattice can be

5    restored and that the implanted doping atoms can go to their

6    proper sites in the crystal.

7            So the p-n junction basically is the interface between

8    the p-type silicon and the n-type region, and that's shown in

9    this figure.

09:23AM 10    So the photodiode now, which is going to be a p-n

11   junction, what's important to note is when you apply a bias to

12   the p-n junction, by putting dielectrics and then contacts and

13   electrodes or circuitry to connect this up to an electrical

14   circuit, when you bias the p-n junction, the p side typically

15   at ground potential, a depletion region is created in the p-n

16   junction.

17           The depletion region causes an electric field, which

18   is now devoid of free carriers, electrons or holes, and that

19   electric field will serve to separate the electron and whole

09:23AM 20   pair that come from the photon that we just talked about.

21           So the typical p-n junction or photodiode is shown

22   here would be an n-type region, what would be referred to as

23   the photodiode part of it in a p-type substrate.  Additionally,

24   that p-n junction from an electron's perspective is an electric

25   potential well or a bucket that can, that will pull the

1     electrons into the n region, and depending on how the detector

2     is built, a current flows or the electrons simply get collected

3     in that region for subsequent later readout.

4          So next we talked about absorption depth, and we'll

5     show from this slide how the photodetector will work in

6     creating a signal from incident light.

7          If you look at the photodetector, any light that hits

8     on metal or circuitry to the yellow to the left-hand side of

9     the figure is simply going to be reflected and doesn't create

09:25AM 10    an electron whole pair.

11         Very short wavelength light, such as UV, will get

12    absorbed extremely close to the surface and may also reflect.

13    Because it's such a short wavelength and it's so very close to

14    the surface, it can also recombine, so the electron whole pair

15    gets created but immediately gets annihilated because the

16    surface between the overlying dielectric or the insulator that

17    separates the connectors from the silicon, the interface

18    between that insulator and the silicon, that surface is not a

19    perfect crystal, and it has regions or energy states that the

09:25AM 20    electron whole pair that have been generated can then just go

21    into and occupy, and then they don't contribute to current and

22    they don't get collected.

23         Subsequently, longer wavelengths such as blue and

24    green will create the electron whole pair a bit deeper from the

25    interface.  The free hole gets drawn by the electric field to

1    the ground contact, and the free electron goes and gets drawn

2    into the n region by the electric field either to immediately

3    produce a current or to be collected in that region for later

4    readout.

5         As the wavelength gets longer, the electron whole pair

6    is created much deeper.  Because it's far away from the

7    electric field, the electron may not go to the photodiode that

8    the photon came into but can go into an adjacent photodiode

9    because it's further away from the electric field, and it can

09:26AM 10    just wander or diffuse, and this is what's referred to as

11    "crosstalk," which we'll talk about later.

12         Any wavelength that has an energy that is beyond the

13    absorption depth of the thickness of the silicon portions of

14    those photons are going to pass directly through and don't

15    contribute to electron whole pair generation.  They're not

16    absorbed and don't contribute to current.  Thank you.

17         One can look at the response of a photodetector by

18    shining light on it, knowing the amount of incident light in

19    terms of its power, optical power, and measuring the resulting

09:27AM 20    photo current.  This is typically referred to as responsivity.

21         It's measured in amps per watt, milliamps of current

22    or per watt of incident optical power.  This particular curve

23    shows an absorption or a responsivity curve for a piece of

24    silicon that is about the same thickness as the one I

25    demonstrated with the LED light.

1        It's about seven and a half to ten microns thick, and

2   what you see is as a result the absorption starts falling off,

3   and the responsivity starts falls off at wavelengths beyond 600

4   nanometers.  This is the problem with thinner silicon is it is

5   not sensitive to longer wavelengths or as sensitive as a thick

6   piece of silicon.  Ideally, thinner piece of silicon would be

7   best for a photodiode in terms of its speed of operation or how

8   quickly it can respond to a frequency change of incident light,

9   which is one key attribute to how photodiodes are used.

09:29AM  10        Thicker silicon is slower.  A thicker silicon will

11   require a larger voltage, so sort of the problem that is set up

12   here is you would like to have thin silicon that has its best

13   attributes but has the sensitivity to longer wavelengths of

14   thick silicon, so one of the ways of overcoming this thick

15   silicon, thin silicon response in longer wavelength tradeoff is

16   the process of texturing.

17        This particular case shows the front side of the

18   silicon is textured, the frontside meaning the side where the

19   diodes and the circuitry to read out the diode would be formed.

09:30AM  20        So the texturing helps with long wavelength light and

21   that photons that come in and hit the textured surface, instead

22   of going substrate through the planar surface in the direction

23   the light ray entered, the textured surface causes refraction

24   and redirection of those photons.  That refraction and

25   redirection now causes that photon to travel a longer distance

in the silicon, so it effectively increases the path length or
the effective thickness of the silicon and improves the long
wavelength response.

Additionally, the textured surface prevents reflection
from that planar interface, so with a textured interface
operates as an anti-reflection coating, so more of the
long-wavelength photons enter into the silicon instead of being
reflected.

One problem, however, is short wavelength light now
because it's also getting refracted and redirected is being
absorbed much closer to the surface than it was previously, so
not only is it closer to the surface, but now the surface has
changed.  It has been textured and has different properties
than the planar interface, so as a result, the short wavelength
light tends to recombine instead of contributing to
photocurrent and response.

This shows a blow-up of the textured region.  This is
a transmission electron microscope picture, and what you can
see in this region is the textured feature and the black, looks
like black regions are areas of the silicon which the crystal
has damage or imperfections, and it is those imperfections that
will cause higher recombination.

One way to repair that damage and improve the response
is by annealling, and we'll be talking about that in a moment,
but what you can see here is a graph showing the absorptance,

1    and the absorptance is did the photon create an electron whole

2    pair vs. wavelength, and you can see the improvement and the

3    absorptance across all wavelengths by performing the texturing

4    process on the frontside of the wafer.

5           However, if you look at the bottom graph in this

6    figure, what you will see is a graph of responsivity versus

7    wavelength, and, again, responsivity is not did the electron

8    whole pair get created, but did it contribute to photocurrent,

9    and what one sees is the responsivity of this one is small

09:33AM 10   enough that I need my glasses.

11          One can see that the response is improved with if you

12   look at the no annealled textured device, if you anneal and

13   repair the damage that I talked about in the last slide, that

14   the responsivity goes up, so this means that the recombination

15   has been reduced, however, what you see is the actual

16   absorptance is going down, so it's very important when looking

17   at this technology to look at the difference and understand the

18   difference between absorptance and responsivity, so if you look

19   at the absorptance curve, you would say don't anneal because it

09:34AM 20   reduces the number of electron whole pairs created, but what's

21   most important is the responsivity.

22          So this graph is responsivity versus wavelength,

23   comparing an untextured surface to a frontside textured

24   surface, and again, this silicon is about seven and a half,

25   would be for silicon, that's about seven and a half to ten

1    microns thick, and you can see for short wavelengths, 200 up to

2    700 nanometers, especially 200 to 400, recombination is

3    occurring because the responsivity has gone down to almost

4    nothing, however, the long wavelength response is improved

5    dramatically over the untextured surface.

6          One other approach is to get around this short

7    wavelength reduction and response is to put the texturing on

8    the backside, the backside meaning opposite the side of the

9    substrate where the detectors and circuits have been built.

09:35AM 10          In this case, the shorter wavelength light gets

11    absorbed near the surface as it originally was and is not

12    affected by the texturing that's done on the back.

13          The longer wavelength light will pass through the

14    substrate, see the texture on the backside, can be redirected

15    and reflected back into the substrate, as shown in the diagram,

16    and then create an electron whole pair rather than being

17    directly transmitted through.

18          If you compare the backside texturing to the baseline

19    no texture and frontside texturing, what one sees is the short

09:36AM 20    wavelength response is restored to the original untextured

21    sample response, but the longer wavelength is improved beyond

22    the standard and beyond the frontside texture because the

23    optical path length is yet longer because it passes all the way

24    through the thickness of the substrate that gets redirected

25    back into the substrate and then can travel a further distance,

1    so the optical path length that that photon travels is longer

2    for the backside texturing than the front side, and that is

3    what causes the increased response for longer wavelength light.

4         Now, that we've talked about the physics of a single

5    photodetector, I want to talk about how those photodetectors

6    now are used and comprising an image sensor, so an image

7    sensor, like the one I passed around, is made up of an array of

8    pixels.  Each of these pixels contain a photodetector such as

9    and most commonly a photodiode.

09:37AM 10        If you look in the left-hand diagram, what you see is

11   a p-type substrate and p-type silicon with an n-type

12   photodiode, the small semicircles at the surface, depletion

13   region around those photodiodes.  These pixels are very small

14   compared to the single photodetector I passed around.  They're

15   on the order of a few microns, and as a result, one needs to

16   put a micro lens over each pixel so that the light is focused

17   through the circuitry that sits on the frontside of the image

18   sensor that's used to read out the charge that's collected in

19   the array of photodiodes.

09:38AM 20        To make a color image sensor, color filters are also

21   put over each pixel.  These filters are optical band pass

22   filters.  They only let through the color light that the filter

23   is shown in the diagram.

24        So what ends up in that photodiode is -- what gets

25   collected in that photodiode is the number of electrons is

1    proportional to the brightness of the light that hit that pixel

2    and that had the green wavelength.

3          So now in this array of image pixels and the array of

4    pixels, what we have are the number of electrons that are

5    collected are directly proportional to the brightness and the

6    color of the image.  That gets read out, which we'll talk about

7    how that happens.

8          So this array of photodiodes is -- the image sensor is

9    used typically in a digital camera.  To the right-hand side,

09:39AM 10   you can see a traditional camera.  There's a taking lens, and

11   you can think of this image sensor occupying the same spot that

12   filmed it in a film camera, so the lens focuses the image onto

13   the image sensor.  The number of electrons in each of the

14   pixels is equivalent to the brightness and color of the image.

15         How this gets read out is dependent on the image

16   sensor type, and there are two common types, a charge-coupled

17   device and a CMOS sensor, which we'll describe momentarily.

18         The charge-coupled device operates by transferring

19   photo electrons charge packets out of the pixels one-by-one

09:40AM 20   through the array to an output amplifier at the edge of the

21   sensor.  It's a very specialized process optimized for

22   photodetectors, so it's a specialized process that you can't

23   use to build like a microprocessor or normal ASIC.

24         Because of that, all the timing and control for the

25   sensor and the analog-to-digital converter that would be used

1    in the camera is all outside of the CCD chip.  What is output

2    off of the CCD image sensor device is an analog voltage.

3    These next set of slides, we'll go through very quickly.  That

4    shows very simplistically the readout.

5         First, the image is captured, and what is resonating

6    in each pixel is the number of electrons proportional to the

7    brightness and color of the image.  The first step is to

8    transfer the charge from the bottom row of the array into a

9    horizontal shift register in parallel.

09:41AM 10    Next, the packets of charge are shipped one-by-one

11   through the horizontal shift register to the readout cell,

12   which converts the charge to a voltage, and then that voltage

13   is buffered so that it can be transmitted off chip.

14        Next, the next row is shifted down, and as you can

15   see, the row above that gets shifted into the bottom row, and

16   this process concedes transferring packets of charge one at a

17   time to an output amplifier at the edge of the chip.  So in a

18   typical image sensor, the single charge packet could be

19   transferred several million times.

09:42AM 20    CMOS sensor also uses an array of photodiodes, the

21   similar type of p-n junction photodetector, but it's different

22   in that the charge is only transferred once, inside the pixel

23   to an amplifier that is in each pixel, so instead of having to

24   make a million transfers to a single amplifier at the edge of

25   the device, there's a single transfer in each pixel to an

1    amplifier in that pixel.

2              It's made in processes that are used to build

3    microprocessors and other common integrated circuit devices.

4    As a result, the pixel array can be integrated with lots of

5    other electronics, the timing electronics, analog-to-digital

6    converter and even image signal processing, and it's X-Y

7    addressable.

8              Like a memory, it can be read out randomly, and it was

9    primarily developed, commercialized about a decade behind CCDs

09:43AM 10   but now is dominant in markets like cell phones because of its

11   very small size, very low, very efficient integration, very low

12   power.  It only needs one clock and like a three-volt power

13   supply as opposed to CCDs, which need several clocks and 9, 10,

14   20 volt power supplies.

15             This is a simple rendition of how CMOS image sensors

16   are read out, and each pixel, again, at the capture, the

17   electrons are collected corresponding to the brightness and

18   color of the image.  The arrow shows a single transfer to an

19   amplifier that's in each pixel.  That's done a row at a time,

09:44AM 20   and on the output of the wire that goes from the output of the

21   amplifier on that wire is an analog voltage signal

22   corresponding to the number of blue electrons in that pixel,

23   the next column over corresponding to the number of green

24   electrons in that pixel and so forth.

25             That is then -- analog voltage is transmitted through

1    gamma amplifiers, goes to an analog-to-digital converter, and

2    then what comes off the chip over to the right-hand side are

3    digital numbers or a digital signal of the green, the blue and

4    green pixels in that row.  The process proceeds now one row at

5    a time in the same manner until all of the images are read out

6    and then processed.

7        The next thing I want to discuss is some of the

8    primary design considerations of a photodetector and an array

9    of photodetectors in an image sensor.  The first is

09:45AM 10   responsivity, which we already talked about, so I won't go into

11   great detail, but it's basically how many number of electron

12   whole pairs would be read out or contribute to photocurrent

13   with light shown on a device.

14       This particular slide shows a CMOS and CCD versus the

15   response of the eye.  The particular CCD here had a different

16   type of photodetector called a photo capacitor, so it has lower

17   blue response.  The CMOS sensor had a photodiode, which has a

18   higher blue response.

19       In addition to responsivity, the other primary metric

09:45AM 20   is called quantum efficiency.  That's a measure of the number

21   of electrons that get collected vs. the number of photons that

22   hit the pixel.  It's different than responsivity because it --

23   responsivity is just looking at sort of silicon by itself.

24   This is looking at the whole pixel design and the detector

25   design as a whole, so if the circuitry gets in the way, it

26

1    causes reflections.  If there's transmission loss through the

2    insulation layers that are above the photodetector to connect

3    the circuits together or if there's recombination due to other

4    interfaces that happened to be in the pixel, like isolation

5    features, then the quantum efficiency can be degraded.

6         A quantum efficiency curve is typically shown in

7    percent.  100 percent would be every photon created in the

8    electron that got collected and then read out.

9         What you can see in the quantum efficiency curve is

09:47AM 10    the effect of crosstalk, which we'll talk about in a minute.

11    If you look at 400 nanometers, you would expect only blue light

12    to come through the blue pixel, but what you see is red and

13    green light show up, and that's because photons that went in

14    the green and red pixel ended up or photons that went through

15    the blue pixel ended up being collected in the green and red

16    pixel, so when you look at quantum efficiency, you can see that

17    effect.

18         Crosstalk can be two things.  One, optical crosstalk,

19    which is shown by a photon that comes in through the red pixel

09:47AM 20    but strikes the detector of the green pixel, so if with the

21    camera lens and the micro lens, which can produce these oblique

22    incident rays, this optical crosstalk effect can happen.  It

23    can bounce off the metals that are shown there and the circuit

24    and reflect off other interfaces and end up in the wrong pixel,

25    so it came through as a red photon, but it gets collected in a

1      green or blue detector.

2              Also, you can have diffusion crosstalk, where a photon

3      comes in through a particular color pixel, the electron whole

4      pair gets created, but instead of being pulled by the electric

5      field back into the correct photodetector, it can diffuse to

6      neighboring photodetectors.

7              This is one of the biggest problems with small pixel

8      color image sensors because it causes color mixing, and to undo

9      this color mixing to make the color look correct in the

09:48AM 10     rendered image, it basically multiplies any readout noise that

11     happens to be in the image sensor, and the image becomes -- the

12     color image becomes extremely noisy, so crosstalk is something

13     that has been worked very hard to reduce.

14             Another primary response is dark current.  Dark

15     current is the generation of electrons in the absence of

16     illumination.  This occurs because the crystal is not perfect.

17     There can be defects that or contamination that can be imparted

18     during the processing of the wafer that disrupt the crystal

19     lattice, and, as I mentioned, before even the planar surface

09:49AM 20     between the silicon and the overlaying insulator can have

21     defects and produce dark current, and, in fact, it does, and

22     the details of the progressing, which I haven't talked about

23     today, go to great lengths to shut that dark current generation

24     down at interfaces.

25             If you look at the image to the left and the image to

1    the right, one is high dark current, one is low dark current,

2    and you can see why an image sensor that has high dark current

3    is not usable in many applications, especially this one where

4    it would be impossible to detect what's a star and what's a

5    defective pixel without jumping through some hoops, and the

6    dark current generation rate is extremely sensitive to the

7    changes and interface state and the interface quality, and it's

8    very sensitive to contamination.

9          For example, one part per billion of a gold atom that

09:50AM 10   happens to make it into the silicon can make the pixel that has

11    that gold atom basically generate so much that it's full all

12    the time, so that's how sensitive dark current can be to

13    metallic contamination.

14          Image sensor people, including myself, I've worked on

15    beating dark current down from equipment and processes and

16    material for 45 years, and it's been very tedious, but it is

17    now very high quality silicon.

18          The last thing I wanted to discuss was the difference

19    between frontside and backside-illuminated sensors.  The

20    frontside illuminated has been the mainstream for most image

21    sensors up until 2009.  With the frontside illumination, the

22    stuff that's on the front, the wire that's used to connect up

23    the circuitry can get in the way and block light.

24          Micro lens are used to focus it into that aperture

25    between that circuitry, but as the pixels get smaller

1    and smaller, the micro lenses no longer work as well.  The

2    aperture is getting smaller than the wavelength of light, and

3    defraction causes huge optical crosstalk.  Because people have

4    been trying to push for smaller and smaller pixels so you can

5    have a 20 megapixel sensor in your cell phone, this prompted

6    the work to go to backside illumination and CMOS sensors in

7    particular.

8            So, in this case, the wafer that's finished is bonded

9    to another wafer flipped over this silicon that is normally 600

09:52AM 10   to 700 microns thick, is then ground down and thinned so that

11   light entering from the backside, especially blue light, can

12   reach the photodetector on the front.

13           If you didn't thin it, the blue light hits the silicon

14   700 microns away, and it's never going to make it to the

15   photodetector.  That thinning process causes an even worse

16   interface than we had on the frontside, so one of the key

17   issues in backside illumination development was how to clean up

18   this ground-down interface that now is the surface where blue

19   light is going to be absorbed, how to make that interface

09:53AM 20   cleaner, low dark current and low recombination, so I'd say 20

21   years of work went into solving the problems of making backside

22   illumination even tenable for even cell phone devices in terms

23   of dark current, in terms of crosstalk, and now what is

24   primarily used in cell phone sensors since like 2010, so

25   anything less than a 1.1 micron pixel is going to be

1    backside-illuminated.

2         The quantum efficiency is improved the back versus the

3    front because the metals don't get in the way, but even though

4    there's less optical crosstalk with the backside-illuminated

5    sensor, it's not low enough without micro lenses and other

6    features and other very careful engineering to keep crosstalk

7    low in a backside-illuminated sensor.

8         Anything that we are trying to focus light into a

9    small region where the photodetector is, not just the entire

09:54AM 10   pixel, so anything that redirects array as it comes into the

11   silicon which undoes that focusing is going to cause crosstalk.

12        THE COURT:  All right.

13        MR. BELANGER:  Any questions, your Honor?

14        THE COURT:  No.

15        MR. BELANGER:  Thank you.

16        Mr. Simmons.

17        MR. SIMMONS:  Yes, your Honor.  We have also brought

18   an expert, Dr. Shukri Souri.  Dr. Souri is merely giving a

19   tutorial.  We weren't going to put this on as testimonial

09:55AM 20   evidence, so if it's okay if Dr. Souri could use the podium.

21        THE COURT:  Sure.

22        DR. SOURI:  Good morning, your Honor.  I'm here today

23   to give you a brief tutorial on this matter.  In the interest

24   of time, I'm going to go very quickly through certain slides

25   that Mr. Guidash has already addressed and maybe just clarify a

1    couple of things, if needed.

2         I could spend some time talking about myself, but if

3    you have any questions about qualifications, I'm happy to

4    respond to any questions you may have.

5         This is an outline of the talk.  I'll go through some

6    brief semiconductor fundamentals, go through some manufacturing

7    and processing steps, typical semiconductor devices and also

8    electronic devices and then end by giving examples of some

9    optoelectronic devices that are used.

09:56AM 10       Semiconductor Fundamentals.  A semiconductor, as

11   Mr. Guidash had already mentioned, has electrical conductivity

12   that is in between that of an insulator and a conductor, such

13   as a metal.  It is generally considered to be a poor conductor

14   of electricity.  I did bring some wafers, but unless you are

15   interested in seeing them, I'll just hang onto those since

16   you've already seen some.

17       THE COURT:  I'm a little nervous.  Do they cost a

18   million dollars each?

19       DR. SOURI:  Well, I did get a dinner plate size one.

09:57AM 20  They come in a variety of sizes.  I show here, for example, on

21   the left-hand side, silicon wafers are manufactured out of a

22   boule of single crystal silicon that are then sliced up into

23   wafers in a variety of thicknesses, and, yes, we've evolved in

24   the industry from very small diameter wafers.

25       When I was at Stanford, I worked on four-inch wafers,

1     and now they are dinner plate size, 12 inches plus, but silicon

2     is not the only semiconductor, gallium arsenide.  There's a

3     variety.  Here in the middle, there's a picture of gallium

4     arsenide boules that are also sliced into wafers, and on the

5     right-hand side, I'm just giving you an example of the

6     patterning process.

7          You would have a wafer that has the same circuit, the

8     same devices that are patterned over and over again in

9     parallel, the end results of which you can dice the wafer and

09:58AM 10    have several tens or hundreds of dye that each can then be

11    packaged into their own individual packages.

12         Understanding electrical conduction, I'm not going to

13    spend too much time here, but this shows you graphically the

14    difference between insulators, semiconductors and conductors,

15    and, indeed, semiconductors do have a bandgap but a lot smaller

16    typically than bandgaps that you would find in an insulator.

17    In an insulator, the idea here is that the bandgap needs to be

18    overcome.

19         If we're able to deliver energy in some form to the

09:59AM 20    electrons that are in the valence band of the material such

21    that they can attain this energy and exceed the bandgap, they

22    get excited, which really that is the term we use in the

23    community, and the electrons or the charge carriers jump to the

24    conduction band.

25         Once they're in the conduction band, they're free to

1    conduct electricity, generally speaking.  An insulator, that

2    bandgap is rather large.  It's really difficult to supply

3    sufficient energy for electrons to become free and available

4    for conduction.  Typically the material would fail first before

5    we're able to do that.

6         A good example of that is ceramics that we use at the

7    top of the electricity poles for conduction insulators.  We

8    increase the voltage so much, that insulator would fail by

9    archaizing or dialectic breakdown well before we're able to

09:59AM 10   turn into an electrical conductor, but that doesn't mean that

11   we can't do it.

12        Glass is a great example.  It's a silicon dioxide, and

13   glass is able to absorb ultraviolet light.  That's why we don't

14   get sunburned in the car on a sunny day, but there is a

15   possibility that we're able to excite electrons through an

16   absorption of energy process.

17        Photoabsorption in Semiconductors.  The idea here is

18   using photons or light, that is one mechanism through which

19   electrons and charge carriers can absorb energy to excite them

10:00AM 20   above and beyond the bandgap.  This is an example here that I'm

21   showing in the hypothetical semiconductor material where the

22   energy is absorbed, and a charge carrier is able to overcome

23   the bandgap and become freely available for conduction in the

24   conduction band.

25        Now, different semiconductor materials will come with

1    different bandgaps, and what you see here on the graph plotted

2    on the right is the absorption coefficient for different

3    materials, different semiconductor materials, and you'll see,

4    for example, that silicon has a particular absorption curve or

5    absorption coefficient curve that starts at practically the

6    bandgap of silicon, around 1.12 or thereabouts.

7         Germanium to the left of it absorbs light at lower

8    energies, and gallium arsenide to the right of it absorbs light

9    at higher energy values, and this is what we do call

10:01AM 10   interaction.  This is light interacting with the semiconductor

11   material, and by interaction, we're really talking about light

12   being absorbed as energy creating, for example, electron whole

13   pairs that can become available for electrical conduction.

14        On this slide, I'm just giving you a sampling of four

15   different semiconductor materials to demonstrate the various

16   different bandgap energies that are available in each and the

17   corresponding wavelength of light for which they can absorb.

18        And so for silicon, we're talking about wavelengths on

19   the order of 1100 nanometers.  That's infrared.  For gallium

20   arsenide, the corresponding wavelength would be around 875

21   nanometers.  That's approaching the red part of the visible

22   spectrum.  For gallium nitride, we're talking about wavelengths

23   on the order of 360 nanometers, which is well into the blue end

24   of the spectrum, and germanium, which you may recall from the

25   previous slide, to the left of silicon, is at 1850 nanometers.

1   That's in the deep infrared, long wavelength infrared, so these

2   are just different materials that have different capabilities

3   depending on their properties for photoabsorption.

4        Doping.  Again, I'm just going to be fairly brief

5   about this.  Doping is the process by which we implant,

6   introduce impurities into a semiconductor material to change

7   its electrical and optical properties.

8        There are two different forms of dopants.  N-type

9   dopants turn the semiconductor material n-type and really

10:03AM 10   standing for a negative in that the impurity introduces an

11   additional negative charge, an electron typically, and silicon

12   having four outer shell electrons or valence electrons, as you

13   may have heard them called, are typically shared between each

14   other, between different silicon atoms, so when we introduce a

15   new impurity, and on the right-hand side here, I've chosen

16   phosphorous, a fairly popular n-type dopant.  Phosphorous has

17   five outer shell electrons, and so the fifth electron is kind

18   of left without being bonded.

19        So what does it do?  It becomes freely available for

10:04AM 20   electrical conduction, but we'll have to go through another

21   step before it does so, but just for completion here, for

22   p-type dopants, I could use a dopant material that has three

23   outer shell electrons thereby creating a net positively charged

24   p-type semiconductor.

25        But before these charge carriers become available for

1   conduction, I typically would go through an annealing process.

2   It's a very standard, basic process and used for decades where

3   we would anneal, apply some heat, temperature, energy,

4   essentially, and what that energy does is it provides that

5   energy to the dopant or the impurity constituents that makes

6   them unbound the additional electron or the additional hole so

7   that they become free to move and thereby truly become

8   activated and available for conduction.

9           I could use a variety of materials or impurities for

10:05AM 10   dopants.  This is the periodic table.  Silicon is highlighted

11   in the green box.  That column has generally four outer shell

12   electrons for their elements.  Anything to the right would have

13   five, anything to the left would have three, so it gives me a

14   set of choices as to what impurities to go for when making n-

15   and p-type semiconductor devices.

16           A P-N Junction Diode, you've heard quite a bit about

17   it.  One of the reasons --

18           THE COURT:  Just --

19           DR. SOURI:  Yes.

10:05AM 20           THE COURT:  I'm sure this is irrelevant, but the

21   carbon silicon germanium column, I assume, are things that form

22   neat crystals; is that right?

23           DR. SOURI:  In some cases.  So, for example, silicon

24   would form single crystal, but silicon can be formed in

25   different ways, for example, there's polycrystalline silicon,

1    which is typically used, for example, in displays.

2            The thin film transistors in this particular display

3    that's in front of us, all of us, is typically made of either

4    amorphous silicon or polycrystalline silicon, and so we can

5    deposit silicon or create silicon and generate, rather, silicon

6    in different ways.

7            Carbon, as you would know, comes in a variety of

8    different forms.  Soot is just amorphous; graphite is

9    semi-crystalline; but diamond is pure crystal, single crystal.

10:06AM 10   We can do the same with germanium.  Once you get into the

11   metals, that's a different, a crystal is a structure but

12   essentially can be formed depending on the temperature and the

13   manufacturing process in crystalline form.

14           THE COURT:  Okay, please continue.  Thank you.

15           DR. SOURI:  P-n junctions, just to add some more color

16   to it, when I take two materials of different polarity,

17   dopants, and put them together, there is generally what we call

18   a space charge region at the center at the junction, and that's

19   a depletion region, space charge region.  You may have heard it

10:07AM 20   being called a bucket as well.  It is an area where an internal

21   electric field is set up so that generally there are very

22   little or very small concentration of carriers in there, and so

23   when radiated by light, the energy is absorbed by the outer

24   shell electrons of the valence charge carriers and get excited,

25   get elevated to the conduction band, and they're free and

1   available for conduction.

2          Now, if I apply a voltage to this device, as I have

3   shown here, where I have a plus v volts applied to the n-type

4   and a minus v volts applied to the p-type, I've set up an

5   additional attractive electric field there where now the

6   electrons that are photo-generated get attracted to the

7   positive voltage terminal and travel through the n-type side of

8   the material of the p-n junction, and the holes would be

9   attracted to the negative applied voltage that you see here

10   connected to the p-type side of the material through which the

11   holes would travel.  That would really constitute the basic

12   photodiode element.

13          We could, hypothetically, and this has been done, of

14   course, make many, many such arrays, hundreds, thousands, tens

15   of thousands and put them in an array type of configuration so

16   that we could have simultaneous detection of light at various

17   different locations, and we'll be talking about arrays.  You've

18   heard about arrays as well, but before we do that, I just

19   wanted to very briefly walk through a process of how typically

20   such a p-n junction would be fabricated.

21          Again, this is just to go through a very brief set.

22   There can be additional complexities to the fabrication

23   process.

24          We'll start off with p-type silicon is a substrate.

25   By the way, this is a process that can generally be referred to

1    as a CMOS process or CMOS compatible process, C being

2    complementary and MOS standing for metal-oxide-semiconductor,

3    complementary because you can make n-type and p-type.

4         Once we start with the p-type substrate, we can grow

5    an oxide layer on it.  Silicon reacts very nicely with oxygen

6    to create glass, silicon dioxide, so this can be done in a

7    furnace with some steam and elevated temperature, and with some

8    time, we can determine exactly what the thickness of our oxide

9    would be, and then I would go through a process of applying a

10:09AM 10   photoresist.

11        A photoresist is again very similar to photography.

12   Where you would have a photosensitive film on a roll film back

13   before the digital days, and when it's exposed to light, of

14   course, it records the light that is incident upon the regions

15   that can be further developed.  It's the same concept with CMOS

16   processing using photoresists.

17        After applying the photoresist, I would put a mask on

18   top of it.  A mask would keep the areas open where I do want

19   the light to go through and block the light where I don't want

10:10AM 20   it, and so that way I can expose the photoresist to light.

21   It's typical to use ultraviolet light in photolithography, and

22   then by moving the mask and developing the photoresist, I can

23   actually create the negative, what we know in the photography

24   world as a negative.

25        There are different types of photoresists.  We can go

1    with negative for now to represent the pattern that I want to

2    build or fabricate on my wafer, and using this mask, I can

3    repeat this process on a wafer hundreds of times and so

4    creating the same device over and over again, then I would go

5    through and etch the oxide, open up a window in the oxide layer

6    that I had oxidized initially and remove the photoresist, and

7    then that would give me the opportunity to start an implanting

8    process, where I would implant, for example, using ion

9    implantation.

10:11AM  10   Ion implantation is not the only doping mechanism

11   available to us but typically used, and ion implantation is

12   what we would use to dope or implant impurities into the

13   semiconductor.

14   In this case, since I started with a p-type substrate,

15   I would want to make an n-type region if I wanted to recreate a

16   p-n junction, so I would use phosphorous as the doping

17   material.

18   Once I've doped, go through an annealing process to

19   activate the dopants and heal any crystal damage due to, for

10:12AM  20   example, what would happen in the ion implantation process, I

21   would then start the process of metallization because at the

22   end of the day what I would like to do is to have leads,

23   electrical leads, coming out of the device that I can apply the

24   voltage to them and make them applicable for photo detection in

25   a measurable way, so I deposit metallization on the top, I

1    would go through a patterning process again so that I could

2    pattern the metallization.  I would also then metallize the

3    bottom size in this example so that I could have an electrode

4    on the other end of the p-n junction.

5         Now, there are other process steps that I didn't talk

6    about, for example, there are surface treatment and processes

7    that include mechanical polishing or etching of the surface

8    that could be done for purposes of, for example, planarization.

9    We typically like surfaces to be as planar as possible.  That

10   certainly makes it more feasible to have smaller dimensions,

11   but also you've heard about texturing.

12        There can also be roughening of the surface, texturing

13   and roughening.  These are processes that are quite well-known,

14   actually dark silicon, which represents some of the earliest

15   discoveries of roughening was discovered accidentally back in

16   the 1980s.

17        MR. BELANGER:  Your Honor, he seems to be branching

18   into an argument about what was known and what wasn't known,

19   which I don't think is appropriate for this hearing.

20        MR. SIMMONS:  I think it's well accepted, your Honor,

21   but I think we can move on.  It's not consequential to the

22   claim construction.

23        THE COURT:  All right.  Let's just move on.  Go ahead.

24        DR. SOURI:  Thank you.  Then there are also processes,

25   such as laser annealing.  I could use a laser beam to anneal

1    the damage.  It's a mechanism of introducing energy into the

2    semiconductor, and certainly laser can be used for

3    recrystallization.  That's typically used, for example, in

4    displays.

5         I'll now walk through just some brief examples of

6    optoelectronic devices.  There is the Avalanche photodiode,

7    which is also a p-n junction.  The only difference there aside

8    from some of these subtler differences of how to fabricate it

9    in terms of dopant densities and so on is that this is a device

10:14AM 10   where I can apply significantly higher voltage to the

11   terminals.

12        Represented here on the n side of the device is a v++

13   for a very high positive voltage and a v-- on the p-type side,

14   and the reason I would do that is that once the electron whole

15   pairs are created as a response to absorption of light energy,

16   they become attracted by the electric field internally and

17   achieve very high speeds.

18        Once they achieve very high speeds and energies, they

19   start bombarding silicon atoms, for example, releasing further

10:15AM 20   electrons, and those electrons can go on to bombard additional

21   atoms and release further electrons.

22        It's a chain reaction, and the reason that we would

23   sometimes want that is in the event that we want a very highly

24   sensitive photodetector detecting very low levels of light, yet

25   once electrical current that is actually measurable, reasonably

1    measurable, we would want to further amplify, so we're adding

2    game to the process of light detection here so that we can

3    reasonably detect it electrically, so this would be known as an

4    Avalanche photodiode.

5        CCDs, charge coupled devices, this represents an

6    example of an array of photodiodes that we had talked about

7    earlier, and the idea here simply is that you have an array, a

8    two-dimensional array that is able to detect light from

9    different positions, and then the charge is actually the

10:16AM 10  photoelectric charge that is generated as a result of the photo

11   detection process gets transferred in a serial manner, as was

12   described earlier, to off the chip where there are electronics

13   that can process the charge, and that's represented on the

14   bottom row where it's leading to a single conversion set of

15   electronics as an output.

16       CMOS detectors are similarly a two-dimensional array.

17   One of the differences between them, between CMOS sensors and

18   CCDs, is that in CMOS, we now are able to put the electronics

19   inside the pixel.  The electronics can actually reside within

10:17AM 20  the pixel, and that gives rise to several advantages in terms

21   of speed and low power, but also there are some disadvantages.

22       Because we have to take some of the real estate's per

23   pixel and dedicate it to electronics, unlike a CCD, we end up

24   with a smaller area, a smaller fraction of the pixel area that

25   is actually dedicated for light detection, and so there are

1      advantages and disadvantages to each, but, of course, which

2      application or which device is actually used depends on the

3      final application requirements and specifications that are

4      required by the customer and the use.

5              With that, your Honor, I think I'm done.

6              THE COURT:  Okay.

7              MR. SIMMONS:  Thank you, your Honor.

8              THE COURT:  All right.  Why don't we plow forward.

9              MR. BELANGER:  Your Honor mentioned 10:30.  Do you

10:17AM 10     want to start with the first term?

11             MR. SIMMONS:  Actually, I think there's two terms in

12     dispute for the Hamamatsu.  I think we could probably

13     accomplish those before the break.

14             THE COURT:  Why don't we just go forward for 13

15     minutes, and then we'll take a break.

16             MR. BELANGER:  That's fine, your Honor.  Unless your

17     Honor has a different preference, we'd agree that we're going

18     to argue each term, so I'll give plaintiff's presentation, then

19     counsel will give defendants and do that on a term-by-term

10:18AM 20     basis, if that's acceptable.

21             THE COURT:  Okay.  That's fine.

22             MR. BELANGER:  The only thing to raise, your Honor, is

23     that the Hamamatsu patents --

24             THE COURT:  Yes.

25             MR. SIMMONS:  -- there's nine Hamamatsu patents.

1    We're actually the owners of the patents, and our inventors,

2    you know, it's challenged what the inventorship is.  I

3    initially thought that we should go first on those patents, but

4    having reviewed plaintiffs' slides, I think it's fine if we

5    just proceed with the plaintiff presenting first on those

6    patents as well, and we'll go term by term.

7            THE COURT:  Okay.

8            MR. BELANGER:  Just to not let it go, our position,

9    obviously, is we're the owner of those patents, and that's the

10:19AM 10   basis of the dispute.

11           THE COURT:  All right.

12           MR. BELANGER:  Your Honor, I think the first term at

13   issue should be relatively brief from our perspective.  So the

14   first term at issue is the term, "irregular asperity."  It's

15   our understanding over the course of the briefing that

16   defendants have made two arguments or two concessions where we

17   think that the meaning proposed by each party has converged to

18   a point that while there's not complete agreement, I don't

19   believe there's any issue for you to decide that's material to

10:19AM 20   this case, and I will explain why.

21           So we originally proposed the definition of a surface

22   characterized by features of various sizes.  Defendants had

23   proposed surface roughness with random variations, so on the

24   face of those two definitions, one concern we had with

25   defendants' proposed construction was simply mentioning

1    roughness.

2          The entire point of these patents is how the irregular

3    asperity interacts with light, and so during the course of the

4    briefing, the defendants had conceded or suggested that they

5    would concede the irregular asperity must be sufficiently rough

6    to interact with incident light, and that's in the reply brief

7    at page 21.

8          They critique our definition on the idea that we were

9    intending to include a regular series of features as opposed to

10:20AM 10    an irregular or random series of features, and that's not our

11    intention, your Honor, so we would be fine with the

12    construction requiring a randomness of size of features.

13          We thought that that was accomplished by saying

14    various sizes, but just so it's clear, our position is that the

15    various sizes mean that they're different as opposed to the

16    irregular asperity being something that is regular in nature,

17    so with those two clarifications --

18          THE COURT:  I'm sorry, what is the dispute then?  It

19    sounds like there are two basic concepts of roughness and

10:21AM 20    irregularity or randomness.

21          MR. BELANGER:  Right, so we think we're in agreement

22    as to the randomness.  Regarding roughness, we would be in

23    agreement so long as it is clear that the roughness is

24    sufficient to interact with incident light, and we think if

25    that was part of the construction, there wouldn't actually be a

1    substantive dispute between -- you know, we chose to describe

2    that as the creation of features as opposed to some incidental

3    variations in the surface, however, in defendants' reply brief

4    they had said that the roughness was intended to be what we

5    would refer to as features, what they refer to as things that

6    are sufficiently sized so that they interact with incident

7    light.  So I would with that, your Honor, pass to the

8    defendants.

9              THE COURT:  All right.  Mr. Simmons.

10:22AM 10     MR. SIMMONS:  Thank you, your Honor.  I think most of

11    what Mr. Belanger said is correct.  We do think that the term

12    "irregular asperity" should be defined as surface roughness

13    with random variations in characteristics.

14          The irregular asperity is really for the purpose of

15    reflecting scattering and diffusing light.  We have no dispute

16    with that.  The issue we have and the real dispute is that the

17    plaintiffs want to use features in their construction, and

18    that's the issue we have with their construction.

19          Features never appears anywhere in the Hamamatsu

10:22AM 20    patents.  It's not used to describe especially the irregular

21    asperity.  Irregular asperity, the term, "asperity" itself, if

22    you look it up, it means roughness, it means a rough surface.

23    There's some other connotations to asperity, but as far as a

24    mechanical device, it means rough.

25          Irregular, that's the part where we say it's the

1    random variations, so if you look at the HPK patents, the

2    Hamamatsu patents, when it talks about how it's formed, it says

3    that the second principal surface is roughened.  That's how

4    it's described as being formed, and that's how it's used

5    throughout the specifications of the patents.

6         THE COURT:  I'm sorry, a feature would be whether the

7    result is a cone or a pyramid or a mesa or a butte or

8    something?

9         MR. SIMMONS:  It gives the connotation of some

10:23AM 10   structure, some big structure that's described in their

11   patents, and that's what the problem is.  They're trying to use

12   the terminology used in the Harvard patents, whether it's

13   intentional or unintentional.  I mean, they've been dealing

14   with these patents for two years plus as well, but that's not

15   what's used in the Hamamatsu patents.

16        We think it's broader, and it's just rough, that's all

17   it is, it's a surface roughness.  It doesn't need to be

18   described by features, which is not a term used in the

19   intrinsic record of these patents, and how it's described as

10:24AM 20   being formed is by roughening.

21        You can see on the drawings, and the drawings that

22   they have on their slides, the same as the drawings we're

23   pointing to, doesn't call out any particular dimensions of any

24   particular part of the roughness, it just shows that it's

25   rough, and that's plain and simple.  We think it's just

1      entitled to be that.

2              MR. BELANGER:  And, your Honor, just two points of

3      clarification, if we could switch to our presentation.  So the

4      first observation, the part of the specification that counsel

5      pointed to regarding roughening, it talks about roughening

6      using a laser, so it is creating a roughened surface using a

7      laser, and this is from their patents, Figure 8, which shows

8      the pyramids and spikes and other types of features that are

9      created through the laser, so it is certainly a significant

10:25AM 10  part of the dispute between the parties regarding whether that

11     is technology that was provided by Dr. Carey to Hamamatsu.

12             We think it's clear what their patents are directed to

13     is, as counsel said, either features or a roughened surface

14     that is sufficiently rough to interact with light.

15             THE COURT:  Okay.

16             MR. SIMMONS:  Your Honor, what Dr. Carey says has

17     nothing to do with the intrinsic record.  The intrinsic record

18     shows that the surface is roughened.  I don't believe that

19     Figure 8 of I think this is the '945 patent shows anything

10:25AM 20  other than a rough surface, this is just the surface roughness,

21     and that's what's described in the patents, and that's what we

22     say that the claim term should mean.

23             Any questions, your Honor?

24             THE COURT:  No.  Okay.  Move onto "optically exposed."

25             MR. BELANGER:  Yes, your Honor.  So I think this is

1       actually more obvious.  So "optically exposed," our proposed

2       definition is just the plain and ordinary meaning, which is

3       "optics" is a common term.  "Optically exposed" means exposed

4       to light, and that's exactly how that term is used in all of

5       the Hamamatsu patents.

6             If I could show you just an exemplary claim.  This is

7       a claim from the disputed patents, and it describes a

8       photodiode, which you heard in both tutorials.  I think

9       Mr. Souri described an Avalanche photodiode, which this

10:27AM 10      particular claim is directed to, but it does talk about a

11      second principal surface that is optically exposed.

12            Now, in our view, there's no reason to give it any

13      special definition.  It's not used in any special way in the

14      patent.  What is clear from the specification, if you go to the

15      next slide, and is discussed also in each of the expert's

16      presentations, this is Figure 11, which is shared across

17      multiple of the Hamamatsu patents, so in the specification,

18      your Honor, "L" is described as light, and so there's an arrow

19      that's shown as "L" being light going to an irregular asperity,

10:28AM 20      which is item Number 10, and it is shown as being reflected,

21      disbursed and generally interacting with that surface 10, so

22      surface 10 is optically exposed in the sense that the light

23      passes through the device and interacts with the surface tab,

24      and, in fact, it's described consistently in the patent.

25            If you go to the next slide, as this is the whole

1    purpose for placing the irregular asperity 10 in the device, so

2    as the highlighted text in the slide, in the photodiode, the

3    Irregular Asperity 10 is formed in the second principal surface

4    1B, which was the bottom of the device.

5         For this reason, light "L" incident into the

6    photodiode is reflected, scattered or diffused by the asperity

7    10 as shown in Figure 11 to travel through a long distance in

8    the n- type semiconductor substrate, so the reason for

9    including the irregular asperity 10 is so that it interacts

10:29AM 10   with light, and optically, optics are the physics of light, and

11   so we think "optically exposed" is used in its plain and

12   ordinary sense to mean that that asperity 10 is exposed to

13   light, and that's exactly what's shown in Figure 11 of the

14   Hamamatsu patents, and it's described as to why you optically

15   expose surface 10.

16        It's for the purpose of reflecting, scattering and

17   diffusing light in order to improve the performance of the

18   devices, so the whole point of these patents is to include the

19   irregular asperity in order to improve the performance of the

10:30AM 20   devices by reflecting, scattering and diffusing the light that

21   reaches that irregular asperity 10 when it is optically exposed

22   or exposed to light.

23        THE COURT:  Okay.

24        MR. BELANGER:  Now, the basis as we understand it for

25   the defendants' position is there's one --

1            THE COURT:  Why don't I hear Mr. Simmons, and then you

2       can reply.  Why don't we handle it that way.

3            MR. BELANGER:  Okay.  That's fine.  So our basic

4       position is it's very clear from the patent what "optically

5       exposed" means, and it's its ordinary meaning.

6            MR. SIMMONS:  Okay, your Honor.  "Optically exposed,"

7       we think we have support for our construction right from the

8       specification.  We're actually going to point you to the line

9       in the specification where we get it from.  It's talking about

10      a configuration of the irregular asperity.  It's talking about

11      what the irregular asperity is, and that is in contact with

12      ambient gas recovered by an optically transparent film.  It's

13      entirely supported by the spec.

14           The plaintiffs say it's plain, ordinary meaning, but

15      we're going to tell you about what "optics" means.  The problem

16      is is that this not a term of art where you can go to a

17      semiconductor handbook and look up and say, look, irregular

18      asperity that is optically exposed means this.  That's not the

19      case here.

20           Their expert tells you in his declaration a lot about

21      what optics means and that light is optically treated, but they

22      don't tell you this is the construction of optically exposed as

23      read in light of these specifications, and that's what our

24      construction is.

25           And as you heard in the argument, the real dispute

1    here is whether light passing through the semiconductor

2    substrate, the normal light that goes through the substrate to

3    be absorbed, to be detected, does that light that reaches the

4    irregular asperity, does that count as the irregular asperity

5    being optically exposed, and we say based on the spec., no, it

6    does not.  "Optically exposed" is defined by what the irregular

7    asperity is in contact with, not where it's located.

8            If you look in the specification, and we picked one of

9    the patents.  Here, it's shown as the '551 patent, Figure 25.

10   I think that plaintiffs agree that this drawing is similar in

11   all its other patents.  It talks about, and you can see along

12   the bottom surface is the irregular asperity.  That's the

13   surface that's in this particular embodiment.

14           I'm going to draw for a second.  In this embodiment,

15   the light comes in from the top.  The irregular asperity is all

16   along this surface, all along this surface.  So if we look at

17   the specification, at this one, it's column 12, items 40 to 45,

18   it says that the second principal surface 20B, that's the

19   bottom here, is optically exposed, is embraced not only by the

20   case where the second principal surface 20B is in contact with

21   ambient gas, such as air, but also the case where an optically

22   transparent film is formed on the second principal surface.

23           While if the irregular asperity or the second

24   principal surface here is to be in contact with ambient gas,

25   it's got to be from this side.  It can't be from within the

1    semiconductor substrate, it's got to be ambient gas from the

2    bottom of, in this picture, in the bottom of the semiconductor

3    substrate, second principal surface where the irregular

4    asperity is.

5         If we go on in the specification, a couple more lines

6    down, it says, "The region where the electrode 39 is formed in

7    the accumulation layer 37 is not optically exposed."  So the

8    spec. tells you what it is, it's when it's in contact with an

9    ambient gas or covered by an optically exposed film, and when

10:33AM 10   it's not, it's when it's in contact with a metal electrode.

11        Well, the metal electrode is on the bottom of the

12   irregular asperity here, so, obviously, it's in contact with an

13   ambient gas from here and here, but here it's not in contact

14   with an ambient gas.  That's why it's what the irregular

15   asperity is, "optically exposed" is in contact with an ambient

16   gas.

17        Under the plaintiff's understanding, they're saying

18   that while light that goes through the semiconductor substrate,

19   through the photosensitive region, here is opposite to it, is

10:34AM 20   optically exposed.  Well, that's true.  That part of the

21   irregular asperity is optically exposed, but that tells you

22   where the irregular asperity is optically exposed, it doesn't

23   tell you what it is.

24        The very next sentence tells you what it is.  The

25   specification never says, "Outside of the photosensitive region

1      21 is not optically exposed."  To the contrary, it says, "Not

2      optically exposed means covered by the metal electrode 39," and

3      that's why we believe that it's not entitled to its plain and

4      ordinary meaning but rather you need to look at the

5      specification where it says it's optically exposed, it's in

6      contact with an ambient gas or covered by an optically

7      transparent film, and an optically transparent film, again,

8      would also be on this surface, it couldn't be from within the

9      semiconductor substrate.

10:35AM 10         Any questions, your Honor?

11             THE COURT:  No.  Why don't we take our break.  I'll

12     hear your response.  We will reconvene at 10:45.

13             MR. SIMMONS:  Thank you, your Honor.

14             THE CLERK:  All rise.

15             ( A recess was taken.)

16             THE CLERK:  All rise.

17             THE COURT:  All right.  Mr. Belanger, "optically

18     exposed."

19             MR. BELANGER:  Your Honor, can you change the

10:48AM 20     presentations.  Just a few points, your Honor.  The first is

21     counsel has relied on a sentence from the specification that

22     they say has a definition of "optically exposed."

23             I just wanted to point out that the sentence isn't

24     actually a definition.  What it says is that optically exposed

25     encompasses, which means includes, and then it gives two things

1    of what it includes.

2          There's nothing in that sentence that says that's

3    exclusive or that's everything that would be optically exposed,

4    and so that language is entirely consistent with our definition

5    where the second principal surface is optically exposed,

6    meaning light reaches it, as shown in all of the examples when

7    the surface is in contact with ambient gas, such as air and

8    also where there's a transparent film formed on that surface,

9    so in either of those scenarios, the light as shown in all of

10   the examples will go through the device and reach the surface

11   10.

12          THE COURT:  I guess I'm struggling a little bit with

13   this one.  So, first off, whether, you know, light can expose,

14   can reach a surface depends on whether it's passing through

15   some sort of medium that's transparent or translucent, right,

16   if it's opaque, light can't get there?

17          MR. BELANGER:  Correct.

18          THE COURT:  Air is transparent, an optically

19   transparent film is transparent, so the light can reach it.

20   This doesn't say the light can only come from one direction, it

21   can only come from the top at a perfectly perpendicular angle,

22   it can come from anywhere, can't it?

23          MR. BELANGER:  That's true, your Honor, and we don't

24   contest that.  So the dispute isn't whether the light is coming

25   from the top or the bottom, your Honor, the dispute, as we

1    understand it, is whether "optically exposed" means that the

2    light is reaching that surface.

3         THE COURT:  All right.  What about Mr. Simmons said

4    his figure 25, the electrode is not optically exposed?

5         MR. BELANGER:  Yes.  So two points on that, your

6    Honor.  The first is that counsel was incorrect when he said

7    that this figure and this statement appears in all of the

8    Hamamatsu patents.

9         In fact, it only appears in three of the patents, and

10:50AM 10    it is not present in any of the '087, '528, '485, '226, '135 or

11    '449 patents, and so counsel's argument that a term should be

12    understood uniformly across patents actually undercuts his

13    argument that this one figure and this one statement should

14    govern the interpretation of all of the patents at issue and

15    this term that appears in all of the patents.  That's the first

16    point.

17         The second point is a practical one, your Honor, and

18    if I may approach?

19         THE COURT:  Yes.

10:51AM 20    MR. BELANGER:  So this was an example that was shown

21    during the tutorial.

22         MR. SIMMONS:  I'm not sure what this is, your Honor,

23    but during the tutorial, none of just for illustrative

24    purposes, your Honor.

25         MR. BELANGER:  So to illustrate our point, your Honor,

1   and I don't believe this is contested, a photodiode is included

2   in the package.  As you can see, there is a metal package

3   surrounding all but the top of the device, so whether the

4   sensor inside is right side up or upside down, there's only

5   light coming into one side of it.

6          THE COURT:  But once inside, it deflects and diffuses

7   and so forth, right?

8          MR. BELANGER:  If it has the texture, that's correct.

9          THE COURT:  Yes.

10:52AM 10   MR. BELANGER:  So our point is that the backside of

11   that sensor, which lays against that packaging, is optically

12   exposed because the light can reach it through the front.

13          As we understand the defendants' position, even if

14   light could reach that back surface through the front lens, the

15   back would not be optically exposed because it's inside a

16   package, and there's metal behind it.

17          THE COURT:  Okay.

18          MR. BELANGER:  We think that that is an incorrect and

19   not plausible reading of the claims and not one that you should

10:53AM 20   adopt.

21          What all the patents says, the patent does not say

22   what counsel suggested, it says that, "The region where

23   electron 39 is formed in the accumulation layer is not

24   optically exposed," so, as illustrated, all that's saying in

25   figure 25, and I think counsel acknowledges this in their

1    briefs, their images where they show light rays going to the

2    top of item 39, that appears nowhere in any of the patents.

3          So, this in our view, is a simple and plain statement

4    that the light in this one particular example, which shows up

5    in three of the nine patents just means that you're not shining

6    light on that surface above contact 39, that it's not being

7    exposed to light.

8          There could be two reasons for that, I'm sure there

9    could be more, that item 25 is described as the photosensitive

10:54AM 10   region.  That's where light is shown as entering the device.

11         Now, it's true that light won't always come in a

12   straight line, but as has been illustrated by both experts,

13   there are lenses that can focus light, there are -- you can

14   block light.  There are many ways that you can prevent that

15   area above electrode 39 from being exposed to light.

16         This is a simple sentence saying that that is what's

17   occurring in this example, and there's a reason for that that

18   is described in the specification and that was explained in

19   both tutorials.

10:54AM 20         There is a benefit that is described in the patent of

21   having a thinned portion that is exposed to light to improve

22   the characteristics of the device, and so as this statement

23   would be interpreted, the intent of this device is having a

24   thin portion being exposed to light.  That's the photosensitive

25   region as described, and in that device, the patent says that

1    because the thickness between the bottom face of the recess and

2    the first principal surface 20*a* is relatively small and is

3    preferably about 150 micrometers, the response becomes higher

4    and the bias voltage applied to the photodiode is reduced.

5         So this is a clear description, your Honor, if you go

6    back to the prior figure that that thin portion and having

7    light pass into that thin portion and absorbed in that thin

8    portion creates a performance benefit.

9         Why does it create a performance benefit?  First,

10:55AM 10   because that area is thinned, and, second, because the light is

11   interacting with that surface 10, it's being reflected,

12   diffused, and as both of the experts in the tutorial explained

13   and is stated over and over in the patent, is the advantage of

14   including the irregular asperity.

15        The advantage of including the irregular asperity is

16   so that it interacts with light, and the illustration in the

17   one sense that counsel points to, clearly says that in this one

18   example light is not intended to reach that area 39, and so a

19   reading that is consistent with the rest of the specification

10:56AM 20   would suggest that you're not shining light through whatever

21   mechanism on area 39 because your intent is to gain the

22   improved performance from the thinned area of the device.

23        THE COURT:  All right.  Mr. Simmons.

24        MR. SIMMONS:  Your Honor, the fact that these terms

25   are used consistently throughout the patents in the Hamamatsu

1    patents was never in dispute.  The fact that this particular

2    device is only shown in three patents, a lot of the devices

3    don't have an electrode on the back, so there's no need to show

4    this particular embodiment, but let me speak a little bit about

5    what they're saying.

6         They're saying that it's optically exposed because

7    light can get to it.  Their expert during his tutorial

8    mentioned that light bends when it comes in the surface.  Well,

9    that entire top surface, you can see light can get in directly

10   above the part where the electrode is.  It can come in from

11   this part where the photosensitive region is, it bends and

12   reflects or can be refracted, and it's going to get to that

13   irregular asperity portion that's under the electrode.

14        The irregular asperity is still there, but the spec.

15   tells you that it's not optically exposed under the electrode,

16   so I think that refutes everything they're saying about the

17   fact that light can get to it, so, therefore, it's optically

18   exposed.

19        The specification also tells you that optically

20   exposed embraces not only the case where the second principal

21   surface is in contact with ambient gas, such as air, that's

22   only going to be from the bottom, right, it's not from within

23   the semiconductor substrate, and when the electrode is over it,

24   it's not in contact with ambient gas.  And the same thing with

25   "covered by an optically transparent film," that's only going

1    to be from the bottom, it can't be from within the

2    semiconductor substrate.

3         That irregular asperity is formed in the substrate.

4    The roughening process occurs on the substrate itself, so it's

5    basically taking a block of silicon and roughening it, so it's

6    not like it's a different layer or something that's glued to

7    it.

8         That asperity is part of the substrate, so in order

9    for it to be in contact with gas, it's got to be from the other

10:58AM 10   side, so that's where our construction tells you that it's in

11   contact with ambient gas or covered by an optically transparent

12   film.  The spec. directly refutes that light can get to it from

13   anywhere makes it optically exposed because light -- we admit

14   that light can get to that irregular asperity through the

15   semiconductor from the other side.

16        It can also pass through the thin substrate, hit the

17   back of whatever surface is there and reflect around.  Not all

18   embodiments or not all devices are described as being in cans,

19   so the fact that he showed you a can that's not part of the

10:59AM 20   intrinsic record has no bearing on the construction of

21   irregular asperity as it is used in these specs.

22        Does that address your question, your Honor?

23        THE COURT:  Maybe.

24        MR. BELANGER:  If I can just address the slide that

25   counsel has on the screen.

1          THE COURT:  Yes.

2          MR. BELANGER:  So the red lines, just to be perfectly

3    clear, show up nowhere in the patent.  That's something that

4    counsel added to this figure.  So all the patent says is the

5    exact opposite of what counsel is illustrating in this figure.

6          The patent says, "the region," so it doesn't say "the

7    electrode is not optically exposed," it says, "The region where

8    the electrode is formed in the accumulation layer 37 is not

9    optically exposed."  A very easy and plausible reading of that

10:59AM 10    one sentence, which appears in three out of the nine patents is

11    that what counsel just drew does not occur in this device,

12    meaning that light is not shined on that surface.

13          With that understanding, your Honor, the rest of the

14    patent, which describes the advantage of optically exposing

15    surface 10 from the front does make sense, and there's

16    absolutely no benefit that's discussed other than having light

17    reach the surface and interact with that surface.

18          So the --

19          THE COURT:  All right.  Let's move on.

11:00AM 20          MR. BELANGER:  So those are the two terms, your Honor,

21    that are in dispute for the Hamamatsu patents.  The balance of

22    the terms are spread between the two Harvard patents and the

23    one Sionyx patent.

24          So the first of the Harvard patents that's at issue is

25    the '446 patent, your Honor, and the first term that is in

1    dispute in this patent is the term "undulating topography," and

2    as we understand the dispute after having read the briefs is in

3    our interpretation of "undulating topography" that the features

4    must have a variety of heights and a variety of widths.

5         While defendants' definition appears to encompass

6    features with different heights, through the course of the

7    briefing, we understand their intention is actually to cover a

8    topography which has all equal heights, and we would submit

9    that defendants' construction in both regards has no support in

11:02AM 10    the intrinsic record.

11         If we could go to two slides over.

12         So this surface, your Honor, Figure 5A is from the

13    '446 patent, and this illustrates, as you've heard at some

14    length in the prior hearings, this illustrates a surface that

15    was created through the application of a laser process.

16         As you can see, the topography of this surface has a

17    number of features, which are of uneven height and uneven

18    width, and so that is what's consistently shown and described

19    as the actual features, which are created from the process

11:02AM 20    described in the pattern that there are varying heights and

21    varying widths.

22         If you go to figure 2.  So I can speak to -- so this

23    figure is the one that is principally relied by defendants in

24    their brief to argue that the claim "undulating topography"

25    encompasses features that are all the same width, and I would

1    point out, your Honor, that this figure is expressly described,

2    and as this is halfway down, it says, "Spikes are shown only

3    for illustrative purposes and are not intended to indicate

4    actual density, size or shape."

5           So while the figure 2 does show cylinders and is an

6    illustration of how you would measure the width and height of

7    cylinders, I point out two things.  First, each of the heights

8    of those cylinders are different; and, second, the

9    specification clearly and expressly says that those cylinders

11:04AM 10   are not intended to indicate actual density size or shape of

11   features.

12          So as I think was essentially agreed to earlier

13   regarding the irregular asperity, the principal dispute here is

14   whether the undulating topography actually undulates or changes

15   and whether the features change in height or width.  That is

16   all that's disclosed in the specification with the exception of

17   that one illustrative figure, and the one illustrative figure

18   expressly says it's not intended to show the actual dimensions

19   of the features.

11:04AM 20          I'd also point you quickly, your Honor, to the

21   language of the claim itself.  So in defendants' construction,

22   they speak only to the height of the feature, yet in the

23   language of the claim, it states that the undulating

24   topography -- sorry, it states that the undulating topography

25   is characterized by plurality of sub-micron size features

1    having an average height of less than about one micrometer and

2    an average width in the range of 100 nanometers to about 500

3    nanometers.

4         So, the claim expressly says that the features have

5    both a height and width that is relevant to the claim and

6    further says that they have an average size, which suggests or

7    is consistent with our proposed definition that "undulating"

8    refers to variations in both height and width, as opposed to

9    all being the same height and all being the same width.

11:05AM 10    So I think that encapsulates the dispute.  Unless your

11   Honor has questions, I will pass to defendants.

12        MR. SIMMONS:  Your Honor, I think there's a little bit

13   of a misunderstanding by plaintiffs as to what we're construing

14   when we say there's variations in height.  The claim calls for

15   an "apparatus," first of all, not a method, "a surface layer

16   having at least a portion exhibiting an undulating topography."

17        It's the surface layer that we're saying has the

18   undulating topography, so we're saying it's variations in

19   height of the surface.  That's what our construction is about.

11:06AM 20    We actually think there's two disputes based on the

21   briefing.  One is do you have to also include widths?  We say

22   no, and do the variations in height encompass repeating

23   patterns, and we say yes, they should.

24        "Undulating topography" is probably not the best

25   choice of words.  "Undulating," if you look it up in the

1    dictionary, it means a sinuous or wave-like motion.  Obviously,

2    a semiconductor substrate doesn't have a motion.  This isn't a

3    method claim, it's not moving, but if we look at it kind of

4    like the surface of an ocean, a sinuous motion, it goes up and

5    down.  That's what one thinks of when you think of undulating,

6    so it's the undulating surface, the fact that it goes up and

7    down is what encapsulates undulating topography, and that's

8    with variations in height is our construction.

9         You know, how far apart waves are or how wide the

11:07AM 10    waves are doesn't make it undulating, the fact that it goes up

11    and down, if it didn't go up and down, it certainly wouldn't be

12    undulating.

13         THE COURT:  Then what about the rest of the sentence

14    that refers to width, and the term, "average," which obviously

15    implies a variation, otherwise you wouldn't need an average?

16         MR. SIMMONS:  Sure, but that's talking about the

17    undulating topography characterized by a plurality of

18    submicron-size features having an average height of about less

19    than one micron and an average width in a range of about 100 to

11:07AM 20    500, so that's the features that are on the surface, so we're

21    saying just the undulating topography describing the surface

22    has variations in height.

23         The claims go on talk about the features and what the

24    ranges of the features are, but to show you, looking at figure

25    2, when counsel described figure 2, if you use their

1    construction, they read out one of their embodiments.

2          Figure 2, it shows the diameter D, all those features

3    are shown as about the same diameter, so having features of

4    various widths, this particular embodiment, I know it says,

5    "This is not limited to this embodiment," but that's what's

6    shown would read out one of the preferred embodiments shown in

7    the patent.

8          We don't think that you need to put in the terms,

9    "height" and "width" with respect to features because those are

11:08AM 10    terms we're about to construe in a couple minutes, right, so

11    features and the average height and the average width of those

12    features are other claim terms.  That's later in the claim, so

13    the rest of the words in the claim describe those features.

14          The undulating topography describes the surface, so

15    it's a surface layer having at least a portion exhibiting an

16    undulating topography, and that's what we're construing.

17    Whether it can encapsulate a regular or repeating pattern, we

18    took in our opposition brief a patent that was filed around the

19    same time and in the same field of endeavor, U.S. Patent

11:09AM 20    7,456,452.  It's to Wells.  We'll call it the Wells patent.

21          This is directed to a light sensor having undulating

22    features for a CMOS imager.  We're not saying it's prior art.

23    It happened to be filed at the same time, and it's the same

24    field of endeavor.

25          This shows a repeating pattern that have the same

1   height, so the surface goes up and down, the same height, and

2   it actually has the same width as measured in the patent

3   because the patent tells you to measure the width at halfway

4   between the base and the tip, so at halfway between the base

5   and the tip, all these have the same width, so it has the same

6   width, but the height goes up and down, so that's what

7   an undulating topography is.  It could encompass this patent.

8           We agree with the plaintiff.  It could also encompass

9   the patents where the surface goes up and down irregularly

11:10AM 10   because it has irregularly-shaped features.  It should

11   encompass both regular and irregularly-shaped surfaces, so it's

12   more important that the variations in height for the surface is

13   what the undulating topography is.  The features are described

14   later in the claim.

15           Any questions, your Honor?

16           THE COURT:  No.

17           Mr. Belganger.

18           MR. BELANGER:  Just briefly for this one, your Honor.

19   If you could shift back.  So let me start with the end of

11:10AM 20   counsel's argument first.  They cite in the reply brief to an

21   unrelated patent that is not part of the intrinsic record, has

22   nothing to do with laser texturing of the surface, and we would

23   submit is totally irrelevant to the construction of these

24   claims.

25           With respect to these claims, your Honor, the language

1    of the claim, it says how the surface is characterized, so it

2    doesn't claim an undulating topography and then separately

3    claim the features, it claims those features as a

4    characteristic of that topography, so that's our argument, your

5    Honor, is that the features -- that undulating topography has a

6    certain characteristic.  It's characterized by features that

7    have varying heights of width, which as your Honor noted, is

8    clear from the use of the term, "average," which suggests

9    variation.

11:11AM 10         Unless your Honor has further questions, I move to the

11   next term.

12         THE COURT:  Let me, Mr. Simmons, is your argument

13   analogizing to a landscape, a forested, hilly, let's picture a

14   forested, hilly landscape.  You're saying the undulation is the

15   hills themselves, and then the features are the trees, which

16   are of different diameters and heights?

17         MR. SIMMONS:  No, that's not it, your Honor.

18         THE COURT:  All right.

19         MR. SIMMONS:  Because the surface has some micron-size

11:12AM 20  features, the surface appears to have an undulation up and down

21   to the surface as compared to a smooth surface, like the top of

22   this table, so if there weren't texturing done, the table would

23   be smooth.

24         THE COURT:  Be smooth, okay.

25         MR. SIMMONS:  Right.  If there were texturing done,

1   whether it be by laser or by mechanical polishing, you get an

2   undulation to the surface.

3           THE COURT:  So the features are what cause the

4   undulation?

5           MR. SIMMONS:  Right.  But if you get down into the

6   details of the features, that's when you get into the later

7   part of the claim that actually looks at the features, and then

8   in dependent claimants, it looks at smaller aspects of the

9   features, if you will.

11:12AM 10           THE COURT:  Okay.

11           MR. BELANGER:  Just to illustrate, your Honor, these

12   are figures from the '446 patent, Figure 6 and various

13   Figure 7s, and I think counsel just reinforced our points, it

14   is the features that create the undulating topography, that's

15   what's described and shown in the patent, and the actual

16   features are shown, for example, in Figure 6.

17           THE COURT:  All right.

18           MR. BELANGER:  So just in your analogy, if you imagine

19   the hills, it says the hills are the features of the undulating

11:13AM 20   topography, and those hills have varying heights to them, and

21   they have varying widths to them.  That's what creates an

22   undulation.

23           THE COURT:  Okay.  Number 4, "At least a portion."

24           MR. BELANGER:  So this I have to admit I don't have

25   much to say.  I'm curious to hear defendants, so in our view,

1    "a portion" is an ordinarily understood English phrase, is used

2    in the manner that it is ordinarily used.  There's no special

3    definition provided, and so we would submit that there's no

4    need to construe "a portion," which means "a part of," and so

5    in reading the briefs, it appears that defendants in some

6    instances want a portion to mean "all."  They've added this

7    notion of textured region, which doesn't appear in these

8    patents.

9         And so, frankly, I'm not -- it's not entirely clear to

11:14AM 10   us what is intended by the definition of this point having read

11   the briefs, but our submission is that the term, "a portion" is

12   used consistently in both the claim and the specification in

13   its ordinary usage to mean "a part of" or "some."

14        THE COURT:  Okay.  Mr. Simmons.

15        MR. SIMMONS:  Yes, your Honor.  What we're asking to

16   be construed, your Honor, we're looking for some guidance is

17   all.  We're actually not asking for "a portion" to be

18   construed, we're asking for "at least a portion exhibiting an

19   undulating topography" to be construed, and I think we caused

11:15AM 20   some confusion because we have bracketed "of the surface

21   layer," and that's for a similar reason that it's referring

22   back to the surface layer.

23        It says, "A surface layer having at least a portion

24   exhibiting an undulating topography," so when we give our

25   construction, we're saying, well, what is the, "a portion of

1    the surface layer that is exhibiting an undulating topography"?

2    Well, our construction is it is that region that was textured,

3    basically intentionally textured to give it that undulating

4    topography, so it's the textured region having variations in

5    height.

6         How was it textured?  It talks about in the preferred

7    embodiment the very detailed description of the invention

8    section, it says, "At least a portion of the substrate surface

9    is placed in contact with a fluid," for example, by disposing a

11:16AM 10    layer of fluid over that portion.

11         In another step, that portion is in contact with a

12   fluid exposed to one or more short laser pulses so as to modify

13   its surface topography.

14         We took figure 2 of the patent, made an exemplary or a

15   demonstrative exhibit out of it, so we're talking here is you

16   have a portion exhibiting an undulating topography.  That's the

17   blue inset with the features shown, then you have the entire

18   surface layer, so we're talking at least a portion exhibiting

19   an undulating topography is that portion that was textured, so

11:16AM 20    that textured region.  It could be the entire surface, but if

21   it is the portion, it's the portion that was textured.  That's

22   the only thing we're looking for in the construction is

23   guidance as to what "at least a portion exhibiting an

24   undulating topography" was.

25         Any questions, your Honor?

1          THE COURT:  No.

2          MR. BELANGER:  So I'm not sure that that particular

3     helps, so "textured region" isn't a term that appears in the

4     patents.  What appeared from counsel's argument that he's

5     pointing to, one of the embodiments which describes the method

6     of creating the undulating topography.  It uses the term, "a

7     portion" in its ordinary English way to mean "a part of."

8          He created a demonstrative that shows a part of the

9     substrate that has an undulating topography, and we would agree

11:17AM 10     that so long as a part of the substrate or surface layer

11     exhibits the underlying topography as claimed, it would meet

12     the claim limitation, so it's still unclear to us unless

13     they're trying to read that particular example or process

14     example into the claims, we would submit both the inclusion of

15     the term, "textured region," and the definition is confusing

16     and unnecessary because the claims in it, "undulating

17     topography," which we discussed the construction of previously,

18     and it simply says, "a portion," which I think counsel

19     acknowledged doesn't mean "all."

11:18AM 20          So long as "a portion" exhibits the undulating

21     topography, it would fall within the scope of the claim.

22     There's nothing that restricts the claim to a particular method

23     or step that counsel pointed to in the example.  As far as the

24     use of language though, it uses "a portion," and it refers to

25     fluid being or a portion of the substrate, meaning part of the

1    substrate being exposed to fluid.

2         We would submit that's used in its ordinary English

3    sentence, so it's still unclear what would be resolved by

4    adopting defendants' construction.  We would submit that it's

5    taken from words that are not found in the claims of the

6    patent, and, therefore, is inappropriate.

7         THE COURT:  All right.  Why don't we move onto

8    average.

9         MR. BELANGER:  So, your Honor, "average," again, this

11:19AM 10    is a term like "portion."  It is an ordinarily understood term.

11    We propose the definition.  It's a single value that summaries

12    or represents the significance of a set of unequal values.

13    That's an ordinary English definition of average.  That we

14    believe is clear.  It appears that the dispute is whether

15    "average" should be limited to "mean."

16         Again, the dictionary definition of average is not so

17    limited.  It's commonly understood to encompass "mean, mode and

18    medium."

19         In the specification, your Honor, the term "typical"

11:20AM 20    is used, so in the example, and this is from the '446 patent,

21    it talks about the spikes having a substantially columnar shape

22    with a typical height of about 500 nanometers and a typical

23    diameter of about 200 nanometers, so that says that the height

24    is varying and the diameter of the features are varying, but

25    the typical or most common attribute is that they're within a

1    certain range, and so we think "average" has an ordinary

2    accepted meaning, and there's no reason to depart from that

3    ordinary and accepted meaning.

4         Regarding, if I can address defendants' indefiniteness

5    argument now or if you want me to --

6         THE COURT:  Why don't I hear from Mr. Simmons.

7         MR. SIMMONS:  Well, your Honor, this pattern is

8    directed to a scientific engineering structural device that has

9    these average heights and average widths, so we went and looked

11:21AM 10    at average, okay.  It doesn't tell us what average is in the

11    specification, so what's a commonly understood definition of

12    "average"?

13         Well, we take the sum of all the heights or the sum of

14    all the widths, of all the features divided by the number of

15    features.  It's a simple average with a simple mean, so it's,

16    you know, all the values added up divided by the number of

17    values.  Once we got plaintiff's construction is when we said,

18    well, if that's your construction, this term is indefinite.

19         We didn't set out to render the term "indefinite,"

11:21AM 20    it's the plaintiff's construction supported by their expert's

21    support or theory of the construction that we say, well, if you

22    don't take this simple average, this term is indefinite, so the

23    real dispute is what method is used to calculate an average?

24         We looked at the plaintiff's construction, and I'm not

25    sure that that encompasses or encapsulates what an average is

1      that would be understood in light of the specification.  They

2      say how do we determine the appropriate single value, how do we

3      determine a general significance?  I'm not sure what that is.

4      It's subjective, at best.  That's not in the specification, and

5      then they interject unequal values.  I know that's in one

6      dictionary, but that's just really another impermissible

7      attempt to import limitations into this term.  It doesn't need

8      to be there.

9             Let's look at the term "average" itself.  The

11:22AM 10   plaintiffs correctly note that our construction doesn't add

11     justification from the spec.  We took this based upon a

12     commonly understood definition of average for the mean.  The

13     plaintiffs admit that there's three different ways to calculate

14     "average," at least three different ways, the mean, the mode

15     and the medium.

16            Their expert puts in a declaration that says you can

17     do the average by at least the mean, the mode and the medium.

18     We looked at those, and I don't think there's any dispute that

19     the mean is the sum of all the values in the group.

11:23AM 20          This is from Dr. Souri's declaration.  The mode is the

21     most frequent recurring value in the group of values, and the

22     medium is the middle value of an ordered list of the values

23     that separates the higher half of values from the lower half.

24            Using at least three methods specified by the

25     plaintiffs, which also have no guidance in the specification of

1      the '446 patent, it would render different infringement

2      conclusions.  That renders the claim indefinite.

3              There was a recent case, it's *Dow Chemical vs. Nova*

4      *Chemicals*.  It's cited in our brief at page 5.  In the *Dow*

5      case, it's very similar to this fact pattern.  The *Dow* case is

6      about plastics.  You measure the plastics.  I don't know if

7      you've ever seen how they measure plastics, but they put them

8      on this press, and it pulls them apart like the old taffy.

9              And as plastic deforms, at first it deforms very slow,

11:23AM 10   and then it gets really thin, and then it breaks, right, so

11     there's different measurements as it curves that shows you how

12     it deforms, and there's a measurement in there called the slope

13     of strain, so we're not going to get into that, but what's

14     important for this is in the *Dow* case, the expert said, look,

15     there's at least three different ways to calculate the slope of

16     strain, you get three different numbers for it.

17             In fact, that expert came up and said, "I also have a

18     method, I think I invented a method for calculating the slope

19     of strain."  The Court said, "Wait a minute, you're getting

11:24AM 20   different infringement results using these three different

21     methods.  How do I know which one to use?  Is there any

22     guidance in the spec.?"  "No."  "Well, then that patent is

23     indefinite."

24             We're in a post-*Nautilus* world, so the Supreme Court

25     in 2014 decided the *Nautilus* case, and it changed the

1  indefiniteness standard.  It used to be if there was some way

2  to do it, some way to calculate it, it wasn't indefinite,

3  right.  Now you have to put people on notice, so if there's one

4  way to do it, you have to tell it in a spec.  If there's more

5  than one way to do it, you have to give them guidance about

6  which way to choose.

7  *Nautilus* said in 2014, the Supreme Court said, "A

8  patent is invalid for indefiniteness if its claims read in

9  light of the specifications delineating the patent and the

11:25AM 10  prosecution history fail to inform with reasonable certainty

11  those skilled in the art as to the scope of the invention."

12  That's the case here.

13  If you adopt plaintiff's construction, somebody who's

14  skilled in the art is not going to know which one to use.  So

15  we had our expert take a hypothetical.  It's in our

16  declaration, it's in our expert's declaration, it's in our

17  opposition.

18  We took five hypothetical values for width on the

19  order of magnitude that's used in the claims.  The claims call

11:25AM 20  for an average width in the range of about 100 nanometers to

21  500 nanometers, so you could have some more, some less.  The

22  average has got to be in that range.

23  So assuming everything else in the claims met, we

24  calculate the average doing three different methods, so if you

25  do the simple average, the mean, you add up the five values,

1   400, 420, 520, 550, 550, divide them by the number of values,

2   you get 488 nanometers.  Would that infringe?  Yes.  If you do

3   it using the medium, the medium for this set of values is the

4   middle value separating the higher from the lower half.  That's

5   529 nanometers.  Would it infringe?  Same set of hypothetical

6   values.  No, it wouldn't.

7        The same thing for the mode, if you do it for the

8   mode, you get 550 nanometers.  That wouldn't infringe either.

9   So, somebody who is going to come to look at this patent

11:26AM 10  wouldn't be put on notice of whether they infringe or not, so

11   that would render the claim term indefinite.

12        As the *Dow* Court said, the patent and prosecution

13   history must disclose a single approach or establish where

14   there are multiple known approaches that exist a person having

15   ordinary skill in the art would know which approach to select.

16        This '446 patent doesn't tell you which is the three

17   ways to calculate an average would be done, so we say you

18   should adopt our construction, which is probably the most

19   commonly understood definition of average, and you add up all

11:26AM 20  the values divided by the number of values, or if you adopt the

21   plaintiff's reasoning and the plaintiff's expert's reasoning,

22   this claim is indefinite, which means it's invalid.

23        Any questions, your Honor?

24        THE COURT:  No.

25        Mr. Belanger.

1           MR. BELANGER:  Your Honor, let me start with the case

2      law, that *Dow Chemical* case that counsel referred to.  So in

3      that case, the claims were found indefinite because there were

4      multiple different ways to measure the value.  It didn't have

5      anything to do with whether the word in the claim was broadly

6      written to encompass multiple different calculations.

7           So there's no dispute here as to how you would measure

8      a feature, it's the height and width.  There is some dispute

9      about what height means and what a width means, but as far as

11:27AM 10  how you would measure a height and measure a width or a

11     feature, it's a linear dimension that's clearly described in

12     the patent as to how to measure it.

13          In the *Dow Chemical* case, it was the measurement

14     differences that caused the uncertainty as to whether something

15     was inside or outside the claim.  So, first, how the

16     specification gives guidance, the specification gives guidance

17     by using the typical, so that's what preferred embodiment

18     describes, which generally would be the most common or the

19     mode, so if you have 10 values that were within the range and

11:28AM 20  one outlier value that's outside the range, that would say the

21     typical feature his inside the range, and, therefore, within

22     the scope of the claim.

23          You could also do the mathematical expression that

24     defendants have suggested, and if you add up all the numbers

25     and divide them by the number of features and you get to a

1    single value that's inside the range, that would be within the

2    scope of the claim as well.

3         This is, and there's probably a better analogy, your

4    Honor, but they are conflating the breadth of the claim with

5    the definiteness of the claim.  If I said that I claim a chair,

6    that could be a broad term.  It doesn't make the claim

7    indefinite because there are multiple types of chairs that

8    would fall within the claim.

9         You could have a chair with three legs, four legs, you

11:29AM 10    just pick the broader term than a chair with three legs.  That

11    is what we have here, that the term "average," which is

12    commonly understood to those in the art, has an understood

13    definition that is broader than the definition that defendants

14    are intending to impose.

15         And it is not an indefinite definition, and it is not

16    one that would lead to different results contrary to what

17    defendants' expert have said and defendants have said.  Each of

18    their examples would fall within the scope of the claim because

19    the average meets the claim language.

11:29AM 20         THE COURT:  So you're saying a person of ordinary

21    skill in the art would read the word, "average" not to mean

22    "mean" but to include "mean, medium and mode"?

23         MR. BELANGER:  Yes, your Honor.

24         THE COURT:  They would see that word, and that's what

25    they would, ah, it means all three values?

1          MR. BELANGER:  Correct, one of skilled in the art.

2     And the guidance that they get for that, your Honor, that's the

3     common scientific dictionary definition of what an average is,

4     Number 1; and, Number 2, the specification uses the word,

5     "typical," and "typical" suggests that you could have outlier

6     as opposed to suggesting that you're going to calculate an

7     exact mathematical --

8          THE COURT:  I'm not sure "typical" adds much here.

9     It's a highly unscientific word.

11:30AM 10          All right.  I get the dispute.  Let's move onto

11    "height."

12          MS. TAWRESEY:  So, your Honor, plaintiff's proposed

13    construction is directly a quote from the specification.  The

14    height is defined as a separation between the base and the tip.

15    Defendants' proposed construction adds additional limitations

16    for which they don't have support.

17          On page 8 of their opening brief, they specifically

18    say that their proposed construction is the, "most logical

19    way," but they don't cite either extrinsic or intrinsic support

11:31AM 20    for that proposition.

21          So here's the exact quote from the specification,

22    which says, "The generated features can be, for example,

23    substantially columnar spikes, each of which extends from a

24    base to its tip and protrudes above the surface.  In many

25    embodiments, the average height of the spikes, i.e., the

1    average separation between the base and the tips can be less

2    than about 1 micron."

3              So we think that that supports plaintiffs' proposed

4    construction and don't find support for the additional

5    limitations in defendants'.

6              THE COURT:  Well, it does raise a question, what is

7    the base?  I mean, as I read this, it's like asking is

8    Mount Everest 29,000 feet high because that's its height from

9    sea level, but if you are standing in the valley next to

11:31AM 10   Mount Everest, it's probably more like 15,000 feet high?

11             MS. TAWRESEY:  Would you like us to go through our

12   argument for base to help understand from the beginning?

13             THE COURT:  Yes.  That's a disputed?

14             MS. TAWRESEY:  It is.

15             THE COURT:  Yes, go ahead.

16             MS. TAWRESEY:  So plaintiff is arguing that plain and

17   ordinary meaning for "base," and I think the only dispute with

18   respect to this term is defendants' proposed construction

19   defines the "base" as not part of the feature, so even if you

11:32AM 20   are talking about the base of Mount Everest, you're still

21   talking about a physical part of Mount Everest, not the valley

22   beside it.  You're not going to be measuring a diagonal length

23   up the side of the mountain, you're going to be measuring from

24   essentially part of the feature.

25             That I think can be illustrated by the figure that

1    defendants have relied on from plaintiffs' IPR response where

2    they're saying it confirms their proposed construction, and we

3    would point out that this figure specifically says that the

4    height is the separation between the base and the tip and shows

5    that the height is -- I'm sorry, that the base is part of the

6    actual feature being measured, not part of the trough.

7         THE COURT:  Okay.  Mr. Simmons.

8         MS. TAWRESEY:  Just to clarify on this figure as well,

9    the original surface is dealing with a different term.  It's

11:33AM 10    not actually relevant to the base.  It deals with the protrude

11    above the surface, which we'll discuss in a minute.

12        MR. SIMMONS:  Thank you, your Honor.  So I don't think

13   there's a dispute that height is defined as the separation

14   between the base and the tip, and as your Honor pointed out

15   correctly, what we're trying to figure out is where do you

16   measure the base so you can find out where the separation

17   between the base and the tip is?

18        We add the construction of base to the construction of

19   height so that to a base that is defined by the lowest point in

11:33AM 20   the trough directly adjacent to the feature.  So we're talking

21   about a feature, so if you look at a single feature, you would

22   look at the lowest point in the trough next to that feature, so

23   the main dispute is whether you have to define the base.

24        You gave the example of Mount Everest is, you know,

25   Mount Everest is at 29,000 feet from sea level or 15,000 feet

1    when you are standing next to it.  What happens when you're on

2    the other side of Mount Everest is really the issue because it

3    could be 14,000 feet from that view, from that side of

4    Mount Everest, it could be 12,000 feet, so it's all relative,

5    and if you took four different measurements, what was the

6    height?  Did it fall within the average?

7           So we're looking for some guidance here as well.  They

8    rely on figure 2.  We all rely on figure 2 of the '446 patent,

9    but their expert says, you don't need to define base, one of

10   ordinary skill in the art would understand what a base is.

11          Look at figure 2.  Well, that's the planar bottom,

12   right.  Everybody would know you measure the base.  The base is

13   the same in this figure.  The problem comes in when you get

14   into the other embodiments, so what's shown here, we made a --

15   we took figure 5A of the '446 patent.

16          This is actually reproduced from an article by the

17   inventors.  It's the same as 5A, it's just better resolution.

18   So the question is if we take this feature in the middle, for

19   example, so I want to draw on this feature.  Where do you

11:35AM 20   measure the height from the separation from the tip to the

21   base?  Is the base over here?  Is the base down here at a

22   different elevation, which is another trough?

23          If you look down in the front, I really can't see how

24   far down that goes, you can see just using that one feature,

25   you could have three different heights, so where is the base

1    there?  The same thing happens with another embodiment.  This

2    is the embodiment shown in Figure 5C.

3         Again, we produced a better resolution figure, but

4    it's the same figure as 5C.  These features are smaller, but

5    you can see if you look at the feature here in the middle, you

6    have a base, potential base here, potential base here, or do

7    you measure it over here from the part that wasn't

8    intentionally textured, in that planar region?  That's why we

9    want to put it in the construction, but we're not the only ones

10   who did.

11        Plaintiffs referred to the IPR, so the IPR, it's an

12   inter partes' review, so Hamamatsu Corporation filed this

13   inter partes' review at the United States Patent & Trademark

14   Office challenging the validity of the '446 patent.

15        In response to our request, Harvard, the patent owner,

16   got to respond.  When Harvard responded, they said, look,

17   here's the height, the separation from the base and the tip,

18   for any feature, let's take the one in the middle.

19        They said, "Here's the tip," and for this one, they

20   used not the trough directly adjacent to it that is shallow,

21   they used the trough directly adjacent to that feature that's

22   the lowest point.  That's how they measured the separation

23   between the base and the tip.  That's the same as our

24   construction.  Harvard agrees.

25        Same thing for this feature here.  You see there's the

1    tip.  There's a trough directly adjacent to it here, and then

2    there's the part where they measured the height from, the

3    separation from the base and the tip, so they didn't do it from

4    all the way over on the trough.

5          They did it, the trough defines the relative elevation

6    of what the height is, so the base and tip is the lowest

7    trough, the lowest point in the trough directly adjacent to the

8    feature.  We think that that gives clarity so that anybody

9    measuring other shaped features would know how to measure them.

11:37AM 10   That's all we're asking, your Honor.

11         Any questions?

12         THE COURT:  No.

13         MS. TAWRESEY:  Bear with me because this is my first

14   time drawing on one of these screens, but I think I can better

15   illustrate maybe the dispute.

16         So defendants' proposed construction of height is a

17   linear dimension measured from a tip to a base that is defined

18   by the lowest surface and the nearest surrounding trough.  That

19   would allow defendants to include this linear dimension.  We

11:38AM 20   are disagreeing with that to the extent that the base should be

21   defined as part of the feature right here, right.  It's not a

22   diagonal dimension, it's the vertical dimension from the base

23   of the feature --

24         THE COURT:  Understood.

25         MS. TAWRESEY:  -- to the tip.

1          MR. SIMMONS:  You could leave that on.  Just for

2     clarity, what we're saying is it's defined by the point of the

3     lowest adjacent trough, so you see the point over where

4     Ms. Tawresey first circled here.  That's where we are going to

5     measure it.  It is the linear dimension, perpendicular

6     dimension, separation between base and tip.  That's what we're

7     looking for.  That point is defined by the lowest point of the

8     trough directly adjacent to the feature, so it's an orientation

9     system.

11:39AM 10          We're not saying, we're not proposing to measure it on

11    an angle.  We agree it's going to be the difference between the

12    tip and the base where it's defined as the lowest point of the

13    trough directly adjacent to it.

14          Just like Harvard drew it, that dot is directly under

15    the tip, right, so that's the measurement.  We're not proposing

16    it be on an angle.  Does that make sense?

17          THE COURT:  Yes.

18          MR. SIMMONS:  Thank you, your Honor.

19          THE COURT:  I think according to that standard, I

11:39AM 20   think Mauna Kea in Hawaii is the highest mountain in the world

21    because you can all the way down to the ocean floor.  It's the

22    highest mountain.

23          All right.  I would be much more comfortable with

24    something electronic or chemical than this basic height and

25    width stuff, but let's keep going.

1          All right.  "Width," is that next?

2          MS. TAWRESEY:  Yes, your Honor.  So, here again, both

3     plaintiffs and defendants have chosen language from the

4     specification.  Defendants have included additional language

5     that is described with respect to certain embodiments but not

6     all embodiments.

7          Plaintiffs proposed construction is consistent with

8     the descriptions in the specification.  Again, figure 2, which

9     is shown only for illustrative purposes but no less defines a

11:40AM 10   diameter of a cross-section, and it's also important to point

11    out that the claims are using the term, "features," and the

12    specification says that features and spikes are referred to as

13    the same, so it makes sense to call a spike having a diameter.

14         Defendants have said that use of the term "diameter"

15    is inappropriate, but part of the specification that they rely

16    on in their opening brief also includes use of the term

17    "diameter," and that is on page 10 of defendants' opening

18    brief.

19         THE COURT:  Okay.  What about the issue, these are not

11:41AM 20   perfect cones, circles have diameters but irregular-shaped

21    objects do not.  What about that?

22         MR. BELANGER:  Well, the specification says that in

23    the case of irregularly-shaped features, it can be the largest

24    linear dimension.  Again, we think that a person of ordinary

25    skill in the art would notice that, you know, its features has

1    sort of a bump-out or a boldness portion.  That wouldn't

2    necessarily be the diameter or the spike of the feature.  That

3    would be sort of an anomaly, and so taking a measurement from

4    that one bump-out would not necessarily be how a person of

5    ordinary skill in the art would measure that.

6              THE COURT:  Okay.  Mr. Simmons.

7              MR. SIMMONS:  I think we actually largely agree on

8    this claim construction term, your Honor.  The only difference

9    in our constructions, both of ours have support in the

11:42AM 10   specification taken substantially parallel to the substrate

11   surface, we say it's of a cross-section of the feature at a

12   location halfway between a base and the tip.

13             The real dispute is whether it's necessary to include

14   the largest linear dimension vs. the diameter of the spike.  We

15   say you need the largest linear dimension because that covers

16   both irregular shapes and regular shapes.  Diameter, most

17   people you think of a diameter, you think of a circle.  I did.

18   I draw roughly a circle.  That's bad, I know.  Sorry.  It's got

19   the bumps, sorry.  The diameter is actually the measure across

11:43AM 20   the geometric center of a shape, so you could have a diameter

21   for a non-circular shape.

22             THE COURT:  Ovals have diameters?

23             MR. SIMMONS:  I'm sorry.

24             THE COURT:  An oval has a diameter?

25             MR. SIMMONS:  According to the dictionary, it's the

dimension measured across the geometric center.  I personally

think our construction would capture both the circle, irregular

shape, which is the diameter of the circle is its largest

center of dimension, but it would also capture this irregular

shape, right, because if you take one of these cones, and

there's no cross-section of these cones, these spikes.

I took, for example, this one and I kind of

guesstimated what it would be.  So if you can see, if everybody

were to measure this, and you took a cross-section halfway up

between the tip and the base, that would be the largest linear

dimension.  We'd all get the same width for the feature.

If these were columns and they were straight up

cylinders, we'd have a circle, much better, the diameter would

be also its largest linear dimension.  An oval, that's a

question mark whether the diameter is its largest linear

dimension across its center because, you know, an oval, it's

symmetrical, actually an ellipsis is symmetrical, you have a

long dimension and a short dimension across this geometric

center, that's why our construction actually covers both,

regular and irregular, and even the question mark, whether the

ellipsis covered by a diameter, so that's why we put forth our

construction, your Honor.

Does that make sense?

THE COURT:  Yes.  Ms. Tawresey.  By the way, I assume

you're not measuring these things with a Stanley tape measure?

1         MR. SIMMONS:  Using probably a scanning electron

2    microscope and some digital or laser technology to measure the

3    actual features, but you would actually probably measure them

4    on the scanning electron microscope image, yes.

5         THE COURT:  On the image itself.

6         Okay, go ahead.

7         MS. TAWRESEY:  Lisa, you could just leave this slide

8    up.

9         Just as a quick housekeeping note, this is the first

11:45AM 10   time we've seen these higher resolution figures.  We haven't

11   had a chance to look over them and confirm that they are

12   actually the same as what's in the patent, but just taking

13   counsel's representation.

14        THE COURT:  I think it's illustrative.  I mean, I

15   think we can agree they're not perfectly regular.

16        MR. SIMMONS:  And they are from the actual inventors,

17   so the inventors of the patent are the authors, and they appear

18   to be identical.  If they're not, they definitely are

19   representative.

11:46AM 20        MS. TAWRESEY:  And, again, I think there are many

21   different types of textures that can be formed, and so just as

22   long as these are understood as representative and not

23   actually --

24        THE COURT:  Again, if they're all perfect columns,

25   it's easy.  We're assuming imperfections and variations.

1          MS. TAWRESEY:  Just two points briefly.  First,

2     counsel circled this as representative of an irregularly-shaped

3     feature.  This actually appears to be two features, one here

4     and one here, so the diameter would not necessarily be

5     representative.

6          The second this is, for example, a bump-out like what

7     I was talking about.  The shape itself shows a substantially

8     columnar shape and just has one area that has sort of an

9     anomalus area, and I think a person of ordinary skill in the

11:46AM 10    art would not measure that as the diameter of the spike or

11    feature.

12         THE COURT:  This photograph, my first reaction is it

13    looks like a little kid pouring sand on the beach, you know,

14    wet sand, but, you know, of course, that's what it is, right,

15    it's silicon and water, right, so it is kind of the same thing.

16         MR. SIMMONS:  Very expensive version of it, your

17    Honor.

18         THE COURT:  Yes.  All right.  Have we talked about

19    "base"?  Do we need to go over that again?

11:47AM 20         MR. SIMMONS:  From our perspective, your Honor, we

21    incapsulated the term, "base" with respect to the term,

22    "height," so we find no need to make further arguments on that.

23         MS. TAWRESEY:  We have nothing further on "base" as

24    well.

25         THE COURT:  All right.  Then "protrude."

1          MS. TAWRESEY:  So here the issue is defendants have

2     essentially defined "protrude above the semiconductor surface

3     by a distance" to be the same as height.  There's a claim 6 is

4     where "protrude above the semiconductor surface" appears.

5     Claim 6 depends from Claim 1.  There's a presumption, for

6     example, explained in *Chicago Board Options Exchange, Inc. vs.*

7     *International Securities Exchange* that claim terms, there's a

8     general presumption that different terms have different

9     meanings.

11:48AM 10          Our construction is consistent with that general

11     presumption that extends above the original surface as opposed

12     to just the height of the feature.  This is also supported by

13     the specification which says that, "The spikes --" excuse me,

14     "have substantially columnar shape with a typical height of

15     about 500 nanometers, a typical diameter of about 200

16     nanometers.  They protrude up to 100 nanometers above the

17     original surface of the wafer, 1C."

18          1C is actually not a figure that is in the patents.  I

19     think it's a typo referring to 5C.  5C here you can see that

11:49AM 20     the original semiconductor surface all the way over to the

21     right and highlighted in green is a flat surface, and the

22     features that protrude above the original semiconductor surface

23     are highlighted in blue.

24          Again, looking at the dependent claim structure, the

25     range of the protrusion is smaller than the height, which is

1   consistent with understanding that the features would extend

2   above the original surface by a lesser distance than the full

3   height of the feature.

4           THE COURT:  Okay.

5           MS. TAWRESEY:  And, finally, the difference between

6   two terms is shown in the figure that Harvard submitted with

7   the inter partes' review response that illustrates the

8   difference between the height and the protrusion above the

9   original surface.

11:49AM 10           THE COURT:  Mr. Simmons.

11           MR. SIMMONS:  Our construction, your Honor, is the

12   same as used in the patent specification.  They equate

13   "protrude above the semiconductor surface," with height.  They

14   equate height with separation between base and tip.  They also

15   equate separation between base and tip as being "protruding

16   above the semiconductor surface."

17           There are these things called Canons of CLAIM

18   Construction, which we agree with.  Canons of Claim

19   Construction are guidelines based upon the case law.  In these

11:50AM 20   Canons of Claim Construction, you should generally have, when

21   you have two different claim terms, they should mean different

22   things unless you rebut it.  In this case, we say it's rebutted

23   by the specification.

24           The specification equated these three concepts, so the

25   dispute here is whether you need to import the term, "original"

with respect to semiconductor surface into Claim 6.  We say you
should not.  "Original" is only used once in the specification
of the '446 patent.  Very specifically it's used once, and it's
never used in the claims.  There's no need to import it into
Claim 6.

So in the spec., it says that, you know, this is where
it equates the height with the separation between base and tip.
The height is defined by the separation between its base and
tip.  It also equates in the spec. at column 2, lines 40 to 46,
the base and tip separation with protruding above the
semiconductor surface, extends from base to tip separated from
the base by a distance.

"For example, the spikes can protrude above the
semiconductor surface by a distance in a range of 100 to 300
nanometers."  That's the range in Claim 6, "protrude above the
semiconductor surface by a distance in a range of about 100 to
just about 300 nanometers."

When it talks about the original surface, it says,
"They, the spikes, protrude up to about 100 nanometers above
the original surface of the wafer."  Well, Claim 6 says that,
"The spikes protrude above the semiconductor surface by a
distance in a range of about 100 nanometers to about 300
nanometers."

So in dependent Claim 6, it doesn't even call for the
value that's called for in the only spot where it talks about

1    the spikes protruding above the original surface.  "Up to 100

2    nanometers" is less than 100 to 300 nanometers.  So the

3    plaintiff also has suggested that because Claim 6 is dependent,

4    it's got to be more dependent than Claim 1, so in Claim 1, you

5    have the independent claim.

6        "The average height for all the features must be less

7    than 1 micron," so some can be greater than 1 micron, ome less

8    than, the average height is less than 1 micron.  It narrows in

9    Claim 5 where it said, "the height of each of the spikes,"

11:52AM 10   which are the features, "must be less than 1 micron."

11       Then you get to Claim 6, which depends from 5.  It

12   further narrows and says, "Each of the spikes," which are the

13   features in this case, "must be between 100 to 300 nanometers."

14       So in each of these cases, the dependent Claim 6 is

15   further dependent even if "protrude above the semiconductor

16   surface" means height, and "height" and "protrude above the

17   semiconductor surface" are used consistently, and "original

18   surface" is not supported in the claims.  The patentee knew how

19   to use that term, didn't put it in the claims.

11:53AM 20       Any questions, your Honor?

21       THE COURT:  No.

22       Ms. Tawresey.

23       MS. TAWRESEY:  Counsel, can I use your slide 47?

24       MR. SIMMONS:  Sure.

25       MS. TAWRESEY:  Opposing counsel has found one way to

1    read the specification that links three terms together.  As we

2    pointed out, that's not the natural reading of the

3    specification, which provides the clear statement that the

4    protrusion above refers to the original surface.

5           The second point to make, counsel pointed out that

6    this 100 nanometers above the original surface is not within

7    the range of Claim 6, however, this is one particular

8    embodiment, and if you look at the size of the spikes in this

9    description, it says, "The spikes of a typical height of about

11:54AM 10   500 nanometers," and that's smaller than the range that's

11   provided in Claim 1, which says that, "The spikes have an

12   average height of about 1 micrometer," so about less than 1

13   micrometer.  So this is at the very lower end or middle of the

14   range of Claim 1, which makes sense that Claim 6 would have a

15   smaller protrusion range if the features are smaller in

16   Claim 1.

17          THE COURT:  Okay.  All right.  Why don't we do this.

18   We're done with the '446 patent; is that correct?

19          MR. BELANGER:  Yes, your Honor.

11:54AM 20          MR. SIMMONS:  Yes, your Honor.

21          THE COURT:  All right.  Why don't we take a break now,

22   and we'll reconvene a couple minutes after noon.

23          THE CLERK:  All rise.

24          (A recess was taken.)

25          THE CLERK:  All rise.

1          THE COURT:  All right.  We are onto the '467 patent.

2     Mr. Belanger.

3          MR. BELANGER:  Yes, your Honor.  Your Honor, just by

4     way of background, so the patent we just discussed deals with

5     the device and features of a device.  The '467 and the

6     preferred embodiment, those features are created through laser

7     texturing.  The claims of the '467 patent, your Honor, are

8     directed to the process.  The method claims are directed to the

9     process of laser texturing, and I thought just by way of

12:05PM 10     background, I would highlight some aspects of the '467 patent

11     that come from or were described as somewhat in both tutorials.

12          The first is the concept of absorption.  So in the

13     '467 patent, it describes the step.  First you are irradiating

14     the surface of the semiconductor, and that process creates both

15     the spikes and irregularly-shaped features but also creates

16     damage to the semiconductor lattice.  I think both experts

17     describe that in their tutorial.

18          The second step, your Honor, in the '467 patent,

19     generally speaking, is an annealing step, which is included to

12:06PM 20     heal that damage and to make the semiconductor with the

21     irregular shapes, spikes and features, to provide improved

22     performance.

23          If we could go to the next slide.  So this Figure 6

24     shows absorption, and you can see the top of the figure, so

25     each of these drafts deal with a surface that has been textured

1    through the laser texturing, and what is shown is that

2    annealing at increasing temperatures reduces at certain

3    wavelengths the absorption, so as the experts described --

4         THE COURT:  It says "absorptance," which is a word I'm

5    stumbling over.

6         MR. BELANGER:  "Absorptance," which as I understand

7    it, that means the absorption of the electrons or the photons

8    and the energy is absorbed to decreasing its depth.

9         Ms. Tawresey is helpfully jotting down the difference

12:07PM 10    between the two.  Go to the next slide.  So that's the percent

11    of absorption, the percent absorbed, so you see on the side of

12    the graph, your Honor, it shows a percent signal.

13         So if you go to the next slide, this illustrates,

14    again, you see there's a curve with a commercial photodiode,

15    and that's the solid line, and you can see the responsivity

16    curve, so the responsivity is the amount of charge that's

17    pulled out of the device as opposed of simply the amount of

18    energy that's absorbed, and this shows the "no anneal."

19         That's the device that has the laser process applied

12:08PM 20    but no annealing, and then this shows the responsivity

21    improving as the annealing is done at higher, various higher

22    temperatures, so the curve at the top with the 825K labeled A,

23    that's shown as having an improved responsivity or a higher

24    responsivity than both the no anneal, which is the device that

25    simply has the laser texturing without annealing, and you can

1    see that the responsivity for that device is, again, higher

2    than what's labeled as a commercial photodiode, so that's the

3    two basic steps, and their importance is obviously a much more

4    detailed description of those in the specification.

5          So in terms of what the claim language in dispute, the

6    first dispute, and I think this is common across two of the

7    terms.  There is a term "so as to generate," and we submit that

8    that is just a plain and ordinary understood term, that the

9    claim is directed to the result of the prior step, so if you go

12:09PM 10   to the claim itself, the claim indicates that you're

11   irradiating a surface location of a silicon substrate with

12   short laser pulses while exposing the locations to a substance

13   and that so as to generate a plurality of surface inclusions.

14         We don't believe there's any need to rewrite the claim

15   or to choose different words than the ones the inventors chose

16   for their claim.  What defendants want to do is add a mental

17   step or an intention element to this claim by rewriting the

18   claim to say rather than "so as to generate," "for the purpose

19   or intent of generating."

12:10PM 20         That's not in the claim, and that's not what's -- we

21   submit that that would be an inappropriate rewriting of the

22   claim, and "so as to generate" is easily and commonly

23   understood not to require an intent.

24         Is there any questions, your Honor?

25         THE COURT:  No.

1          Mr. Simmons.

2          MR. SIMMONS:  We initially had a meet and confer on

3     these two claim terms, and we agreed, they could be treated

4     together.  This is one claim, and it's a very long claim, very

5     few steps.  We said, yeah, the words mean their plain and

6     ordinary meaning, but if you'll agree that they intended them

7     to have purpose, like the inventors meant to include these

8     steps, so we're saying that the "so as to" is for the purpose

9     of generating, and the "selected to" meant that it was

12:11PM 10     intentionally chosen.

11          Let's look at the claim, I think it makes more sense.

12     This is a method of fabricating a semiconductor.  The thrust of

13     the '467 patent is about laser treating a semiconductor

14     substrate in an atmosphere of a particular gas.

15          In this case, it's FS6 and that the laser will then

16     implant the gas or a constituent of the gas, which in this case

17     is sulfur as it's opened, so it implants sulfur into the

18     surface of the substrate, then you anneal it so as the sulfur

19     is reconstituted, it gives off electrons, which then enhances

12:12PM 20     the density of the charge carriers.

21          We'll go back in the spec. and look at it.  Let's look

22     at the claim, so the claim has two steps.  Irradiating one or

23     more of the surface locations of a silicon substrate with a

24     plurality of temporally short laser pulses while exposing said

25     one or more locations to a substance.

1         They could have stopped there.  It would have been a

2    simpler and easier to read claim, probably easier to prove

3    infringement.  They didn't.  They went on to say, "So as to

4    generate a plurality of surface inclusions containing at least

5    a constituent of said substance in a surface layer of said

6    substrate."  They meant to include that phrase, probably to get

7    over prior art, but they meant to include that phrase.

8         So in order to infringe this claim, it has to be with

9    the view, you irradiate it with the laser so as to generate a

12:12PM 10   plurality of a surface inclusion containing at least a

11   constituent of said substance in a surface layer of said

12   substrate.

13        You can't just merely irradiate the surface with a

14   laser, it's got to be so as to generate a plurality of surface

15   inclusions containing at least a constituent --

16        THE COURT:  You said the mental intent of the person

17   irradiating is what matters?

18        MR. SIMMONS:  It's not the mental intent, it's that

19   the step itself, the purpose of that step is to achieve this.

12:13PM 20   So it's not a mental intent, that's the *Amazon 1-Click* case,

21   it's that this particular step is for the purpose of generating

22   a plurality of surface inclusions.

23        If the step is not chosen for the purpose of

24   generating surface inclusions, that's what's not the "so as to

25   generate a plurality of surface inclusions."

1          THE COURT:  Even if it does generate a plurality of

2     surface inclusions?

3          MR. SIMMONS:  If something else generates the

4     plurality of surface inclusions, it had to be that this was --

5     these are the words that they chose.  They are saying that you

6     had to do this irradiation with the laser pulses in this

7     substance so as to generate these surface inclusions.

8          I think it's more clear when you look at the annealing

9     step.  Your annealing says, "Substrate at an elevated

12:13PM 10     temperature and poor duration."  That elevated temperature and

11     poor duration are selected to enhance a density of charge

12     carriers in said surface layer, so they meant to include that

13     you select the elevated temperature and duration to enhance the

14     density of charge carriers in the surface layer, so that step

15     was put in, they selected the time and temperature, so the

16     duration, the duration and the temperature so that they

17     enhanced the density of the charge carriers.  That's what we

18     mean by there's an intent in the step.  The step was to achieve

19     this particular result.

12:14PM 20          If you look back at the spec., what Mr. Belanger was

21     leaving out was all the part about why they're doing the

22     irradiation with the laser.  They are irradiating it, all the

23     embodiments he showed you, in an FS6 atmosphere.  They talk

24     about other atmospheres that could be used, but FS6 is the

25     preferred embodiment, and that's to drive the sulfur into the

1   silicon, to implant the sulfur as a doping.  That doping

2   doesn't do anything until you anneal it and the silicon

3   releases donor electrons.

4          In the spec., it says, "Exposing the surface to a

5   substance having an electron-donating constituent so as to

6   generate surface inclusions containing a concentration of the

7   electron-donating constituent."

8          Subsequent to that step, the substrate can be annealed

9   at a sufficiently elevated temperature for a selected time

12:15PM 10   duration so as to cause an increase in the charge carry density

11   in the microstructured layer, so when they do this step, they

12   do it on purpose.  That is to generate the plurality of surface

13   inclusions and the annealing temperature and duration are

14   selected to enhance charge carrier density.

15          You can't just irradiate and anneal, otherwise these

16   two steps aren't tied together, that's all we're saying.

17          THE COURT:  Mr. Belanger.

18          MR. BELANGER:  Would it be possible to switch to the

19   Elmo?

12:16PM 20          THE CLERK:  Yes.

21          MR. BELANGER:  So just a basic point, during the meet

22   and confer, we did not agree, as counsel suggested, that "so as

23   to generate" and "for the purpose of" or, sorry, "selected to"

24   are terms of intent or that they have the same meaning.

25          We did argue that they could be argued together, but

1    as you can see from the briefing, they're used in different

2    parts of the claim to mean different things, to modify

3    different steps, and neither of which, your Honor, implies some

4    subjective intent on the part of the infringer, and I think you

5    isolated the issue well when you said that the defendant's

6    method is likely to or one accused of infringing the claim is

7    likely to generate the surface inclusions, and they will argue

8    that it wasn't done intentionally, and, therefore, they avoid

9    infringement of the claim, so that's the "so as to generate."

12:17PM 10        I think counsel also acknowledged what the real intent

11   of their construction is, which is to limit the patent, excuse

12   me, limit the claim to the preferred embodiment, so the areas

13   of preferred embodiment where FS6 is used as the substance or

14   the gas, which is subject to the laser pulses, however, the

15   specification, and this is the '467 patent, Column 6 starting

16   at line 16, says, "By way of example in some embodiments, a

17   silicon surface can be exposed to a sulfur-containing gas while

18   irradiated by the laser pulses."

19        In some other embodiments, CL2 or N2 is employed as

12:17PM 20   the electron donating substance within which the silicon

21   surface is in contact during laser irradiation, so the crux of

22   the dispute, your Honor, if you have, for example, short laser

23   pulses -- can you switch back to the presentation, please, if

24   you go to the claim language.

25        So the real dispute is if you have short laser pulses

1    while exposing the locations to a substance, for example,

2    nitrogen, and you, in fact, generate surface inclusions

3    containing nitrogen, we would submit that's within the scope of

4    the claim, and we understand the crux of the dispute is that

5    defendants would say unless they intended to or had the mental

6    process of trying to include those inclusions, they would avoid

7    infringement.

8            The dispute as to "selected to," if I could touch on

9    that briefly, your Honor, and just keeping the same Claim 1, as

12:19PM 10   we understand defendants' argument on "selected to," they are

11   trying to tie the charge carriers to the surface inclusions,

12   and that just given the way the claim is written, that's not

13   correct.

14           The "selected to" phrase modifies the annealing

15   temperature, and the temperature is what's selected to enhance

16   the density of charge carriers and the surface layer.  That's

17   not saying that the substance where the laser is performed or

18   the surface exclusions are selected to enhance charge carrier

19   density, it's saying that the annealing temperatures is so

12:19PM 20   selected.

21           So we don't believe that it would be appropriate to

22   conflate those two terms and to tie the "selected to" language,

23   which is modifying the annealing temperature and tie those to

24   the surface inclusions, and we think it's further inappropriate

25   to add a mental step or mental intent to the claim to avoid

1    infringement.

2         THE COURT:  Anything further, Mr. Simmons?

3         MR. SIMMONS:  Yes, just briefly, your Honor.  They

4    chose the words in the claim, they being the patentholder, so

5    when they said "selected to enhance the density of the charge

6    carriers in the surface layer," that step was for the purpose

7    of enhancing charge carrier density, so the step is chosen to

8    achieve this purpose.

9         With respect to when we say, "the temperature and

12:20PM 10   duration were selected to enhance the density of charge

11   carriers," we're not saying it, the claim says it, so that's

12   all we're saying.

13        We're not trying to limit it to the preferred

14   embodiment of FS6, we're saying it's got to be at a constituent

15   that donates electrons, which donates charge carriers, so

16   that's all we're saying, so it doesn't have to be limited

17   to sulfur or FS6.

18        Any questions, your Honor?

19        THE COURT:  No.

12:21PM 20   MR. BELANGER:  Just I guess in closing, we're not --

21   we're happy to leave the claims as written, and we're not

22   asking you to rewrite them, we're just saying that the claims

23   should be read in their ordinary way using the terms that are

24   in the claims as opposed to a substituted language that would

25   require intent.

1          THE COURT:  Okay.  Go on to "Charge Carriers."

2          MR. BELANGER:  So I think this, again, is a similar,

3     if not the same issue, your Honor, which is our proposed

4     definition of "charge carriers" are electrons or holes.  This

5     is on page 52 of our slides, your Honor.

6          If you look at the claim themselves, the charge

7     carriers are not tied in the claim in any way to the surface

8     inclusions.  It doesn't -- so, and if you look at the preferred

9     embodiment, your Honor, it says the term, ""Charge carrier

12:22PM 10   density" is known to those having ordinary skill in the art,"

11    so, again, it says clearly and specifically in the preferred

12    embodiment that charge carriers are being used in their

13    ordinary and customary way.  There's no special re-definement

14    that "charge carrier" or "charge carrier density" is being

15    limited to the surface inclusions.

16         So, in our view "charge carriers" has an ordinary

17    accepted meaning.  We've picked it.  It's clear that the

18    defendants' instruction is not the ordinary and accepted

19    meaning of "charge carriers."

12:22PM 20         THE COURT:  Mr. Simmons.

21         MR. SIMMONS:  I think we don't dispute that charge

22    carriers in the normal meaning are electrons or holes, it's

23    just how it's used in this claim, where it says, "selected to

24    enhance a density of charge carriers," it's got to be those

25    electrons or holes were from the surface inclusions in the

1    prior step.

2         So we're just looking for clarity that what they meant

3    is they're annealling the substrate to the elevated temperature

4    and duration selected to enhance a density of charge carriers

5    in the surface layer.  There were charge carriers in the

6    surface layer, they were enhanced because of the inclusions

7    that were annealed to cause them to activate.

8         When you look at their specification, they've referred

9    to the preferred embodiment, so shall we.  It talks about

12:23PM 10   sulfur in the microstructured layer before annealing is

11   incorporated in silicon such that its donor electrons do not

12   substantially contribute to conduction.

13        And the annealing step, according to the teachings of

14   the invention, causes atomic bond rearrangements in the

15   microstructure layer so as to free up donor electrons for

16   contributing to electroconduction.

17        So it's the fact that the charge carriers come from

18   the constituent in the claim.  It's charge carriers as in this

19   claim that we're looking to construe, not the term "charge

12:24PM 20   carrier" generally in the spec., so it's electrons or holes

21   contributed by the surface inclusion from the prior step.

22        Any questions, your Honor?

23        THE COURT:  No.

24        MR. BELANGER:  Your Honor, if I could just point you

25   back to the claim, and I think defendants' argument, there's no

1    link in the claim saying that the charge carriers are from the

2    surface inclusions.  In fact, just in terms of the antecedent

3    basis, you'll see it says, A, "Density charge carrier in said

4    surface layer," so typically if it said -- if it wanted to

5    refer back to something earlier, the claim could do that.

6         Instead, the density charge carriers is introduced

7    with the term A suggesting that it is not referring to

8    something antecedent in the claim.

9         Now, counsel has pointed to one of the embodiments

12:25PM 10    where the annealing step does enhance charge carrier density

11    that is contributed by the surface inclusions, however, the

12    specification also describes alternate embodiments where that's

13    not the case, and so the two steps of the method are clear on

14    their face, and there's no reason to read in the extra

15    limitation from the preferred embodiment tieing the density of

16    charge carriers to the surface inclusions.

17         THE COURT:  Okay.  All right.  We're going on now to

18    the '591 patent.

19         MR. BELANGER:  Yes, your Honor.  So the '591 patent,

12:26PM 20    so the first two patents we discussed were Harvard patents,

21    your Honor, the patents where the original applications were

22    filed by Harvard.  The '591 is a patent filed by Sionyx, and

23    while there's some overlap in terms of technology, it is

24    directed generally to an imaging device, including CCDs, which

25    you heard some discussion at length and CMOS imaging devices.

1        The patent does describe the use of texture and

2   textured regions to improve the performance of those devices,

3   and it is directed to improving the performance of those

4   devices in a way also that you've heard during the tutorial

5   where the texture can be used to redirect the radiation and to

6   absorb the electromagnetic radiation to increase the quantum

7   efficiency of the device and the patent is directed to varying

8   the use and qualities of that texture to optimize various

9   aspects of the device performance.

12:27PM 10        The patent talks about specifically changing the type

11   and location of the texture in a way to tune various aspects of

12   the device as well, so the first term that's at issue, your

13   Honor, which we think is relatively straightforward in terms of

14   the dispute, we've proposed that an imager device actually

15   produces an image, whereas defendants have proposed a

16   construction that would not require that the imager device

17   produce an image.

18        We think that just the ordinary usage of the term,

19   "imager device" as it is used in the claim, in the

12:28PM 20   specification, implies the generation of an image, that is an

21   imager, and so we think its ordinary meaning should be adopted,

22   which is plaintiffs' definition as opposed to defendants'.

23        This is consistent with the specification.  This is

24   our slide 63, where the background talks about silicon imaging

25   devices used in various technologies, such as digital cameras,

1    optical mice, video cameras, cell phones and the like.  Each of

2    those exemplary devices have a sensor that produces an image.

3    That's well-known in the art, so that in essence is the dispute

4    with this term is whether this imager requires an image or

5    merely absorption of the electromagnetic radiation.

6              THE COURT:  Okay.

7              MR. SIMMONS:  Your Honor, our construction of a

8    photosensitive imager device is what's supported by the

9    specification.  It's broad, it just means a device that absorbs

12:29PM 10    and detects light, electromagnetic radiation.  An "array" is an

11    array of photosensitive imager devices.  The dispute is whether

12    you have to incorporate a conversion to digital image, and that

13    won't make sense in terms of the context of the array.

14              The plaintiffs rely on passing mentions in the

15    specification that these devices can be used in various

16    technologies, like digital cameras, optical mice, video cameras

17    and the like.  They also say that these low-level CMOS centers,

18    CMOS centers are typically manufactured from silicon and can

19    convert visible light into a photocurrent and ultimately into a

12:30PM 20    digital image.

21              Nowhere in the specification does it show you the

22    circuitry necessary to take what's at the low-level imager

23    device, which is whether it's a CMOS or the like and convert

24    that into what's shown on your cell phone display or from a

25    digital camera.  That's not what's in this patent.  This patent

1    talks about a pixel and an array of pixels.

2         Our construction encompasses a pixel, and that's

3    described throughout the '591 patent specification.

4    Plaintiff's construction does not.  Our construction is

5    consistent with the array of Claim 11 since the specification

6    explicitly teaches an array of pixels.

7         Claim 11 of the '591 patent says, "A photosensitive

8    image array comprising at least two photosensitive image or

9    devices of Claim 1."  These are construction, it's an array of

12:30PM 10   devices that absorb and detect electromagnetic radiation.

11        Using plaintiff's construction, that one makes sense.

12   It would be an array of digital cameras.  Claim 12 would even

13   further not make sense, which is further comprising at least

14   one trench isolation position between the two, the at least two

15   photosensitive imager devices, and now we put the trench

16   between the digital cameras, but you can see that the

17   construction would not make sense.

18        So we say that the photosensitive imager device should

19   be used as it's used in the context of this particular patent,

12:31PM 20   which is describing a pixel, and that pixel is for basically

21   absorbing and detecting electromagnetic radiation.  It's not

22   more complicated to convert an incident radiation into a

23   digital image.

24        Any questions, your Honor?

25        THE COURT:  No, thank you.

1          MR. BELANGER:  Your Honor, I think counsel's argument

2     may have narrowed the dispute between the parties, so he's

3     referred in his argument to the pixel.  The pixel was known in

4     the art as a contraction for a picture --

5          THE COURT:  I'm sorry, a pixel is known as what?

6          MR. BELANGER:  As a contraction for a picture element,

7     and so the dispute as to whether the device as claimed would be

8     generating an image if it is a picture element or an array of

9     picture elements, I think that would go a long way to resolving

12:32PM 10     the dispute between the parties.

11          We had understood defendants' construction up until

12     the argument to also include a photodiode, which would simply

13     sense light but would not be used in any way to create an

14     image, so no one would think of that as an imager device

15     because its construction is not to generate an image, it is to

16     simply sense the presence or absence of light.

17          THE COURT:  Does pixel actually create an image as

18     opposed to --

19          MR. BELANGER:  A portion of an image, your Honor.

20          THE COURT:  A portion of an image.

21          MR. BELANGER:  That's right.  So if you think about

22     when megapixel cameras is sometimes commonly used, that would

23     be the number of pictured elements within the image sensor.

24     Each one would be a digital point in the image that are all

25     aligned.

1        THE COURT:  The digital point itself, it's like the

2   Seurat painting, right, it's red or it's blue or it's green or

3   whatever it is?

4        MR. BELANGER:  Correct.  But our point, your Honor, is

5   that the patent is directed towards images or devices, not

6   merely light-sensing devices, and that's the claim term.

7        THE COURT:  Mr. Simmons.

8        MR. SIMMONS:  I think he hit it on the head, a pixel

9   is a subcomponent of an image, and a photosensitive imager

10  device could be a pixel.  An array of them could be a plurality

11  of photosensitive image or devices, so I think that going to

12  say that you need to convert it into a digital image is not

13  required in this claim and not supported by the specification.

14       THE COURT:  Okay.  All right.  "Coupled To, Coupling

15  To."

16       MR. BELANGER:  Again, your Honor, I think this is an

17  example where the plain meaning of the words is sufficient.

18  So, plain and ordinary understanding of "coupling" or "coupled

19  to" encompasses both direct or indirect contact.  Defendant's

20  construction requires affixed or joined, which is not ordinary

21  meaning of "coupled to" nor is it the way that "coupled to" is

22  used in the specification, however, as the briefing has

23  progressed, we don't understand the actual dispute or the

24  actual issue to be whether "coupled to" requires it to be

25  joined or fixed, rather, we understand that defendants are

1    trying to argue that coupled to requires some separate portion

2    as opposed to the texture being part of the bulk substrate, so

3    that's what we understand their argument to be after the

4    briefing.

5         That their original proposed construction is wrong is

6    clear from the specification.  If you look at column 10,

7    lines 27 to 41, it talks about a lens that is optically coupled

8    to the semiconductor substrate.  It says, "A reflected layer

9    can be coupled to the semiconductor substrate, and a lens can

10   be optically coupled to the semiconductor substrate and

11   positioned to focus incident electromagnetic radiation into the

12   substrate."

13        Clearly, the lens is not joined or affixed to the

14   substrate, rather it is separate from, and the coupling that's

15   described in the claim is the fact that light passes through

16   the lens to the substrate.

17        THE COURT:  Well, "coupled to" can't just mean in

18   contact with, right?  My pen is in contact with my paper right

19   now, but it's not coupled in any meaningful way, right, it has

20   to have a relationship of some kind?

21        MR. BELANGER:  Correct.

22        THE COURT:  And if it isn't physically affixed or

23   joined to, I mean, you could be coupled because you have a

24   relationship, in fact, you don't have to be in contact to be

25   coupled, but it has to be connected either physically or in

1    some other way; does it not?

2         MR. BELANGER:  Yes, and we fully hear that optically

3    coupled, for example, it's used to show that the optical, the

4    light travels between one element and the other.  Typically,

5    you are talking about things being electrically coupled.  They

6    might be connected by a wire.

7         You would say that theirs would be coupled, even

8    though they're not physically affixed or joined, but I think

9    the real argument, as we understand it, is trying to remove the

12:37PM  10   preferred embodiment from the scope of the claims where the

11   texture is formed in the semiconductor substrate as opposed to

12   the texture being glued onto the substrate, so as we understand

13   from the briefing, they appear to be trying to exclude the

14   preferred embodiment where the texture is formed as part of the

15   bulk substrate.

16        For example, in figure 10 of the '591 patent, it

17   describes a region 90, which is the textured region, and then

18   it also describes a highly doped region 46, excuse me, 76, and

19   it shows that it should be noted that in one aspect, the highly

12:38PM  20   doped region can be the textured region, in other words,

21   textured surface features can be formed on or in the highly

22   doped region, so that's 76.

23        So, as you heard in the tutorial, you could start with

24   a bulk substrate, you could dope that substrate through various

25   techniques, and then this is describing creating the texture

1    within the bulk substrate.  That is in our view coupled to the

2    substrate.  As we understand defendants' definition, that would

3    not be coupled to the substrate.

4          If I could switch to the Elmo, I could show you one

5    other example.

6          So this is another description of that same concept.

7          THE COURT:  I'm sorry, what's that from?

8          MR. BELANGER:  This is from column 11 of the '591

9    patent, your Honor.

12:39PM 10          THE COURT:  Okay.

11          MR. BELANGER:  This is the description of how the

12   texture is applied to the device, so it says in one aspect the

13   texturing process can be performed during the manufacture of

14   the photosensitive device, and then in another aspect the

15   texturing process can be performed on a photosensitive device

16   that has previously been made, but in either case, it talks

17   about the material layers are removed to expose the

18   semiconductor substrate or bulk material upon which a textured

19   region may be formed, and it goes on to talk about how one

12:40PM 20   effective method of producing a textured region is through

21   laser processing.

22          You've heard an extensive description of laser

23   processing being one technique to create a textured surface on

24   silicon, so that texture is coupled to the substrate, but it's

25   formed as part of it as a separate step, so that's what the

1   patent describes as "coupled to" and we believe consistent with

2   its ordinary meaning, your Honor.

3          THE COURT:  Mr. Simmons.

4          MR. SIMMONS:  Before I start, I just want to point out

5   when the patentee uses, "forming" in the specification, they

6   use it differently than "coupled" in the specification.  So,

7   there's two different words, "forming" and "coupling."  Some

8   parts of the device are formed, some parts are coupled.  They

9   needed to use the two words.  They used them differently.

12:41PM 10       When they used the term, "coupled," they're talking

11  about joining two mechanical devices.  Any time coupled is used

12  by itself, it's with respect to the mechanical sense of the

13  word.  It's coupled to.  So one layer is coupled to another

14  layer.  So that's joining it, just like your pen would be

15  coupled to the desk if you used Super Glue.  It would be

16  affixed or joined to the desk, right, same thing with layers

17  that are used in this patent specification, so the real dispute

18  is the type of connection between the claimed elements.

19         The plaintiffs admit that there's at least an

12:41PM 20  embodiment where the textured region is adhered to the

21  substrate.  In their brief at page 32, they say, "One

22  embodiment taught in the specification does adhere a textured

23  region to the pixel."  That's the coupling we're talking about,

24  not forming it.  They didn't grow it in the substrate, they

25  coupled it to by adhering it.

1          Let's look at the drawings of the '591 patent.  They

2     showed you figure 10.  Figure 7, 8 and 9 show you a nice

3     progression where they use the term, "coupled."  So you look at

4     figure 8 and figure 7.  So, before 8, you see 7.  There's that

5     layer 82, and it says, "A carrier substrate or a carrier wafer

6     88," that's this, "can be coupled to the photosensing pixel,"

7     that's this.  So you can see those two layers are the same, and

8     they couple to it a carrier wafer.

9          In the specification with respect to figure 9, they

12:42PM 10   talk about a texture region 90, that's down here, and they say,

11    "The textured region 90 is coupled to the semiconductor

12    substrate 72."  That's here.  So you can see that that layer

13    was the same, and they coupled to it, they coupled to the

14    semiconductor substrate 72 a textured region 90.  That's the

15    type of coupling we're talking about.

16          Mr. Belanger pointed you to sections of the

17    specification, and all those specification sections where they

18    said, "forming," that's different than coupling.  The other

19    embodiment that is described by the plaintiffs is a different

12:43PM 20   term.

21          In the claims, they use the two different words, so in

22    Claim 13, all the independent claims say "forming and coupling"

23    or "formed and coupled."  They have, "forming a textured

24    region, forming integrated circuitry in a substantially planar

25    surface and coupling the electrical transfer element to the

1    semiconductor substrate."  They knew how to use those words.

2    They are different words.  They could have said, "forming,

3    forming, forming."  You shouldn't rewrite the claims now to

4    suit the plaintiffs trying to read the claims broader.

5         There was a similar case *Chef America*, it's an old

6    case.  In *Chef America,* the claim terms said, "Baking the bread

7    to 400 degrees."  The Court said, Well, wait a minute, baking

8    the bread to 400 degrees would have an absurd result, you'd

9    burn the bread, right, it would combust.  What you meant was

12:43PM 10    baking it at 400 degrees, right, but let me go look at the

11   specification.  I know you want to rewrite it to be baking the

12   bread at 400 degrees.  When I look at the spec, though, you

13   consistently said, "Baking the bread to 400 degrees."  So even

14   though that's an absurd result, we're not going to rewrite the

15   claim.

16        It's the same thing here.  We shouldn't rewrite the

17   claim.  This one doesn't have an absurd result, but you

18   shouldn't rewrite the claim now because they want it to be

19   broader for purposes of infringement analysis.  They chose the

12:44PM 20    word, "coupling."  "Coupling" means mechanically joining that.

21        Any questions, your Honor?

22        THE COURT:  No.

23        Any response, Mr. Belanger?

24        MR. BELANGER:  Yes, your Honor.  So counsel's example,

25   he excerpted certain parts of column 16 of the '591 patent, and

1    I think it's important, first of all, to read that in context,

2    and I think the quotes in context don't say what he suggested

3    they say.

4         So there is a statement with respect to figure 8 that

5    a carrier wafer 88 can be coupled to the photosensing pixel,

6    and then it goes on to say with respect to the carrier

7    substrate wafer 88, that in one aspect, and this is at line 11,

8    your Honor, it says, "In one aspect, for example, the coupling

9    can occur by way of a bonding layer or adhesive layer disposed

12:45PM 10   on the device, for example, on the passivation layer," so with

11   respect to the carrier substrate, it gives that as one

12   non-limiting example of coupling.

13        When it gets to the description of the textured

14   region, however, it does also say, "The textured region is

15   coupled to the semiconductor substrate 72 opposite the doped

16   region," but the earlier description of how the textured region

17   is formed consistently describes using a laser irradiation of

18   that semiconductor substrate, and so we're not arguing that the

19   claim should be rewritten, and we're not arguing that coupled

12:46PM 20   to can't encompass bonding or gluing together, we're saying

21   that it encompasses both bonding or gluing together and forming

22   the texture within the semiconductor substrate, so it's broad

23   enough to include a situation, as counsel described, where

24   something is bonded or glued together.

25        That's clearly an example of what's done with the

1    carrier substrate, but "coupled to" also includes the example

2    as is described in the prior column where the column 11, where

3    the texture is formed by exposing the semiconductor substrate

4    or bulk material to, for example, a laser process or some other

5    texturing process.

6            If we could go back to the presentation and just look

7    at the claim.  So, similarly, we're not -- and one other point

8    that counsel made that I disagree with, he said that coupling

9    is always used in the patent to describe some physical joining

12:47PM 10    of parts, and that's just simply not true, as they admit, and a

11    lens is optically coupled to the semiconductor substrate.

12            It's not talking about it being physically joined or

13    glued, it's talking about it being optically connected so that

14    they interact together, that the light that goes through the

15    lens, interacts with the semiconductor substrate, so coupling

16    is used in the claims and in the specification to encompass not

17    simply a mechanical joining of two parts but also an optical or

18    electrical joining of parts.

19            And as the claim talks about the textured region

12:48PM 20    coupled to the semiconductor substrate, it's clearly when the

21    laser or other texturing process is applied to the substrate,

22    it's clear that the textured region is coupled to that

23    substrate electrically and optically, as has been described at

24    length, the textured region.  The purpose for including the

25    textured region, as described in the patent, is to interact

1    with the light that passes through the semiconductor substrate

2    and to reflect and refract the light back into that substrate

3    so that it can be collected to enhance and improve the

4    performance of the device.

5         So we would submit, your Honor, that "coupled to"

6    should be read in its ordinary way rather than limited to

7    physical or mechanical joining, as defendants suggest.

8         Any questions, your Honor?

9         THE COURT:  No.

12:48PM 10    MR. SIMMONS:  The only thing I would like to clarify,

11   your Honor, if I wasn't clear is when "coupled" is used alone,

12   it's not modified by electrically or optically, in this patent

13   specification, and I think in the normal use of the word, it

14   means "mechanically coupled."

15        "Electrically coupled" and "optically coupled" have

16   different meanings, but in this patent and in the claims, when

17   it just says coupled, and it doesn't say "electrically coupled"

18   or "optically coupled," it means "mechanically coupled," which

19   is affixed or joined.  "Optically coupled" doesn't require

12:49PM 20   direct contact, doesn't require contact, indirect or direct.

21        You can shine your -- remote control your TV, it's

22   optically coupled, but it's not contacting it at all, so just

23   for clarity, "coupled," when it's used alone means

24   "mechanically coupled" in this patent.

25        THE COURT:  Okay.

1          MR. SIMMONS:  Thank you, your Honor.

2          THE COURT:  It's about ten minutes to one.  I know

3     we're almost there, and if I had better endurance, I would just

4     say why don't we go through, but I think I'll be more attentive

5     if I have something to eat for lunch, so I would propose that

6     we break now.  I'm conscious that you're not working for free,

7     and in a perfect world, as I said, I'd go straight through, but

8     I think we have three more terms or sets of terms to go.  Is

9     that right?

12:50PM 10          MR. SIMMONS:  I think three, your Honor.

11          THE COURT:  I appreciate that you have been concise

12     and efficient and so forth, but why don't we reconvene at ten

13     minutes to two, and we'll keep going at that point.

14          THE CLERK:  All rise.

15          (A recess was taken.)

16          THE CLERK:  All rise.  Thank you.  You may be seated.

17     Court is now back in session.

18          THE COURT:  All right.  I'm content and alert.  Let's

19     see how long that lasts, and we'll go on to "Positioned to

01:51PM 20     interact with electromagnetic radiation."

21          MR. BELANGER:  So, your Honor, the dispute between the

22     parties, as we understand it, has to do with the word

23     "interact," and just to distill the issue, we believe the claim

24     requires that the light interact with the textured region that

25     is consistently described as the purpose of including texture

to interact with light, whereas defendants' proposed

construction, as we understand it, would actually weed out the

word, "interact," and just if something was positioned but did

not interact with light, that would fall within the scope of

the claim, and if you look at, so, what is positioned to

interact with the electromagnetic radiation or light, it's the

textured region, which is coupled to the semiconductor

substrate.

The method claim and the other independent claim have

the same phrase, and we think it has the same meaning where the

textured region is formed and positioned in such a way as to

interact with the electromagnetic radiation or light, so that's

in Claims 1, 13 and 23.

So, your Honor, in the specification, and I will give

you a case cite for this proposition, so it is appropriate to

define a claim term in a way that is consistent with what the

inventors believed to be their invention.

That's standard law, and when the inventor

consistently described something as being their invention, it

is appropriate to define the claim terms in that concept, in

that context, and the case cite for you for that proposition is

the *Honeywell International vs. ITT Industries* case, 452 F.3d

1361, and that's a 2004 Federal Circuit case.

If you read the disclosure of the '591, your Honor,

what it describes is taking a traditional imager device that

1    has certain light absorption and detection properties and

2    adding to that device texture that is positioned and configured

3    in such a way as to improve the performance of the device.

4         So in the claim language, it talks about the texture

5    being positioned to interact with the light, and we think the

6    word "interact" should be given meaning as described in the

7    specification.

8         So, for example, in this portion of the specification,

9    the patent describes traditional imagers have certain

01:54PM 10   performance characteristics.  You heard both tutorials describe

11   this, where depending on the thickness of the silicon, certain

12   wavelengths of light are absorbed more or less efficiently, and

13   there are various other device tradeoffs.

14        What the patent describes as the devices of the

15   present disclosure or the present invention increase the

16   absorption of semiconductor materials by decreasing the

17   effective absorption length to longer wavelengths as compared

18   to traditional materials, and so how does the patent describe

19   doing that?  It describes doing that by positioning and forming

01:54PM 20   texture in an appropriate way so that, as has been described

21   previously in the tutorials and as we've been discussing in the

22   context of the earlier patents, the light can be refracted,

23   reflected and better absorbed within the semiconductor.

24        It also at the bottom says that by appropriately

25   placing the texture and configuring the texture in addition to

1   increasing the effective absorption length, the response rate,

2   or response speed of the device can be increased because you

3   can use thinner semiconductor materials.

4       That's the last part of this phrase, and that's

5   consistent with what you heard in the tutorials, your Honor, so

6   the problem that is intended to be solved by the '591 patent is

7   a selection of appropriate location and configuration of

8   texture to improve the device's performance in this way, so

9   what is the -- how does the texture improve this performance?

01:55PM 10   There are two basic improvements or effects of the texture that

11   are described at length in the specification.

12       First, this is set forth in column 14, the location

13   the texture is used to provide enhancement and/or filtering of

14   the incoming electromagnetic radiation.  So, in our view --

15       THE COURT:  You've changed that to "enhanced

16   response."  And why is that?  I mean, even assuming I adopt

17   what's in the specification, you haven't tracked it quite

18   exactly.

19       MR. BELANGER:  So as we discussed earlier in the

01:56PM 20   tutorial, the enhancements that's being described is enhancing

21   the response of the device, so we think it's consistently used

22   when it talks about enhancement, it talks about enhancing the

23   response of the device.

24       We would be fine with the enhancement or filtering,

25   but we believe it's clear that the enhancement that's being

1    discussed is enhancing the response of the device.

2         This is clearly what's described as the tuning of the

3    device, which is accomplished by locating the texture in a

4    certain way to either enhance the response by the reflection or

5    to possibly filter a certain wavelength's light depending on

6    the size, shape and placement of the texture.

7         In this example, it talks about purposefully filtering

8    blue wavelengths through the appropriate placement of texture,

9    and then it talks about in another example, you are increasing

01:57PM 10    the absorption of the green wavelengths, and so you're thereby

11    increasing the absorption of those wavelengths, so that's when

12    the texture is positioned, it's positioned in such a way as to

13    interact with the light to either enhance the response of the

14    device or to filter certain wavelengths of light.

15         We'll go to the next slide.  So this is another

16    discussion of the same concept, and I've got several of these

17    in here, and the fact that there's several in here is important

18    based on the case law, your Honor, because it is, and this is

19    the *Irdeto* case, which is cited in our brief, which stands for

01:58PM 20    the proposition that the repeated, consistent and exclusive use

21    of a term in a particular manner should be considered when

22    interpreting that claim, and the positioning of the texture is

23    consistently repeatedly and exclusively used to describe either

24    enhancing the performance of the device or by enhancing

25    responsivity or by filtering specific wavelengths, so that's

1        this column 10 citation talks about manipulating feature size,

2        dimension, material type, doping profiles and location to allow

3        the region to be tunable for a specific wavelength, and so that

4        is a description of the filtering that is one of the reasons

5        why you position the texture to interact with the

6        electromagnetic radiation that's described in the spec.

7                The other is at the bottom right, it describes that

8        you're locating the texture to facilitate an enhanced

9        absorption, and, again, that would improve the performance of

01:59PM 10   the device.

11               Can you go to the next slide.  So that's the basic

12       issue, your Honor, is we think consistent with the teachings in

13       the specification, enhancement of the responsivity and

14       filtering are consistently described as the reason why you

15       position the texture in a certain way, and we think defendants'

16       construction is incorrect because it doesn't give effect to the

17       term, "interact."

18               THE COURT:  Okay.

19               MR. SIMMONS:  You can leave that up for one second,

20       Lisa.

21               Your Honor, you'll notice that in the two locations in

22       the specification on this page and on the prior page, it never

23       says "interact" means enhanced filtering or means "enhanced

24       response" or "filtering."  It never uses the term, "interact"

25       in either of these spots.  It talks about tuning.  Tuning can

1    be accomplished by manipulating feature size, dimensions, and

2    material type, and dopants.  It never uses "interact."

3    Interact is not used in the specification to mean "enhanced

4    response and/or filtering."

5         We can switch to our slides, please.  Thank you.  So

6    the real dispute is whether "positioned to interact with

7    electromagnetic radiation" should include "enhanced response"

8    or "filtering" in place of "interact."  That's what the dispute

9    is.

02:01PM 10         The patentholder has actually advanced this argument

11   before, so Hamamatsu Corporation has also filed an inter

12   partes' review request at the United States Patent and

13   Trademark Office challenging the validity of the '591 patent,

14   and the patentholder put forth the same type of construction of

15   "positioned to interact with," and twice a panel of three

16   administrative law judges, who are trained in this technology

17   and who are also trained in patent law found that the

18   specification never equates the term, "interact with" providing

19   "enhanced response for filtering."

02:01PM 20         They're doing the construction of the term.  They're

21   saying, Look, you weren't your own lexicographer, you didn't

22   say "interact" is equated to providing "enhanced response or

23   filtering," and that's why you should not do it here.

24         The same reason, "interaction" is used broadly in the

25   specification in describing the prior art.  The prior art

1    lacked "enhanced response or filtering."  They're saying their

2    overall invention provides enhanced response or filtering, not

3    that the interaction with electromagnetic radiation positioning

4    it to interact with provides enhanced response or filtering.

5         If you look at the specification at column 1, lines 15

6    to 16, the interaction of light with semiconductor materials

7    has been a significant invention.  That's described in the

8    prior art.  The prior art lacks enhanced response or filtering,

9    so, accordingly, there's no need to incorporate into interact

02:02PM 10   this enhanced response or filtering, and with respect to the

11   case that Mr. Belanger was referencing, in that case, they're

12   talking about preferred embodiments would say that that's what

13   this term should mean.

14        The specification doesn't support that construction.

15   There's nothing in the passage of the spec. he points to where

16   it says "interact" means "enhanced response or filtering."

17        Any questions, your Honor?

18        THE COURT:  Yes.  I'm not sure I understand this

19   dispute.  I'm struggling because it looks to me like your

02:03PM 20   construction is broader than the plaintiffs --

21        MR. SIMMONS:  Right.

22        THE COURT:  -- which is unusual.  And yours doesn't

23   quite match either.  I mean, "interact" doesn't mean "receive."

24   "Receiving" is kind of a passive thing, "interact" sort of

25   seems to involve things going in both directions.

1          MR. SIMMONS:  We could speculate that the plaintiffs

2     want to narrow the construction so they could avoid prior art

3     references.  I don't know that's why they want it, but, you

4     know, with respect to our construction, we're just saying the

5     claim merely says that, "Forming a textured region on a

6     semiconductor substrate wherein the semiconductor substrate is

7     a substantial planar surface opposite the textured region," I'm

8     sorry, "and wherein the textured region is formed in a position

9     to interact with electromagnetic radiation," that's why we say

02:03PM 10     it's there to receive light, it's going to interact with the

11     light, so the textured region is there to get the light.

12          Does it have to be receive electromagnetic radiation?

13     It could be that it's located on the purpose.

14          THE COURT:  But it's not just receiving, right, it's

15     also absorbing, reflecting, diffusing.  It's doing things other

16     than receiving, isn't it?

17          MR. SIMMONS:  I think if those terms were in this

18     construction, I don't think it would hurt it.  If it was to

19     receive and absorb electromagnetic radiation, I think that

02:04PM 20     would be supported by interacting with electromagnetic

21     radiation, but "enhanced response and/or filtering," that's

22     much more complicated.

23          That's not just receiving light and absorbing the

24     light, that's talking about something that's specific to their

25     alleged invention.  It's not in the claim, at least that term

1    isn't.

2              THE COURT:  Mr. Belanger.

3              MR. BELANGER:  Yes, your Honor, so a few things.

4    First, counsel's mention of the inter partes' review process,

5    first, I am not aware of anything that says that the patent

6    office judges are trained in this technology.

7              THE COURT:  Got to be better trained than I am.

8              MR. BELANGER:  But the key is they're applying a

9    totally different legal standard than your Honor has to apply,

02:05PM 10    and they did so on a preliminary basis, so the decision that

11    you referred to was a decision under the broadest reasonable

12    interpretation standard, which is a standard for whether to

13    begin an inter partes' review proceeding, and the Federal

14    Circuit has made clear that's a different standard than the one

15    your Honor is asked to apply in this case, so that definition

16    or, excuse me, that finding is neither binding on this Court

17    nor particularly useful because it's applied in a different

18    legal standard.

19              As far as your question about whether "interact"

02:05PM 20    connotes absorbing, enhancing or filtering, that is, in fact,

21    what we believe the crux of the dispute is.  We would be fine

22    with a definition that encompassed the texture being placed so

23    that it absorbs, enhances or filters the incoming light.

24              What we believe the defendants' construction is

25    intended to account for is a texture that simply has light

1    simply passing through without interaction or without change or

2    effect, and so clearly the purpose of the patent, the purpose

3    of the invention, as I think counsel acknowledged, is to place

4    the texture in a way that interacts with light to get some

5    beneficial effect, and that would not be met by simply

6    receiving light, there needs to be some interaction, and that's

7    what we were intending to capture with our definition, and that

8    is the crux of the dispute.

9         If the light is absorbed, refracted, reflected, any of

02:07PM 10    the changes to the light due to the interaction with the

11    texture that are described at length in the patent, that would

12    meet the interacting limitation.  If it was simply passing

13    through, not interacting, you could say it's received but not

14    interacting.  I think that would be inappropriately broad

15    construction.

16         MR. SIMMONS:  Just to clarify, your Honor, when we

17    talked about the PTO proceeding, those administrative law

18    judges found that they never equate in the specification

19    "interact" with "enhanced response or filtering."  It wasn't a

02:07PM 20    construction of the term.  They said, "This patentee didn't act

21    as a lexicographer and equate "interact" with "enhanced

22    response or filtering.""  It supports our position that

23    "interact" is used in a broader sense.

24         "Interact" also is used to talk about it interacts

25    with the semiconductor substrate itself.  Light interacts with

1    silicon, right, so this texture is placed to interact with

2    light.  It is the same thing as the silicon interacts with

3    light.  Parts of the silicon that are blocked from light don't

4    interact with it.

5           The textured region that would be covered or blocked

6    wouldn't interact with light, so if it's positioned to interact

7    with electromagnetic radiation, it's positioned to receive and

8    absorb, but it doesn't have to provide enhanced response and/or

9    filtering.  Those terms go beyond the understanding of

02:08PM 10    interact, and both experts used "interact" in their

11    presentations today to talk about silicon interacting with

12    light, not that the silicon was providing enhanced response or

13    filtering.

14           THE COURT:  Okay.

15           MR. BELANGER:  If I, your Honor, can I show you very

16    briefly a picture from the tutorial to try to illustrate our

17    position?

18           THE COURT:  Yes.

19           MR. BELANGER:  So counsel just said that it's known

02:09PM 20    that light interacts with silicon, and I think the point, our

21    point in construing this term is the claim additionally

22    requires the placement of texture so as to interact with light.

23           If the claim was simply describing light coming into

24    the silicon, there would be no need or no purpose for adding

25    the texture.  The patent clearly describes the purpose of

1    adding the texture.  It's so that the light will interact with

2    that texture.

3          As illustrated in the tutorial, for example, the light

4    can interact with a texture through refraction, reflection, and

5    it is those types of interactions are the ones that we're

6    trying to capture, your Honor, that the light is actually

7    interacting with that texture in a way that changes it in some

8    way, as your Honor mentioned earlier in your observations, that

9    the interaction that is being described is some actual change

02:10PM 10    to the light, whether it's reflecting the light or refracting

11    the light in order to enhance the response of the device.

12          So that's the basic dispute, your Honor.

13          THE COURT:  Okay.  Let's move onto "transfer element."

14          MR. BELANGER:  So, "transfer element," your Honor,

15    this is a term of art that is known in the CMOS and CCD image

16    sensor art.  The difference in the two constructions is

17    transfer element as commonly understood by those of ordinary

18    skill in this art would refer to integrated circuitry that is

19    used to read or transfer charge from the photosensitive pixel.

02:11PM 20          I think when each of the two experts in their tutorial

21    were describing how either CMOS or CCD image sensor worked,

22    they showed this type of integrated circuitry transferring a

23    reading charge out of the pixel.

24          It appears that the defendants' construction would

25    simply be met by a wire or something that would not be

1    understood by one of skilled in the art to be a transfer

2    element.

3         Can you go to the next slide.  So the claim refers to

4    "electrical transfer element" and also talks about the transfer

5    element is operable to transfer an electrical signal from at

6    least one junction, and then in the dependent claim, it talks

7    about the transfer element being selected from the group

8    consisting of a transistor, a sensing node, a transfer gate and

9    combinations thereof.

02:12PM 10         Those are all examples of integrated circuitry, your

11   Honor, and one of ordinary skill in the art would understand

12   the term "transfer element" to have a common meaning and usage

13   in this art, which is consistent with the way it's used in the

14   claim.  It's also consistent with the way the term is used.

15        So this is the ordinary meaning of the term as

16   supported by Mr. Guidash's declaration, which we provided with

17   our brief, that this is a term of art that's commonly used and

18   understood in the way that we proposed to be construed.

19        Then, in particular, that in a CCD device that there's

02:13PM 20   circuitry, which transfers charge into a shift register, and

21   that was illustrated in the tutorial this morning.  Similarly,

22   with the CMOS pixel, there are transfer elements that are again

23   used to transfer charge out of the individual pixel element, so

24   we submit that our construction is consistent with the ordinary

25   understanding of those of skill in the art and that the only

1    evidence as to what the ordinary understanding of one skilled

2    in the art is Mr. Guidash's declaration.  That is consistent

3    with the way the term is used in the specification.

4         The next slide, which refers specifically to

5    charge-coupled devices that are widely used in digital imaging

6    and also discusses CMOS imagers, which are as of the time of

7    the filing becoming more common and having increased

8    performance, so in each of these examples, the transfer

9    element is a commonly used term to describe circuitry-related

02:14PM 10   devices.

11        The next slide.  So the patent, when it describes the

12   transfer element, it describes it in the same way.  It refers

13   to an electrical transfer element 86, and, again, this is

14   identifying circuitry within the imager, which is transferring

15   charge from the pixel, so that in the imager, you're reading

16   the charge out of that pixel, and depending on whether it's

17   red, green or blue or the particular imaging application, that

18   shows the brightness of the light that has been received by

19   that particular element.

02:15PM 20        So, again, the transfer element is used in the way

21   that would be commonly understood.

22        So unless your Honor has any questions, I'd pass to

23   the defendant.

24        THE COURT:  Mr. Simmons.

25        MR. SIMMONS:  So our construction of the transfer

1    element is an electrical conductor for transferring an

2    electrical signal from one component to another.  It's broader

3    than plaintiff's construction, but it only reads not only in

4    Claim 1 but also in Claim 2.

5         The problem with plaintiff's construction is it's

6    trying to read into that term, simple term, "electrical

7    transfer element," things that go against what's in the rest of

8    the claim, so the three disputes are whether the electrical

9    transfer element is a component of the integrated circuitry,

02:16PM 10    and we say no, it's not.

11         If you look at the claim, "integrated circuitry formed

12    at the substantially planar surface" is a separate element from

13    an "electrical transfer element."  Electrical transfer element

14    is not a subcomponent of integrated circuitry, it's a separate

15    element.

16         The plaintiffs agree.  In their brief at page 39, they

17    say the claims specifically require an electrical transfer

18    element or transfer element in addition to integrated

19    circuitry, so that should not be put in the construction.

02:16PM 20         Whether the electrical transfer element transfers a

21    charge, we say no, it doesn't.  Why?  Because the rest of the

22    claim already tells you what it does.

23         If you look at the last element of the claim, it says,

24    "An electrical transfer element coupled to the semiconductor

25    substrate and operable to transfer an electrical signal."  It

1    doesn't say "electrical charge," it says an "electrical

2    signal," so there's no need to put a charge into the

3    construction because the rest of the claim tells you that.

4    There's into reason to narrow the claim element to include

5    further things that already are told to you in the claim.

6           And, lastly, does the electrical transfer element

7    transfer from a photosensitive pixel?  Again, if you keep

8    reading the claim, it says, "The electrical transfer element is

9    operable to transfer an electrical signal from the at least one

02:17PM 10    junction," not from a photosensitive pixel, "from at least one

11    junction."

12           Now, in the plaintiffs' argument, he pointed out that,

13    well, Claim 2 says, a dependent claim, says, "Well, selected

14    from the group consisting of a transistor, a sensing node, a

15    transfer gate and combinations thereof."  Well, all those

16    things are electrical conductors for transferring electrical

17    signals.  A transistor is an electrical conductor, a transfer

18    gate is an electrical conductor, a sensing node is an

19    electrical conductor.

02:17PM 20           Claim 1 has got to be broader than Claim 2.  Claim 2

21    is dependent.  It tells you that, okay, in this case, the

22    electrical transfer element is selected from the group

23    consisting of these things.  That means that Claim 1 is broader

24    than just a transistor, a transfer gate and a transfer sensing

25    node, so for that reason, we think that the term, "electrical

1    transfer element" should be broader, that it should be "an

2    electrical conductor for transferring an electrical signal from

3    one component to another," and that plaintiff's construction

4    tries to put a whole bunch of things in that term that don't

5    need to be there.

6         THE COURT:  What about the argument that your

7    construction would apply to just bare copper wire?

8         MR. SIMMONS:  Well, that could be an electrical

9    transfer element.  Copper wire is probably not what you use on

02:18PM 10   a semiconductor substrate.  When they say a transfer gate, gate

11   is metal.  A transfer gate can be metal.  It's more likely it's

12   what's described in this patent is a transistor, so it's more

13   likely that the electrical conductor for transferring a signal

14   is a transistor, but when you energize a transistor, it pretty

15   much makes the two gates become a wire.  The point between two

16   gates when you energize the third, when you drive the gate,

17   that makes it connect the two, and it becomes a wire, so it

18   transfers an electrical signal through the electrical

19   conductor.

02:19PM 20        THE COURT:  Mr. Belanger.

21        MR. BELANGER:  So I think there are sort of a couple

22   aspects to the argument.  The first is that this is just a

23   device, not an imager, so I think we made some progress on the

24   earlier term, "imager" that they are in alignment, that it

25   actually requires a component of a picture element that is used

1    to generate an image.

2            As far as the observation that a transistor is a wire,

3    that's, first of all, counsel, it's not one skilled in the art,

4    but that's not correct, a transistor is typically a switch.  It

5    can be on or off.

6            THE COURT:  A switch, which means, at least I heard

7    him to say that you flip a light switch, you're completing a

8    circuit, it's the functional equivalent of having it be a

9    continuous wire, right, so doesn't transistor more or less do

02:20PM 10   the same thing?

11           MR. BELANGER:  A transistor does not do the same

12   thing, it's just a wire because you have some control over it.

13           THE COURT:  You can control it, but when it's in the

14   connect or closed position, right, it's just a continuous

15   connection, just like your light switch is a continuous

16   connection, right?

17           MR. BELANGER:  Right, I think commonly understood as

18   being like a light switch, but that is in the class of

19   circuitry that would be used and understood to be a transfer

02:20PM 20   element, and a simple wire would not be understood by one

21   skilled in the art to be a transfer element.

22           We would submit that the only evidence that you have

23   as to what one skilled in the art would understand this to be

24   is Mr. Guidash's declaration where he explains that this is the

25   common term in the industry, so your Honor's charge is to

1    interpret the words as they would be understood by one of skill

2    in the art.  Certainly Mr. Guidash is qualified to speak as to

3    what one skilled in the art would understand.

4          He has extensive experience in this industry, and you

5    have his declaration supporting that this is how one of skilled

6    in the art would understand this commonly used term in this

7    context, but I do think a core of the dispute between the

8    parties is whether this is directed to an imager or some more

9    general device.

02:21PM 10          And regarding the argument on Claim 2, excuse me,

11    Claim 1 where the integrated circuitry is in addition to the

12    transfer element, again, as was described by the experts and is

13    illustrated in figure 7 of the patents, there is an electrical

14    transfer element 86, but there's also within the device

15    integrated circuitry, which will collect energy from multiple

16    pixels, so metal region 78 and via 80, that's the interconnect,

17    which is the typical part of the integrated circuitry that you

18    would expect to find in a standard CMOS device, so it has

19    integrated circuitry all labeled as 78 and 80 in addition to

02:22PM 20    the electrical transfer 86, so they're illustrated as two

21    different, one collection of components and then the electric

22    transfer element.

23          That doesn't mean that the electrical transfer element

24    is not integrated.  It shouldn't be understood to be circuitry,

25    but it does show how the specification shows integrated

1    circuitry and then separately shows the transfer element.

2            MR. SIMMONS:  Just briefly, your Honor, we agree with

3    your analogy to the light switch.  When you close the light

4    switch, it's the same thing as driving the gate of a

5    transistor.  It becomes a wire that passes through, but a node,

6    just like when you solder two wires together, that's a node.

7            So that junction where the two wires meet, that would

8    meet an electrical conductor, so that's also, and a gate, a

9    gate is absolutely, that is an electrical conductor.  That is a

10   wire.  A transfer gate merely is metal.

11           When it comes down to the specification section

12   Mr. Belanger is talking about, interestingly, integrated

13   circuitry was added to the claims during the prosecution.

14           There's no actual support in the specification related

15   to integrated circuitry.  We're not challenging that term on

16   those grounds, but there's nowhere where we are going to find

17   that electrical conductors described as being part of the

18   integrated circuitry because it's not in the spec., but,

19   nonetheless, we think that an electrical conductor for

20   transferring an electrical signal is embraced by the dependent

21   claim and by the independent claim.  It need not have all these

22   other things read into it.  Thank you, your Honor.

23           THE COURT:  All right.  "Position to maintain."

24           MS. TAWRESEY:  Yes, your Honor, I think based off of

25   the briefing, the parties' constructions are actually not

1   necessarily in disagreement on this term.  Plaintiffs' proposed

2   construction is maybe just a bit clearer because it explains

3   that the positioning of the reflective layer can't be on the

4   light incident surface.

5       If light is being maintained within the semiconductor

6   substrate, that must mean that it's already entered the

7   semiconductor substrate.  Defendants appear to agree with this

8   in their briefing at page 30, so I don't know that there's

9   necessarily any substantive disagreement.  I think the parties

02:24PM 10   are in general agreement.  Plaintiffs' proposed construction

11   just makes it more explicit that the reflective layer can't be

12   on the light incident surface.

13       THE COURT:  Mr. Simmons.

14       MR. BELANGER:  I think Ms. Tawresey is correct.  I

15   think that they have actually acknowledged that our

16   construction is technically accurate.  We just want to make

17   sure that it's located for the purpose of reflecting the

18   electromagnetic radiation back to the substrate.  I think our

19   construction is just a little simpler, but they both mean the

02:25PM 20   same thing.

21       THE COURT:  Okay.  Is that it?

22       MR. BELANGER:  That's it for plaintiffs, your Honor.

23       MR. SIMMONS:  That's everything, your Honor.  Thank

24   you for your time.

25       THE COURT:  Well, thank you.  Again, I appreciate that

1    everyone was concise and clear.  It was well briefed and well

2    argued on both sides.  I also appreciated the two tutorials.  I

3    will take everything under advisement.  Thank you, and safe

4    travels for those of you who are out of town.

5            THE CLERK:  All rise.

6            MR. SIMMONS:  Thank you, your Honor.

7            (Whereupon, the hearing was adjourned at

8    1:01 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                       C E R T I F I C A T E

2

3     UNITED STATES DISTRICT COURT )

4     DISTRICT OF MASSACHUSETTS ) ss.

5     CITY OF BOSTON )

6

7              I do hereby certify that the foregoing transcript,

8     Pages 1 through 150 inclusive, was recorded by me

9     stenographically at the time and place aforesaid in Civil

10    Action No. 15-13488-FDS, SIONYX, LLC and PRESIDENT AND FELLOW

11    OF HARVARD COLLEGE vs. HAMAMATSU PROTONICS K.K., HAMAMATSU

12    CORPORATION, OCEAN OPTICS, INC., and DOES 1 THROUGH 10 and

13    thereafter by me reduced to typewriting and is a true and

14    accurate record of the proceedings.

15              Dated this 12th day of July, 2017.

16

17                        s/s Valerie A. O'Hara

18              _____

19              VALERIE A. O'HARA

20              OFFICIAL COURT REPORTER

21

22

23

24

25