# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

———————————————————————
|  |  |
|---|---|
| SIONYX, LLC and PRESIDENT AND FELLOWS OF HARVARD COLLEGE, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| HAMAMATSU PHOTONICS K.K., HAMAMATSU CORP., OCEAN OPTICS, INC., and JOHN DOES 1-10, | ) ) ) ) |
| Defendants. | ) ) |

**Civil Action No. 15-13488-FDS**

———————————————————————

## MEMORANDUM AND ORDER ON PLAINTIFFS' MOTION TO AMEND AND CROSS-MOTIONS FOR SUMMARY JUDGMENT

**SAYLOR, J.**

This is an action for patent infringement, breach of contract, and correction of inventorship. The technology at issue involves a device that improves the detection of near-infrared light, which has a variety of potential commercial and scientific applications. Plaintiff SiOnyx, LLC alleges that it approached defendant Hamamatsu Photonics K.K. ("HPK") concerning a potential business partnership involving the technology. The parties entered into a nondisclosure agreement and SiOnyx provided HPK with certain technical information.

SiOnyx alleges that after the approach proved unsuccessful, HPK violated the nondisclosure agreement, obtained patents on SiOnyx's technology without naming SiOnyx personnel as inventors, and infringed other patents held by SiOnyx. HPK contends that its engineers independently developed the technology contained in its patents and practiced by its products, and that it does not infringe SiOnyx's patents.

Defendants have filed six separate motions for partial summary judgment. Plaintiffs have moved to amend the complaint and for partial summary judgment.[1]

For the following reasons:

- HPK and HC's motion for partial summary judgment that SiOnyx's and Harvard's claims for breach of contract and unjust enrichment are barred by the statute of limitations will be denied;

- SiOnyx and Harvard's motion for leave to amend the second amended complaint will be denied as moot;

- SiOnyx's motion for partial summary judgment that HPK breached the non-disclosure agreement will be denied;

- HPK's motion for partial summary judgment on SiOnyx's unjust enrichment claim will be granted;

- HPK's motion for partial summary judgment on Harvard's unjust enrichment claim will be granted;

- HC's motion for partial summary judgment on SiOnyx's and Harvard's unjust enrichment claims will be granted as to the claim of Harvard and otherwise denied;

- HPK's motion for partial summary judgment on SiOnyx's claim for consequential damages will be denied;

- HPK's motion for partial summary judgment that Mazur is not a co-inventor will be granted.

---

[1] After the hearing on these motions, defendants collectively filed six additional motions for summary judgment, and plaintiffs filed two additional motions for summary judgment. Those motions will be addressed in a subsequent order.

# I.    Background

## A.    Factual Background

The following facts appear to be undisputed.

### 1.    The Parties

SiOnyx, LLC was founded in 2006 by Eric Mazur, a physics professor at Harvard University, and James Carey, his former doctoral student.  (ECF 337-40 at 7:5-6, 8:3-9:7).  Their goal was to commercialize laser-textured black silicon photodetectors, which had been the topic of Carey's Ph.D. dissertation and postdoctoral work in Mazur's laboratory.  (ECF 337-40 at 9:15-11:11).  Stephen Saylor joined SiOnyx in the fall of 2006 as President and CEO.  (ECF 337-40 at 9:8-14).[2]  SiOnyx owns U.S. Patent No. 8,680,591, which it asserts in this lawsuit.  (ECF 163-2 ¶¶ 12-17, 19).

The President and Fellows of Harvard College ("Harvard") are the assignees of the other patent asserted in this lawsuit, U.S. Patent No. 8,080,467, which covers Mazur and Carey's work.[3]  SiOnyx is the exclusive licensee of that patent.  (ECF 342 Ex. G).

Hamamatsu Photonics K.K. is a Japanese integrated photonics company that researches, develops, and manufactures optical devices and image sensors.  (ECF 163-2 ¶¶ 54-55; ECF 178 ¶¶ 54-55; ECF 337-41 at 114:5-18).  It is the assignee of U.S. Patent Nos. 8,564,087; 8,629,485; 8,742,528; 8,884,226; 8,916,945; 8,994,135; 9,190,551; 9,293,499; and 9,614,109, in addition to several Japanese patents covering similar inventions.  (ECFs 337-22 through 337-31).

Hamamatsu Corporation ("HC") is the marketing and sales company responsible for

---

[2] Stephen Saylor is no relation to the undersigned judge.

[3] The complaint in this case also included allegations of infringement of U.S. Patent No. 7,884,446 (owned by Harvard and naming Mazur as an inventor), but the parties recently stipulated to dismissal of that patent from the suit.  (ECF 422).

distributing HPK's products in North America. (ECF 97 at 3). It is a New Jersey corporation with its principal place of business in New Jersey. (ECF 97 at 3). HC is a wholly owned subsidiary of Photonics Management Corp., which is a holding company owned by HPK. (ECF 97 at 3, 13). HC purchases products from HPK at a price set by HPK. (ECF 97 at 3; ECF 382-1 at 62:21-65:7). HC has the authority to set its own resale prices, and it separately profits from its sales to end users. (ECF 97 at 3; ECF 382-1 at 62:21-65:7).

### 2.    The Technology at Issue

The technology at issue involves silicon photodetectors where one surface has been irradiated by a pulsed laser beam.

The photodetectors use p-n photodiodes, which work by transforming light into electrical current. The photodiode is formed from a silicon semiconductor substrate that has two types of charge-neutral impurities: (1) those that donate electrons (n-type impurities) and (2) those that accept electrons (p-type impurities), which can be said to have electron "holes." (ECF 377-1 at 87). When n-doped silicon is placed next to p-doped silicon, it creates a p-n junction, around which the electrons and holes rearrange themselves until they reach an equilibrium. (ECF 377-1 at 88-89). At equilibrium, there is a thin insulating layer at the juncture where the electrons and holes (charge carriers) have recombined (depletion region), and an electric field—created by the ions left behind when the electrons and holes diffused away—preventing further diffusion. (ECF 377-1 at 89; *see* ECF 201 at 13:10-14:20).

The outermost electrons associated with the silicon substrate are said to be in the "valence band," and have a certain energy. The next-highest energy state available is in the "conduction band." The difference in energy between the valence band and the conduction band is a physical property of the semiconductor material; for silicon, the band-gap energy is about 1.07 eV, which corresponds to light with a wavelength around 1100 nm. (ECF 377-1 at 1, 63-

64).

If a photon of sufficient energy (that is, for silicon, one with a wavelength of less than 1100 nm) interacts with the silicon substrate, it may transfer its energy to an electron in the valence band and promote it to the conduction band; in other words, the photon is absorbed. (ECF 377-1 at 63; *see* ECF 201 at 10:21-11:21). Higher-energy photons will be absorbed closer to the light-incident surface, while lower-energy photons are absorbed deeper in the substrate. (ECF 386 Ex E at HPK0022535; *see* ECF 201 at 12:8-13:9, 15:11-16:16).

When a photon is absorbed, it creates an electron-hole pair (by promoting an electron to the conduction band). (ECF 377-1 at 93). If the photon is absorbed in the depletion region of the photodiode, the electron and the hole are immediately separated because of the electric field, which creates a current. (ECF 377-1 at 93-94). Photons absorbed too far away from the depletion region are much less likely to produce a current. (ECF 201 at 15:11-16:16).

Thus, in an ordinary p-n photodiode, light enters through one surface of the photodiode and, to some extent, is absorbed in the depletion region, resulting in electric current. (ECF 377-1 at 63). Light that is not absorbed will either go right through the photodiode (in which case it does not contribute to the sensitivity of the photodiode) or reflect off the back surface of the photodiode back into the photodiode, in which case it has another opportunity to be absorbed and turned into current. ('109 patent, col. 7 ll. 24-34). Whatever portion of that light is still unabsorbed after a second trip through the photodiode will either pass through the light-incident surface (again without contributing to the sensitivity of the photodiode) or be reflected by that surface, and so on. ('109 patent, col. 7 ll. 34-37). Infrared light is more likely to go through the photodiode without being absorbed than visible light, because its longer wavelength (and correspondingly lower energy) is absorbed deeper in the substrate and its energy may be

insufficient to bridge the band gap of the silicon semiconductor. (ECF 377-1 at 6-7, 63-64; *see* ECF 201 at 9:3-13; 12:1-7).

The technology at issue seeks to improve the sensitivity of the photodiode to near-infrared light by irradiating a surface of the silicon substrate with a laser. That irradiation creates an irregular texture on the surface, so that, instead of being smooth, it has micro- or nanometer-scale features that cause the surface to look black to the human eye. (ECF 377-1 at 6-7). Changing the parameters of the irradiation protocol can change the size and shape of those features. (ECF 377-1 at 55 tbl.3.2).

When applied to the back surface of a photodiode, the irregular asperity has the effect of improving the sensitivity of the photodiode to infrared light. In that case, the light enters the photodiode from one surface, and, as before, some is absorbed by the substrate. But instead of meeting a smooth surface on the backside of the photodetector, the unabsorbed light meets the irregular asperity. Light components that hit the asperity an angles greater than or equal to 16.6° will be totally reflected, and because the asperity is irregular, they will be reflected back toward the first surface and the side surfaces in many different directions. ('109 patent, col. 7 ll. 39-50). Because they are arriving from all different directions, they "are extremely highly likely to be totally reflected" on the first and side surfaces, and therefore to be "repeatedly totally reflected on different faces to further increase their travel distance" inside the photodiode. ('109 patent col. 7 ll. 51-59). By increasing the travel distance of light inside the photodiode, the asperity makes a thinner piece of silicon act "thicker," and infrared light that otherwise would pass through can be absorbed "deeper" than the photodiode actually is. (*See* ECF 201 at 16:12-18:3). The longer the light is trapped within the photodiode, the more likely it is to be absorbed and generate current, and the more sensitive the photodiode will be. ('109 patent, col. 7 l. 59-col.8 l.

2; *see* ECF 201 at 12:8-13:9; 17:20-18:3; 20:6-21:3).

### 3.   The 2007 Nondisclosure Agreement

In late 2006, SiOnyx, through Mazur, reached out to HPK about a possible business

relationship.  (ECF 337-40 at 14:3-15:15; ECF 353 Ex. B at 119:4-24).  Mazur, Carey, and

Saylor went to Japan in November 2006 to meet with representatives of HPK, where Mazur gave

a presentation introducing the technology.  (ECF 386 Ex. F at 22:4-25:8; *see id.* Ex. E).

SiOnyx and HPK entered into a mutual nondisclosure agreement on January 11, 2007, to

facilitate a possible business relationship.  (ECF 337-2).  The parties agree that this is a valid and

enforceable contact.  (ECF 400 at 1).

The nondisclosure agreement provides:

> Each of the parties has developed certain products, technology and
> methodologies, including information that each party regards as confidential,
> proprietary, trade secret information.  Each party proposes to disclose certain of
> such information to the other party, to be used by the other party solely for the
> limited purpose of <u>EVALUATING APPLICATIONS AND JOINTS [sic]
> DEVELOPMENT OPPORTUNITES OF PULSED LASER PROCESS DOPED
> PHOTONIC DEVICES</u> and for no other purposes whatsoever (the "Permitted
> Purpose.").

(ECF 337-2 at 1).  The agreement defines "Confidential Information" as

> any proprietary business, financial and technical information, whether oral,
> written, electronic, magnetic, visual or otherwise, of a party, disclosed by such
> party (the "Disclosing Party") to the other party to this Agreement (the
> "Receiving Party"), including without limitation, information acquired by the
> Receiving Party from any business plan or similar document or from the
> Disclosing Party's employees or agents relating to the Disclosing Party's
> business, products, services, trade secrets, all forms of intellectual property,
> designs, methods, subscribers, customers, partners, suppliers, strategy, plans,
> opportunities, finances, research, development, know-how or personnel, and
> confidential information disclosed to the Disclosing Party by third parties.

(ECF 337-2 at 1).  Although the nondisclosure agreement prohibits the use of confidential

information for any purpose outside the "Permitted Purpose," it also provides that the prohibition

> shall not apply to the extent that the Receiving Party can demonstrate that certain

> Confidential Information:  (a) was in the public domain prior to the time of its disclosure under this Agreement; (b) entered the public domain after the time of its disclosure under this Agreement through means other than an unauthorized disclosure resulting from an act or omission by the Receiving Party; (c) was independently developed or discovered by the Receiving Party without use of the Confidential Information; or (d) is or was disclosed to the Receiving Party at any time, whether prior to or after the time of its disclosure under this Agreement, by a third party having no fiduciary relationship with the Disclosing Party and having no obligation of confidentiality with respect to such Confidential Information.

(ECF 337-2 at 1).

SiOnyx and HPK agreed that any breach of the nondisclosure agreement would constitute irreparable harm, so that the "Disclosing Party" would be entitled to equitable relief to enforce the agreement.  (ECF 337-2 at 2).  And they agreed that all ownership rights in any intellectual property arising from "Confidential Information" would remain with the "Disclosing Party" in the absence of a separate written instrument expressly granting those rights.  (ECF 337-2 at 2).

### 4.    The Confidential Architectures

On January 16, 2007, Saylor and Carey met with Keith Kobayashi (of HPK's International Division) and Koei Yamamoto (Senior Executive Managing Director and General Manager of HPK's Solid State Division) by telephone to plan possible experimental prototypes. (ECF 337-3; ECF 337-40 at 17:13-19, 19:19-20:9).

The following day, on January 17, 2007, Carey emailed Kobayashi "the first draft of a device architecture we would like to pursue."  (ECF 337-3 at 2).  He explained that "[t]he suggested device architecture was selected based on our past experiments and what we believe is compatible with current Hamamatsu photodetectors," and he "also included two possible alternatives if the preferred architecture is difficult."  (ECF 337-3 at 2-3).  The first of those alternatives—"Alternative #1"—showed a p-n photodiode where the laser-textured layer was positioned on the back of the device, opposite the side where light would enter the device.  (ECF 337-3 at 5; ECF 337-40 at 19:13-20:21).

Carey marked these architectures "confidential," and Kobayashi responded that he "forwarded the device diagram to Mr. Yamamoto and other related people who were notified of the confidentiality." (ECF 337-5).

Carey testified that he had discussed the architectures with Mazur prior to disclosing them to HPK and that the discussion was "collaborative." (ECF 353 Ex. A at 334:20-335:9). He said, "We discussed architectures together . . . specifically that architecture that I feel like we taught to Hamamatsu was not one we had publicly disclosed and would benefit shortwave response, like it said in the description of architecture Alternative Number 1. How to take advantage of different properties ranging from the shortwave infrared response, the gain, and the photovoltaic near-infrared response." (ECF 353 Ex. A at 336:14-22). But he also testified that he could not recall any writing or email between him and Mazur that would demonstrate that Mazur had collaborated on the architectures. (ECF 353 Ex. A at 335:10-15).

Mazur also testified that he discussed the architectures with Carey. Looking at claim 1 of the '945 patent, he testified:

> Q. Based upon that, what, if anything, do you believe you contributed to this claim?
>
> . . . .
>
> A. Certainly part of the second paragraph was the irregular asperity in the region opposed to the pn junction and the irregular asperity constituting the light incident surface.
>
> . . . .
>
> Q. Sure. So let me ask you this: Based upon what you just told me, when did you conceive of that idea?
>
> A. Beginning during the year that [Carey] was a postdoc. And then the structuring on the back side, as shown also in the diagram on the front page, during the time that SiOnyx was collaborating with [HPK].
>
> Q. Did you actually conceive of that while SiOnyx was collaborating with

[HPK]?

A. It was [Carey] and I, and at some point [Saylor] discussed this idea.

Q. Was that in the time that [HPK] and SiOnyx were collaborating?

A. I believe so, yes.

Q. Did you tell it to Jim Carey and Steve Saylor, or did Jim Carey tell it to you?

A. It sort of emerged in a conversation.

Q. Was there anybody else there?

A. No. Because the only two people I really dealt with on a regular basis were [Carey], who was my former student, and [Saylor].

Q. Did you write it down?

A. I did not.

Q. So all there was was a conversation with you and Dr. Carey?

A. But he didn't write it out.

(ECF 353 Ex. B at 176:8-177:23).

Carey testified that prior to his January 17, 2007 email, neither he nor anyone else at SiOnyx had ever discussed the idea of locating the laser-textured layer as depicted in Alternative #1 with anyone outside SiOnyx. (ECF 337-4 at 345:20-346:2; ECF 337-40 at 20:10-21:1).

HPK produced a slide presentation created by Terumasa Nagano (of HPK's Microelectrical Mechanical Systems Manufacturing Development Group) in November 2006, prior to receiving the architectures from Carey. That presentation includes a device architecture that has a laser-textured surface on one side, and p-type region on the other side, like Carey's Alternative #1. (ECF 377-14 at HPK0068533). The diagram does not indicate the surface through which the light enters the device, and it needs to be flipped upside-down to match up with Alternative #1.

## 5.     The SiOnyx-HPK Collaboration

On April 4, 2007, Saylor traveled to Japan to meet with representatives of HPK.  At the meeting, HPK representatives showed a presentation created by Akira Sakamoto (of HPK's Solid-State Production Development Group) at the direction of Yamamoto.  The presentation outlined a plan for HPK to make four types of silicon test wafers, each created by up to three different processes.  (ECF 337-8 at 55:5-57:17; ECF 337-7).  The wafers would be laser textured by SiOnyx, sent back to HPK for final processing, and tested for their optical-response characteristics.  (ECF 337-8 at 14:6-15:3).  That presentation showed architectures very similar to those proposed by Carey.  (*Compare* ECF 337-3 *with* ECF 337-7).

Between April and November 2007, SiOnyx and HPK jointly tested 38 wafers.  HPK fabricated the test devices up until the laser-texturing step, and mailed them to SiOnyx for texturing.  SiOnyx then returned them to HPK for final processing and testing.  (ECF 337-8 at 14:3-15:3; ECF 337-40 at 44:21-45:20).  The results of the testing showed that at least some of the devices that were laser-textured by SiOnyx had improved infrared photosensitivity as compared to one of HPK's standard devices.  (ECF 337-9 at HPK0010411).  The testing also showed that the photosensitivity of devices having the laser-textured surface on the side of the device opposite from the direction of incident light (front illuminated, in this case where the textured surface is on the back) had stronger performance than devices having the laser-textured surface on the same side as the incident light (back illuminated), which performed significantly worse than the reference device.  (ECF 337-11 at 14).

Some knowledge about laser-texturing devices was in the public domain—due, in part, to Mazur's many academic publications on the topic.  Carey testified, however, that SiOnyx had discovered that there was a preferred target size for the structures making up the texture, which balanced optical response against certain disadvantageous properties.  That texture, and the

process for making it, was confidential information of commercial value to SiOnyx. (ECF 337-40 at 21:2-22:1). SiOnyx, when it textured the test devices from HPK, used its confidential process to produce its preferred texture. (ECF 337-40 at 49:21-50:14). But SiOnyx shared very limited information as to the process parameters for achieving that texture with HPK—nothing except the identity of the ambient gas in the laser-processing chamber. (ECF 337-10; ECF 45-2 at 69:4-15, 94:3-7). As part of the testing procedure, HPK took scanning-electron-microscope ("SEM") images of the textures, which showed detailed images of textures achieved and allowed structural features of the textures to be measured. (ECF 337-9 at HPK0010405-08, HPK0010415). Carey testified that the size of the features shown in these SEM images were within the target range identified by SiOnyx, which he considered to be confidential. (ECF 337-40 at 49:5-50:14).

The joint-testing program primarily took place between SiOnyx and HPK. Mazur was present at the initial meeting in November 2006 and discussed the confidential architectures with Carey. However, he was "kept out of the details" of the SiOnyx-HPK talks; "[o]ther than knowing that something was going on, [he] didn't know" what was being discussed. (ECF 382-17 at 149:18-152:8; *see also* ECF 353 Ex. A at 334:9-336:6 (Carey testifying that he does not recall Mazur being involved)). Mazur testified that he had "technical input into what SiOnyx was doing, but [he] was not informed of any—and [he] knew that [HPK] was making devices that were being structured at SiOnyx and then sent back. And [he] knew about plans to modify the architecture, but that's about the extent to which [his] exchanges . . . with [Carey] went," and that he had not reviewed any technical documents during this time. (ECF 382-17 at 152:2-16).

Harvard had no confidentiality agreement with HPK, and had no involvement in the collaboration apart from the activities of Mazur. (ECF 342 Ex. F at 57:22-24). Harvard's Rule

30(b)(6) deposition witness testified that Harvard did not have any authority to approve or deny any terms within the nondisclosure agreement between SiOnyx and HPK. (ECF 342 Ex. F at 58:10-13).

An employee of HC was at the initial November 2006 meeting, and another employee of HC actually signed the nondisclosure agreement on behalf of HPK, but following that there were no communications between SiOnyx and HC. (ECF 97 at 13; ECF 345 Ex. Q at 172:10-19, Ex. S at 255:3-256:21, Ex. U at 121:10-15).

### 6.     The End of the Collaboration and HPK's Further Activities

After the testing was finished, Saylor and Kobayashi exchanged a few emails concerning the possibility of further tests. (ECF 337-12). But on January 15, 2008, Kobayashi responded as follows:

> After discussing with related people mainly from technical aspects, we reached to the following conclusions.
>
> As a commercial entity, [HPK], of course, has to study the possibility to enhance our product capability. However, we are not confident that black silicon technology will greatly contribute. We would rather like to stick with our own technique/technology for that purpose because we would like to keep our own pace of development and accumulate our own know-hows. In [HPK] culture, business decisions almost always come after full technical evaluation, which seems to be quite different from your company. Therefore, we would like to do study by ourselves without further reference to proprietary information of SiOnyx.

(ECF 337-12 at 1). The collaboration effectively ended at that time.

That same day, someone from HPK's Central Research Laboratory emailed Kobayashi to say that technology regarding the processing of black silicon was a top priority. (ECF 337 ¶ 45 (Pl. SMF); *see* ECF 377 ¶ 45 (Def. Response)).

Nagano testified that HPK kept the test wafers than had been textured by SiOnyx until at least 2010. (ECF 337-13 at 84:5-16). Prototype reports from April 29 and May 22, 2008, show

13

that HPK's Central Research Laboratory was attempting to replicate the quantum efficiency of the SiOnyx-textured device and comparing the textures they were able to achieve to those SiOnyx achieved. (ECF 337-36 at SIONYXHARVARD_00107908, SIONYXHARVARD_00107916; ECF 337-43 at HPK0012401, HPK0012412, HPK0012425; *see* ECF 337 ¶ 53). A presentation dated July 17, 2008—authored by Sakamoto and Nagano and titled "Black Silicon Technology In-House Production"—has, as its first page, a slide titled "PD sensitivity characteristics increase by SiOnyx Company laser processing." (ECF 337-13 at 131:22-132:25; *see also* ECF 337-14 (mostly in Japanese, but containing the words "Black Si" and "SiOnyx" in English)). That slide shows a graph of photosensitivity at different wavelengths of light (the same characteristics measured during the SiOnyx-HPK collaboration) that compares the performance of SiOnyx's device (labeled "SPL Si PD") with HPK's standard silicon photodiode (labeled "STD Si PD"). (ECF 337-13 at 134:11-136:10; ECF 337-14 at HPK0038509). Another slide in that presentation states that HPK had attempted its own laser texturing, but was not able to achieve the same infrared-sensitivity improvement as SiOnyx. (EDF 337-13 at 137:16-139:15; ECF 337-14 at HPK0038511). And another slide contains a schedule, as to which Nagano testified:

> Q. Just looking at row 6, the first element in the rightmost column says prototype 1 comparison with SiOnyx; is that correct?
>
> A. Yes.
>
> Q. And in the next row down, row 7, does that refer to progress?
>
> A. Yes.
>
> Q. And the first item under progress is completed data acquisition of existing patterns SiOnyx laser processing; is that correct?
>
> A. Yes.

(ECF 337-13 at 140:4-20; *see* ECF 337-14 at HPK0038512).

Another HPK presentation, dated July 31, 2008, contains a slide titled "laser process conditions," and shows three scanning electron microscope ("SEM") images. (ECF 337-13 at 142:15-23; ECF 337-17 at HPK0024515). The leftmost image is labeled "SiOnyx." (ECF 337-13 at 142:24-25; ECF 337-17 at HPK0024515). Under the third image, the text reads "visually equivalent to SiOnyx's wafer" and that, like SiOnyx's wafer, "no silicon scum is attached." (ECF 337-13 at 145:4-13; ECF 337-17 at HPK0024515).

Sakamoto testified that HPK's Central Research Laboratory had examined SiOnyx's publications and attempted to estimate the process conditions for the laser texturing. However, it was unable to recreate the texture shown in those publications, and saw almost no surface roughness. (ECF 337-8 at 119:5-122:16). He also testified that "[t]he samples provided to us by SiOnyx, we looked at them in the prototyping of the silicon photodiode black silicon processing." (ECF 337-8 at 122:1-16). Yamamoto testified that for the photodiode product that HPK produced, the "wafers were prepared by Hamamatsu without using the wafers from SiOnyx." (ECF 337-19 at 140:12-15). He further testified:

> Q. And that's because the Solid State Division had wafers that SiOnyx had created the texture and worked to replicate that texture and the performance of that texture before you released a commercial product; isn't that true?
>
> Mr. Simmons: Objection to form.
>
> The Witness: No.
>
> By Mr. Belanger:
>
> Q: And you agree that if [HPK] had done that, that would have been a violation of your agreement with SiOnyx, correct?
>
> Mr. Simmons: Objection to form.
>
> The Witness: Yes.

(ECF 337-19 at 140:24-141:13).

### 7. The 2009 Photonics Fair Emails

A few years later, on February 9, 2009, Kobayashi sent an email to Saylor and Mazur at SiOnyx stating that "[HPK] will introduce various products under development at our general exhibition, PHOTON FAIR 2009 in February in Hamamatsu, Japan" and that "[o]ne of these products is Silicon Photodiode with higher sensitivity covering through 1200nm range." (ECF 316 Ex. E at 1). It reminded Saylor and Mazur that when the HPK-SiOnyx talks terminated, HPK had "informed you that we, by ourselves, would like to focus our development efforts on photovoltaic type," and explained that "while we are greatly appreciating having given us an opportunity to think about further enhancement/improvement of our accumulated know-how as a photonics company, we do not think we are infringing any of your IP or originality, or breaching any obligation of confidentiality." (*Id.*).

The email attached a file showing the architecture of HPK's device and a chart of its spectral photosensitivity. (*Id.* at 2). The email also described the device, stating that it "has PN junction on the one side and the back side consists of an accumulation layer by ion implantation over the black silicon surface fabricated by laser in the inert gas atmosphere." (*Id.* at 1).

Saylor responded by email ten days later, as follows:

> Regarding our prior collaboration and information exchanged under Mutual Non-Disclosure Agreement, SiOnyx is confident that [HPK] will ensure the integrity of SiOnyx confidential information. While the diagram provided in your email is insufficient for our understanding, it looks very similar to the work product of our collaboration. Should [HPK] wish to provide SiOnyx detailed specifications and English translation versions of the presentation materials planned for the Photon Fair, we may be able to comment on your conclusion that your laser processed NIR enhanced Silicon Photodiode does not utilize SiOnyx IP or violate any provisions of our prior agreement.

(ECF 316 Ex. H at 1).

On February 24, 2009, Kobayashi replied with the following assurances:

> First of all, we would like to emphasize that we only applied our own know-how

and technology to the developed products, which we will introduce at our Photon Fair. . . .  Although we briefly discussed the results, our structure and processes in the attached file are our own idea.  Therefore, we strongly believe that our developed product does not infringe your patents or use any of your proprietary information disclosed to us because the development is based on only our own wafer process technologies.  We believe that following points are explicit differences.

> We do not use Femto second laser for fabrication of black silicon surface[.]
> Laser treatment is in the inert gas atmosphere[.]
> We form backside accumulation layer by ion implantation and high temperature annealing[.]

All of above technologies are our own technologies. . . .  [HPK] believes that we only applied our own know-how and technologies to the development of photovoltaic type Silicon Photodiode to be introduced at the Photon Fair.

(ECF 316 Ex. I at 1).  That email attached a step-by-step process flow diagram, in English, describing how HPK's photodiode was made.  (ECF 316 Ex. I at 4).  HPK admits that the process-flow diagram was very similar to one discussed by the parties during the collaboration. (ECF 315 at 2-3; *see* ECF 316 Ex. B at 2).

Saylor replied on March 10, 2009, that SiOnyx would "review the information provided," and reiterated its interest in a possible business relationship with HPK.  (ECF 316 Ex. K at 1). That same day, Kobayashi replied that HPK was not interested in a business relationship with SiOnyx at that time.  (ECF 316 Ex. L at 1).  On April 15, 2009, Kobayashi contacted Saylor again to say that he hadn't heard from him about the proposed disclosure at the Photon Fair and thanking him for his "understanding that our technique explained in our e-mails is not infringing your intellectual property."  (ECF 316 Ex. M at 1).  There was no other communication between the parties about the photodiode HPK planned to show at the Photon Fair.

The parties were asked about those communications in their depositions.  Carey testified that HPK's first email was concerning because it seemed to him that the diagram HPK sent depicted a device that would be covered by SiOnyx's intellectual property.  (ECF 316 Ex. F at 265:16-266:11, 273:17).  Mazur also testified that he thought the device shown in the diagram

would be covered by SiOnyx's intellectual property. (ECF 316 Ex. G at 157:14-24). He further testified that the differences HPK pointed out in their second email failed to convince him that the HPK product did not infringe SiOnyx's rights. (ECF 316 Ex. G at 161:5-24, 163:1-165:24, 167:1-171:24). Saylor, testifying as SiOnyx's Rule 30(b)(6) deposition witness, stated that the architecture of HPK's photodiode was "the same architecture from an optical perspective as what Jim Carey disclosed." (ECF 316 Ex. J at 191:16-23). But he also testified that while Carey and another employee had suspicions because it was close to what SiOnyx and HPK had worked on together, Saylor "emphasized with them that [HPK] is clearly articulating to us that they had independently developed all of this." (ECF 316 Ex. J at 192:4-19). He read the emails "to mean that none of the people who worked on the project with us would have worked on this, because in big companies, you typically—what you would do is, you would firewall your team, so I'm assuming that's what they've done; otherwise, I don't know how he can claim that it's all their own know-how. They must have firewalled the team." (ECF 316 Ex. J at 189:3-10). He found Kobayashi's final email to be "amusing" because it thanked him for an understanding that he never gave, but he never corrected him or sent a response. (ECF 316 Ex. J at 201:14-202:15).

A certified translation of an email sent on February 6, 2009, from Sakamoto to Kobayashi contains a draft of the email to SiOnyx. The text above that draft states:

> Thank you for all you'd done during the infrared high sensitivity device studies performed with SiOnyx the year before last. One sample prepared at that time was commercialized this time and the technology will be displayed at the Photon Fair. Although considered not likely to be in conflict with the patent filed by Harvard College, because there is a description, "photodetector that detects even at the wavelength of energy at or less than the Si bandgap due to a femtosecond laser processing" in one claim, and the N2 gas atmosphere is also described, we have been reviewing how to make the presentation. As a result, if it is commercialized and becomes successful business in the future, rather than hiding a risky notation, we have decided to appeal that our processing is completely different than the one performed by SiOnyx by clarifying the specifics. It is a fact that it was jointly studied in 2007 and since the structure of the sample fabricated

18

at that time and the technique used were already defined, please convey this and notify of the commercialization.

(ECF 326-4 at 6-7). In response to the draft, Kobayashi asked, "Was the sample prepared at that time the one we prepared? And what kinds of information did we receive from SiOnyx for our preparing the sample?" (*Id.* at 5). Sakamoto responded that the sample was the one HPK had prepared, but that SiOnyx had done the black-silicon laser processing; that he thought they had received some information concerning the laser conditions from SiOnyx; and that while they had also received information concerning annealing conditions from SiOnyx, they were not currently using those annealing conditions. (*Id.*).

When asked about that email exchange, Kobayashi testified as follows:

Q. [Sakamoto] suggests that you tell SiOnyx that you intend to commercialize the structures and methods that you jointly studied in 2007, correct?

. . . .

THE WITNESS: Well, if you put the two parts together, it may come out to that. What we wanted to impress upon SiOnyx was that what we are doing is something completely different. The background to this is that there is the fact that the way of making the structures was something that we had worked on jointly and wanted to make that clear to SiOnyx that what we were doing was something different.

(ECF 326-6 at 109:5-23).

Q. So you—your understanding of this email is Sakamoto was trying to give the impression that the [HPK] products were based only on information in the public domain?

A. I believe what it was, was to give the impression that it was information in the public domain and also information that belonged to HPK itself.

(*Id.* at 123:18-25).

### 8. The Patents of HPK

As relevant to this lawsuit, HPK owns nine U.S. patents relating to silicon photodetectors with a textured surface that improves absorption of near-infrared light. U.S. Patent Nos.

8,564,087 ("the '087 patent"); 8,629,485 ("the '485 patent"); 8,742,528 ("the '528 patent");

8,884,226 ("the '226 patent"); 8,916,945 ("the '945 patent"); 8,994,135 ("the '135 patent");

9,190,551 ("the '551 patent"); 9,293,499 ("the '499 patent"); and 9,614,109 ("the '109 patent").

(ECFs 337-22 through 337-31).

HPK started applying for its Japanese patents in February 2009, and U.S. patents in

February 2010.  One or more of Sakamoto, Yamamoto, Nagano, and Kazuhisa Yamamura

(another employee of HPK) are listed as inventors on every patent except the '226 patent.  Six of

the nine patents claim priority to Japanese Patent Application 2009-041078 (the '485, '528, '945,

'135, '551, and '109 patents).  The "invention submission form" of that Japanese application

mentions the collaboration between SiOnyx and HPK as part of the "background and motive of

the invention."  (ECF 337-34; ECF 337-35 at SIONYXHARVARD_00107991; *see* ECF 337

¶ 70 (Pl. SMF); ECF 377 ¶ 70 (Def. Response)).[4]  Those same six patents describe an

embodiment wherein the photodiode is configured to have a laser-processed layer on the surface

---

[4] There is some confusion as to the exact translation of the document.  A certified translation of the
document says: "Background and Motivation for the Invention . . . .  From April through December 2007, in joint
development with SiOnyx, the femtosecond laser of SiOnyx was used to prototype Si photodiodes that are sensitive
to infrared."  (ECF 337-35 at SIONYXHARVARD_00107991).  Yamamura was asked about this document at his
deposition, and the interpreters seemed to disagree slightly:

> Q.  And what is the title of this section, the first line on this page on the left?
> A.  The background and the motive of the invention.
> Q.  And could you read the first sentence starting with 2007, please?
> A.  Just the first sentence?
> Q.  Yes, please.
> A.  From April to December 2007, in collaboration with SiOnyx using femtosecond laser from
> SiOnyx, we prepared the prototype of a silicon PD that has infrared sensitivity.
> . . . .
> Check Interpreter.  Excuse me.  The beginning of the sentence, it was during our joint
> develop [sic] with SiOnyx, we did these things.
> The Lead Interpreter.  In collaboration with SiOnyx.
> Check Interpreter.  I have development.

(ECF 337 ¶ 70 (Pl. SMF, quoting from pages of the Yamamura deposition which are not attached to the motion);
ECF 377 ¶ 70 (Def. Response, admitting that the quoted portion appears in the deposition)).

opposite to the light-incident surface, and contain, as Figure 11, a diagram of an architecture very close to the architecture Carey provided to HPK as "Alternative #1." ('485 patent, fig.11, col. 7 ll. 8-12; '528 patent, fig.11, col. 8 ll. 18-23; '945 patent, fig.11, col. 6 ll. 31-36; '135 patent, fig.11, col. 8 ll. 25-30; '551 patent, fig.11, col. 6 l. 66-col. 7 l. 4; '109 patent, fig.11, col. 7 ll. 18-23). The '087 patent shows a more complicated architecture at Figure 6 that nonetheless incorporates the basic idea of an irregular asperity opposite the p-n junction and incident light. ('087 patent, fig.6, col. 7 ll.7-26).

The six patents containing an architecture close to Carey's "Alternative #1" also contain a figure showing the invention's increased photosensitivity in the near-infrared range, which is similar to the results obtained from the HPK-SiOnyx joint testing. ('485 patent, fig.12, col. 8 ll. 31-35; '528 patent, fig.12, col. 9 ll. 32-46; '945 patent, fig.12, col. 7 ll. 44-58; '135 patent, fig.12, col. 9 ll. 38-52; '551 patent, fig.12, col. 8 ll. 13-27; '109 patent, fig.12, col. 8 ll. 32-46). The '087 patent contains a figure showing somewhat improved sensitivity from illuminating the device from opposite the textured surface as compared to illuminating from the side with the textured surface, and much improved sensitivity from the use of texturing as compared to no texturing. ('087 patent, fig.13, col. 10 l. 64-col. 11 l. 13).

All nine patents teach an "irregular asperity," and contain a figure showing an SEM image of the asperity. ('087 patent, fig.5, col. 6 ll. 63-66; '485 patent, fig.8, col. 6 ll. 17-20; '528 patent, fig.8, col. 7 ll. 27-31; '226 patent, fig.6, col. 7 ll. 25-29; '945 patent, fig.8, col. 5 ll. 40-44; '135 patent, fig.8, col. 7 ll. 33-37; '551 patent, fig.8, col. 6 ll. 8-12; '499 patent, fig.8, col. 7 l. 61-col. 8 l. 1).

### 9.    The Patents of SiOnyx and Harvard

One patent asserted in this lawsuit is owned by SiOnyx outright: U.S. Patent No. 8,680,591, which names six SiOnyx employees as inventors (but not Carey or Mazur). The other

patent asserted in this lawsuit is owned by Harvard:  U.S. Patent No. 8,080,467 (naming both

Mazur and Carey as inventors).  Harvard, however, licensed that patent to SiOnyx on an

exclusive basis.  (ECF 342 Ex. G).  The Third Amended and Restated Exclusive Patent License

Agreement dated July 27, 2015, gives SiOnyx the exclusive right to develop, make, use, sell,

offer to sell, lease, or import the technologies covered by the claims.  (ECF 342 Ex. G at 7-8).[5]

In return, Harvard received a partial ownership interest in SiOnyx and the rights to certain

royalties.  (ECF 342 Ex. G at 11-17).  By its terms, the agreement covers technology falling

within the scope of a valid claim of the listed patents, and "future inventions."  "Future

Inventions" are defined as:

> [A] patentable invention that meets the following criteria:  (a) the invention was
> conceived and/or reduced to practice in the laboratories of Dr. Eric Mazur at
> HARVARD at any time during the Term; (b) the invention is (i) a method of
> making, an improved form of, or a new use specific to, BLACK SILICON and
> (ii) necessary or useful for the development of commercialization of LICENSED
> PRODUCTS; and (c) the only inventors of the invention (other than employees or
> consultants of [SiOnyx] are Dr. Eric Mazur and/or other researchers in his
> laboratory under Dr. Mazur's direction.

(ECF 342 Ex. G at 2).  It does not purport to cover "confidential information."  There appears to

be no other agreement concerning intellectual-property rights between Harvard and SiOnyx.

### 10.     The 2014 "Godzilla" Deal

On December 27, 2014, SiOnyx entered into a Memorandum of Understanding with a

large company whose name the parties insist is confidential; the Court will refer to it as

"Godzilla."  That MOU outlined the beginning of the terms of an exclusive development-and-

supply agreement under which SiOnyx would supply Godzilla with a custom sensor.  (ECF 349

Ex. A).  Although it was not legally binding, the MOU stated that Godzilla had proposed to pay

---

[5] The original exclusive patent-license agreement was dated February 10, 2006.  (ECF 342 Ex. G at 1).  It appears to have been amended to include new patents as they were filed.

SiOnyx $5,000,000 for the development and supply of the custom sensor, and $2,000,000 for an exclusive supply of a non-custom sensor.  (ECF 349 Ex. A at 1-2).  It also outlined several milestones to be reached before the binding agreement would be executed.

On February 20, 2015, SiOnyx and Godzilla executed a Feasibility Study Agreement, under which Godzilla paid SiOnyx $250,000 to evaluate the feasibility of using SiOnyx's technology for the application Godzilla had in mind.  (ECF 349 Ex. C, Ex. E, Ex. F).  Godzilla also performed its own feasibility study at that time.  (ECF 349 Ex. G).  In an email to SiOnyx on March 5, 2015, Godzilla seemed to conclude that the results from its feasibility study were discouraging enough to require "time . . . to reconsider a specification" for the custom sensor, but also indicated that it would "like to continue technical discussion about cross point of your customization category and our new plan."  (ECF 349 Ex. H at 1).

On March 20, 2015, SiOnyx proposed a revised schedule for project milestones.  (ECF 349 Ex. I).  Godzilla expressed reservations about that proposal, but agreed to talk about it at the next SiOnyx-Godzilla meeting.  (ECF 350 Ex. J).

On March 30, 2015, Godzilla canceled the upcoming meeting.  A representative of Godzilla, who copied at least nine Godzilla employees, sent an e-mail that stated the following: "We are very sorry but we are required to suspend the WebEx meeting by our IP section.  The period is not clear at this moment, unfortunately.  It might be very delicate because of IP related issue, I guess.  I ask for your kind understanding and cooperation."  (ECF 350 Ex. K at 1).  No SiOnyx-Godzilla transaction ultimately went forward.

In August 2015, after SiOnyx discovered the existence of HPK's patents, it confronted HPK.  At that time, SiOnyx and HPK entered into a "standstill agreement," by which they agreed not to sue each other for at least 30 days in order that they might attempt to negotiate a

settlement out of court.  (ECF 388-3 ¶¶ 1, 3).[6]

Carey testified that Saylor told him that Godzilla had terminated its business relationship with SiOnyx because it had discovered the existence of two of HPK's patents.  (ECF 350 Ex. N at 342:7-343:19).  Mazur also testified that Saylor told him that "the deal with [Godzilla] was off because of there's [sic] a discovery process that had shown the filing of the patent that infringed on our intellectual property," but that Saylor did not tell him which patent or anything else about it.  (ECF 350 Ex. M at 103:7-11, 110:8-20).  Saylor himself testified that, at an in-person meeting at Godzilla's offices sometime in the first quarter of 2015, an "executive officer" of Godzilla, or maybe its "inside counsel," told him that Godzilla had suspended the relationship because of HPK's patent portfolio.  (ECF 350 Ex. O at 77:19-78:4, Ex. P at 25:5-26:1; ECF 388-1 at 43:8-44:4, 45:9-24).  He testified that the entire Godzilla team he had been working with was present at that meeting, about a dozen people, and that a senior vice president or general manager might have been there too.  (ECF 388-1 at 45:25-46:3, 46:19-47:24).  But he could not remember the identity of the "executive officer" who told him that the reason the deal was off was HPK's patents.  No one else from SiOnyx appears to have been at the meeting.  (ECF 388-1 at 45:25-46:3).

Yamamoto, the senior managing director of HPK, testified that he discussed HPK's patents with thousands of people at the Photon Fair, and that he had also discussed them with customers.  (ECF 388-4 at 157:16-159:4).  Hisanori Suzuki, one of HPK's Rule 30(b)(6) deposition witnesses, testified that Godzilla was a customer of HPK at the time when Godzilla

---

[6] That agreement also tolled the limitations period for the "Term" of the agreement, which was defined as ending upon:  "the earlier of (a) the execution of final agreements resolving this dispute . . . or (b) the date thirty (30) days from the execution of this [Letter of Intent], provided, however, that this date may be extended by the mutual agreement of the parties."  (ECF 388-3 ¶¶ 1, 4).

broke off discussions with SiOnyx. (ECF 388-5 at 19:20-20:9, 20:22-21:4, 22:4-11, 27:2-28:11). Much later, on January 4, 2018, Godzilla emailed SiOnyx to say that it would like to sign a new NDA with SiOnyx, but the "corporate legal team decided recently that [Godzilla] should wait for the final [judgment] of legal matter between SiOnyx and [HPK]." (ECF 388-10).

### B. Procedural Background

SiOnyx and Harvard filed this action on October 1, 2015. The second amended complaint, deemed filed on May 8, 2017, asserts 24 counts. Counts 1-14 and 21-24 seek relief under 35 U.S.C. § 256 and assert that Mazur and Carey should be named sole joint inventors on each of HPK's nine patents, or, alternatively, that they be named joint co-inventors with the inventors currently listed on those patents. (ECF 163-2 ¶¶ 127-168, 262-273). Count 15 seeks declaratory judgment of the same. (*Id.* ¶¶ 169-173). Count 16 alleges that HPK breached the nondisclosure agreement. (*Id.* ¶¶ 174-181). Count 17 alleges that HPK and HC were unjustly enriched. (*Id.* ¶¶ 182-188). Count 18 has been voluntarily dismissed. (ECF 422). And Counts 19-20 allege that all defendants have infringed each of SiOnyx and Harvard's patents. (ECF 163-2 ¶¶ 215-261).

Defendants have filed six motions for partial summary judgment asserting the following contentions: (1) that Harvard and SiOnyx's claims for breach of contract are barred by the statute of limitations; (2) that SiOnyx cannot prove an unjust-enrichment claim against HPK; (3) that Harvard cannot prove an unjust-enrichment claim against HPK; (4) that SiOnyx and Harvard cannot prove unjust-enrichment claims against HC; (5) that SiOnyx and Harvard have failed to prove consequential damages; and (6) that SiOnyx and Harvard have failed to prove that Mazur is a co-inventor of HPK's patents. SiOnyx in turn has filed a motion for leave to amend the second amended complaint and a motion for partial summary judgment that HPK breached the nondisclosure agreement.

## II.    <u>Standard of Review</u>

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (internal quotation mark omitted). Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Essentially, Rule 56[] mandates the entry of summary judgment 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Coll v. PB Diagnostic Sys., Inc.*, 50 F.3d 1115, 1121 (1st Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). In making that determination, the court must "view the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009). When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and footnotes omitted). The non-moving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256-57.

## III.    <u>Analysis</u>

### A.    <u>Statute of Limitations</u>

Defendants HPK and HC have moved for summary judgment as to Count 16 (breach of contract against HPK) and Count 17 (unjust enrichment against HPK and HC) on the ground that those claims are barred by the statute of limitations. In response, plaintiffs contend that HPK fraudulently concealed the breach and therefore the limitations period should be tolled. They further seek permission to amend the second amended complaint to include allegations of

statutory and equitable tolling.

The limitations period for a breach-of-contract claim in Massachusetts is six years. Mass. Gen. Laws ch. 260, § 2; *Creative Playthings Franchising, Corp. v. Reiser*, 463 Mass. 758, 758 (2012). Where an unjust-enrichment claim is contractual in nature, the limitations period for that claim is likewise six years. *Diviacchi v. Affinion Grp., Inc.*, 2015 WL 3631605, at *11 (D. Mass. Mar. 11, 2015); *Suffolk Constr. Co. v. Benchmark Mech. Sys., Inc.*, 475 Mass. 150, 156-57 (2016). The period begins to run from the time the cause of action accrues, which is ordinarily the time of breach. *Saenger Org., Inc. v. Nationwide Ins. Licensing Assocs., Inc.*, 119 F.3d 55, 64 (1st Cir. 1997).

Massachusetts, however, follows the discovery rule, which can delay the accrual of a cause of action until the time "'when a plaintiff discovers, or any earlier date when she should reasonably have discovered, that she has been harmed or may have been harmed by the defendant's conduct.'" *Epstein v. C.R. Bard, Inc.*, 460 F.3d 183, 187 (1st Cir. 2006) (quoting *Bowen v. Eli Lilly & Co.*, 408 Mass. 204, 205-06 (1990)); *Riley v. Presnell*, 409 Mass. 239, 244 (1991) ("A cause of action will accrue when the plaintiff actually knows of the cause of action or when the plaintiff should have known of the cause of action."). "'A claim does not accrue when a person has a mere hunch, hint, suspicion, or rumor of a claim, but such suspicions do give rise to a duty to inquire into the possible existence of a claim in the exercise of due diligence.'" *Cutting v. United States*, 204 F. Supp. 2d 216, 225 (D. Mass. 2002) (quoting *Kronisch v. United States*, 150 F.3d 112, 121 (2d Cir. 1998)).

Under the statutory doctrine of fraudulent concealment, the limitations period can be tolled "if the wrongdoer . . . 'concealed the existence of a cause of action through some affirmative act done with intent to deceive.'" *Puritan Med. Ctr., Inc. v. Cashman*, 413 Mass.

167, 175 (1992) (quoting *Frank Cooke, Inc. v. Hurwitz*, 10 Mass. App. Ct. 99, 108 (1980)); *see* Mass. Gen. Laws ch. 260, § 12 ("If the person liable to a personal action fraudulently conceals the cause of such action from the knowledge of the person entitled to bring it, the period prior to the discovery of his cause of action by the person so entitled shall be excluded in determining the time limited for the commencement of the action.").

A limitations period can also be equitably tolled when "some affirmative misconduct by the party against whom it is employed" causes the other party to miss a filing deadline. *Kelley v. Nat'l Labor Relations Bd.*, 79 F.3d 1238, 1248 (1st Cir. 1996). Factors to consider in determining whether a limitations period should be equitably tolled include "(1) lack of actual notice of the filing requirement; (2) lack of constructive knowledge of the filing requirement; (3) diligence in pursuing one's rights; (4) absence of prejudice to the defendant; and (5) a plaintiff's reasonableness in remaining ignorant of the notice requirement." *Id.* (quoting *Kale v. Combined Ins. Co. of Am.*, 861 F.2d 746, 752-53 (1st Cir. 1988)).

Furthermore, a defendant might be equitably estopped from asserting the statute of limitations as a bar to a claim where "statements of the defendant lulled the plaintiff into the false belief that it was not necessary . . . to commence action within the statutory period of limitations . . . , that the plaintiff was induced by these statements to refrain from bringing suit, as otherwise [the plaintiff] would have done, and was thereby harmed, and that the defendant knew or had reasonable cause to know that such consequence might follow." *Pagliarini v. Iannaco*, 440 Mass. 1032, 1033 (2003) (alterations in original) (quoting *Ford v. Rogovin*, 289 Mass. 549, 552 (1935)) (internal quotation marks omitted). The plaintiff's reliance on the defendant's statements must be reasonable, and estoppel will not apply if a reasonable time remains within the limitations period for filing the action once the lulling has ceased. *Id.*

The question of when a cause of action accrued is normally a question of fact. *Riley*, 409 Mass at 240 ("[T]he question when a plaintiff knew or should have known of his cause of action is one of fact which in most instances will be decided by the trier of fact."); *see Murphy v. Aero-Med Ltd.*, 345 F. Supp. 2d 40, 45 (D. Mass. 2004).

Plaintiffs filed this action on October 1, 2015. Because the limitations period is six years, the latest date their claim could have accrued for this action to be considered timely, absent tolling, was October 1, 2009.[7]

Defendants contend that plaintiffs must have been aware of their potential breach-of-contract claim as early as February 2009, when Kobayashi sent Saylor the two emails disclosing the architecture and manufacturing methods of the photodiode HPK planned to exhibit at the Photon Fair in Japan. In defendants' view, if those diagrams and processes indeed contained plaintiffs' confidential information (which defendants dispute), attaching them to an email and announcing an intent to commercialize them should have put plaintiffs on notice of their claims for breach of contract and unjust enrichment. Defendants also point to the statements by Carey and Mazur that they were concerned and suspicious because the device depicted looked like it was covered by their intellectual property.

Plaintiffs, however, have put forth sufficient evidence to create a genuine issue of material fact as to whether their claims accrued at that time. The principal claim at issue here is

---

[7] Plaintiffs contend that they approached defendants about their potential claims in August 2015, that the parties entered into a "standstill agreement on August 21, 2015," that they only filed suit after discussions failed, and therefore the critical date for the statute of limitations is August 22, 2009. (ECF 325 at 10; ECF 388-3 ¶¶ 1, 3). But that agreement, by its terms, expired "thirty (30) days from the execution of this [agreement]" unless it was "extended by the mutual agreement of the parties," and that the applicable limitations period would be tolled for the period "begin[ning] as of the date of this agreement, and . . . end[ing] at the expiration of the term." (ECF 388-3 ¶¶ 1, 4). Plaintiffs have provided no evidence that the parties extended the date beyond September 20, 2015. Therefore, at best, the evidence shows that the claim could have accrued as late as September 1, 2009, and still be considered timely. The exact date, however, is inconsequential.

for breach of contract—specifically, the nondisclosure agreement that prohibits HPK from using SiOnyx's confidential information for any purpose other than "evaluating applications and joint[] development opportunities of pulsed laser process doped photonic devices." (ECF 316 Ex. A at 1). Therefore, the question is whether the e-mails put plaintiffs on notice that HPK had *used* SiOnyx's confidential information for the improper purpose of developing their own commercial photodiode.

Ordinarily, evidence of great similarity between the device HPK proposed to show at the Photon Fair and the confidential information SiOnyx had shared would be enough to raise a reasonable inference that HPK misused SiOnyx's information. That would seem to be sufficient to put a plaintiff on notice of its claim, or at least to trigger a duty to investigate further. Here, however, HPK's emails went out of their way to repeatedly assure plaintiffs that the device had been developed entirely from HPK's own knowledge and expertise. HPK witnesses testified that they intended the emails to communicate to SiOnyx that the device had been developed independently from the confidential information provided by SiOnyx. And Saylor testified that he interpreted HPK's email to mean that they had likely walled off the engineers who had been part of the potential SiOnyx-HPK collaboration from working on HPK's further enhanced-IR photodiode development because (1) such arrangements were common in the industry and (2) "otherwise, I don't know how he can claim that it's all their own know-how. They must have firewalled the team." (ECF 316 Ex. J at 189:3-10). That evidence is sufficient to create a genuine issue of material fact as to whether SiOnyx reasonably should have known that it had a potential claim for breach of contract prior to October 1, 2009.

SiOnyx has also proffered internal HPK emails that tend to show that HPK knew that the

assurances it was giving SiOnyx were false.[8]  Although the translation may be less than perfect, read in the light most favorable to plaintiffs, they suggest that the very sample prepared with SiOnyx was the basis of the product about to be commercialized.  (ECF 326-4 at 6).  That is enough to create a genuine issue of material fact as to whether HPK "concealed the existence of a cause of action through some affirmative act done with intent to deceive," *Puritan Med. Ctr*, 413 Mass. at 167, which would entitle SiOnyx to statutory tolling under Mass. Gen. Laws ch. 260, § 12.[9]  It may also be enough to allege affirmative misconduct warranting equitable tolling.

Defendants' motion for summary judgment that plaintiffs' breach-of-contract and unjust-enrichment claims are barred by the statute of limitations will therefore be denied.

Plaintiffs have also moved for leave to amend their complaint to include allegations of statutory and equitable tolling and equitable estoppel.  Plaintiffs explained at the hearing that the only reason they sought such amendment was so that they could raise those issues in response to defendants' motion for partial summary judgment on statute of limitations grounds.  All parties, and the Court, agree that plaintiffs may raise those issues whether or not the complaint is amended to expressly include them.  (March 16, 2018 Hearing Tr. 36:21-37:24).  Therefore, plaintiff's motion to amend has no practical effect and will be denied as moot.

### B.    Breach of Contract

SiOnyx has moved for summary judgment in its favor on the breach-of-contract claim, on the ground that "HPK breached the Mutual Non-Disclosure Agreement (1) by reverse

---

[8] Those emails were first produced to SiOnyx on Nov. 17, 2017.  (ECF 309 at 10).

[9] It is not wholly clear from the papers what date plaintiffs contend their claims did accrue.  Plaintiffs contend that they did not know that there had been no firewall until HPK filed their patents, which named the same engineers SiOnyx had spoken to as inventors.  (ECF 325 at 13; *see* ECF 326-14 at 17:40-20:10 (Carey testifying as a 30(b)(6) witness that he did not know about a particular patent application until 2015, even though it was published in 2011); ECF 325 at 16 (earliest patent filings would not have been public until September 2010)).

engineering the laser-processed texture created on prototype samples provided to HPK by SiOnyx under the NDA, (2) by utilizing its reverse engineering results and other SiOnyx Confidential Information, and disclosing the same, in Japanese and United States Patent Applications, (3) by developing and selling products derived from those reverse engineering efforts, and (4) by claiming ownership of the Patents that issued from Patent Applications based on SiOnyx confidential information." (ECF 336 at 2). Because the agreement provides that confidential information is to be kept confidential (not disclosed in patents), used only for joint development (not for reverse engineering or HPK product development), and owned by the disclosing party absent an express intellectual-property agreement (not made available for the receiving party to patent), those alleged actions would constitute a breach of the agreement.

It is useful at the outset to clarify exactly what SiOnyx claims is the confidential information at issue: it is, first, a photodiode architecture wherein the laser-textured surface is that opposite the surface through which light enters the device, and second, the particular texture achieved by SiOnyx's laser processing, which SiOnyx asserts has features of a particular target size. (ECF 336 at 7-8; ECF 337-40 at 20:10-22:1).

With respect to the architecture, HPK does *not* argue either (1) that it came up with the architectures to test contained in the April 2007 presentation[10] wholly or partially independently from the architectures disclosed by SiOnyx; (2) that the April 2007 architectures were meaningfully different from the architectures disclosed by SiOnyx; or (3) that the architectures disclosed in the patent were meaningfully different from either the architectures disclosed by SiOnyx or the architectures in the April 2007 presentation. Instead, it argues that the

---

[10] The proposed April 2007 architectures appear to be identical to the actually tested architectures depicted in the November 2007 presentation, which appears to show the direction of illumination with yellow arrows. (*Compare* ECF 337-7 at HPK0010142, *with* ECF 337-9 at HPK0010400, HPK0010414).

architectures were not actually "Confidential Information" within the meaning of the agreement, because HPK had already conceived of a photodetector having "the textured silicon layer positioned on the surface <u>opposite</u> the p-n junction, just as in Dr. Carey's proposal" prior to its meetings with SiOnyx.  (ECF 376 at 11 (footnote omitted)).  It points to a presentation made by Nagano in November 2006 that includes a device architecture with a (non-laser) textured surface on one side and a p-doped region on the other side, like Carey's Alternative #1.  (ECF 377-14 at HPK0068533).  That evidence, however, is not dispositive of the claim.

First, a textured surface opposite the p-n junction is not what SiOnyx claims is its confidential contribution (although its architecture exhibits that feature); to defeat summary judgment, it appears that HPK must show that it had already conceived of a device having a textured surface opposite the surface through which light enters the device.

Second, the November 2006 diagram does not show what side the light comes in, and HPK has offered no testimony, either by the author or someone skilled at looking at such diagrams, as to the side from which the light would be understood to enter the device.  There are three large black arrows that, if they did represent light, would show that it was incident on the *same* surface as the texturing.  In addition, the diagram must be flipped upside-down to make it resemble the architecture disclosed by Carey and present in the patents.  That makes it even more critical to understand from which side the light is entering the device—in every other diagram, even other diagrams that do not show the direction of the light, there appears to be no dispute that it comes in from the top.  (*See* ECF 337-3 at 5; ECF 337-7 at HPK0010142).  Furthermore, another slide in the same presentation shows a close-up of the irregular asperity with light seeming to enter from the same side on which the asperity was formed.  (ECF 377-14 at HPK0068525).

Nevertheless, the diagram is evidence at least that HPK was already considering using texturing, and had already conceived of an architecture where the texturing was opposite the p-n junction. The Court simply cannot determine from the evidence provided whether light would always or typically come from the p-side of a p-n photodiode or whether, at least, it would be understood to come from that direction in that image. Absent any testimony one way or the other, the November 2006 diagram appears to raise a genuine question of material fact as to whether HPK had already considered the key feature of the architecture proposed by Carey.

As to the textured surface, HPK does not contest that it retained SiOnyx's textured samples and used them as a visual and performance reference in the course of developing its own black silicon technology. Instead, HPK first argues that it could not possibly have copied the laser processing from SiOnyx because SiOnyx never disclosed the parameters of its process. But that argument misses the point. SiOnyx does not accuse HPK of stealing its laser parameters; it accuses HPK of using its images of SiOnyx's successful surface asperity to reverse-engineer the appropriate parameters. SiOnyx has presented ample evidence to show that HPK was comparing its surfaces with the surface achieved by SiOnyx and shared under the nondisclosure agreement.

Second, HPK contends that the texture of HPK's development samples, actual product, and patent figures is (1) observably different from the texture of SiOnyx's samples, even on the slide where HPK's sample is labelled "visually equivalent" to that of SiOnyx; and (2) closer to the textures disclosed in Mazur's and Carey's publicly available data (which, according to HPK, show rounded structures) than to the textures of SiOnyx's samples (which show sharper, conical structures). HPK cites to a statement by SiOnyx's infringement expert that microstructures in HPK's CCD photodiode product are similar to the structures disclosed in Harvard's '467 patent, which claims priority to an application that first published in 2005. (ECF 377-18 at 70). SiOnyx

contends that this is only attorney argument about their relative similarity and points out that, according to the presentation, HPK considered its development sample and SiOnyx's wafer "visually equivalent" at the time. But the pictures, side by side, in combination with expert testimony tending to show that HPK's textures are similar to publicly available textures, is sufficient to create a genuine issue of material fact as to whether SiOnyx's confidential texture was ultimately incorporated into HPK's patents or products.

The Court acknowledges that even if the texture HPK ultimately achieved looked more like publicly available textures than the texture provided to it by SiOnyx, the evidence shows— and HPK does not dispute—that it *actually used* SiOnyx's wafer during its black silicon development. That use is prohibited under the nondisclosure agreement as long as the texture SiOnyx gave them was confidential. HPK does not argue that that texture was publicly available—indeed, their whole opposition is premised on the idea that the texture on SiOnyx's wafer was *different* from the publicly available textures (which HPK says its patent and product incorporate). (*See* ECF 376 at 14 ("Not only are HPK's textures different from the ones formed by SiOnyx during the joint development, but they are actually more similar to the prior art that Harvard and Dr. Carey had previously published.")).

The consequences, however, of HP's use of SiOnyx's wafer are far from clear. It may have been a breach of the agreement to have used the wafers at all. But if in fact the wafers gave HPK very little to go on, if HPK had to guess at the parameters from publicly available documents, and if the design HPK ultimately came up with was very different from the particular texture SiOnyx claims was confidential, then the full extent of relief SiOnyx requests is not appropriate. For example, if the texture ultimately arrived at was materially different from SiOnyx's confidential texture, then HPK cannot be said to have disclosed SiOnyx's confidential

information in its patents or to have breached the agreement by claiming ownership in the patents. It cannot be that *any* use of SiOnyx's wafers in *any* step of HPK's development process of its own black silicon entitles SiOnyx to complete ownership of everything discovered and commercialized from that point forward. While the evidence may establish *some* breach of the agreement, at a minimum, there is a genuine question of material fact as to the scope of that breach. Summary judgment as to the breach of contract claim is therefore inappropriate.

### C. Unjust Enrichment

"Unjust enrichment provides an equitable stopgap for occasional inadequacies in contractual remedies at law by mandating that '[a] person who has been unjustly enriched at the expense of another is required to make restitution to the other.'" *Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 412 F.3d 215, 234 (1st Cir. 2005) (alteration in original) (quoting *Fox v. F&J Gattozzi Corp.*, 41 Mass. App. Ct. 581, 589 (1996)). "A plaintiff asserting a claim for unjust enrichment must establish not only that the defendant received a benefit, but also that such a benefit was unjust, 'a quality that turns on the reasonable expectations of the parties.'" *Metro. Life Ins. Co. v. Cotter*, 464 Mass. 623, 644 (2013) (quoting *Global Inv'rs Agent Corp. v. Nat'l Fire Ins. Co.*, 76 Mass. App. Ct. 812, 826 (2010)). The elements of an unjust-enrichment claim are "(1) a benefit conferred on the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) acceptance or retention by the defendant of the benefit under the circumstances would be inequitable without payment of its value." 26 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 68:5 (4th ed. 1993) (cited by *Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 552 F.3d 47, 58 (1st Cir. 2009)).

"A plaintiff is not entitled to recover on a theory of quantum meruit where there is a valid contract that defines the obligations of the parties." *Bos. Med. Ctr. Corp. v. Sec'y of Executive*

*Office of Health & Human Servs.*, 463 Mass. 447, 467 (2012) (citing *York v. Zurich Scudder Invs., Inc.*, 66 Mass. App. Ct. 610, 620 (2006); Restatement (Third) of Restitution and Unjust Enrichment § 2 (2011) ("A valid contract defines the obligations of the parties as to matters within its scope, displacing to that extent any inquiry into unjust enrichment.")). "Massachusetts law does not allow litigants to override an express contract by arguing unjust enrichment." *Platten v. HG Bermuda Exempted Ltd.*, 437 F.3d 118, 130 (1st Cir. 2006).

Disclosure of confidential information has been considered a "benefit" in the context of unjust-enrichment suits. *Mass Eye & Ear*, 552 F.3d at 57-58; *Mass Cash Register, Inc. v. Comtrex Sys. Corp.*, 901 F. Supp. 404, 423 (D. Mass. 1995) (quoting *John Alden Transp. Co. v. Arnold Bloom*, 11 Mass. App. Ct. 920, 921 (1981)).

### 1.     The Claim of SiOnyx against HPK

HPK argues that the availability of a remedy for breach of contract means that there is a remedy at law for the complained-of conduct and therefore SiOnyx's unjust-enrichment claim against HPK must be dismissed. "[A] party with an adequate remedy at law cannot claim unjust enrichment . . . .   It is the availability of a remedy at law, not the viability of that remedy, that prohibits a claim for unjust enrichment." *Shaulis v. Nordstrom, Inc.*, 865 F.3d 1, 16 (1st Cir. 2017); *see Platten*, 437 F.3d at 130; *Reed v. Zipcar, Inc.*, 883 F. Supp. 329, 334 (D. Mass. 2012) (holding that the existence of a chapter 93A claim, regardless of its viability, barred plaintiff's claim for unjust enrichment); *Fernandes v. Havkin*, 731 F. Supp. 2d 103, 114 (D. Mass. 2010) (same).

It is true that plaintiffs may plead breach of contract and unjust enrichment as alternative theories, even though they are mutually exclusive. *Cooper v. Charter Commc'ns Entm'ts I, LLC*, 760 F.3d 103, 112-13 (1st Cir. 2014) (pleading stage); *Lass v. Bank of Am. N.A.*, 695 F.3d 129, 140-41 (1st Cir. 2012) (pleading stage). Where claims have been allowed to proceed in parallel

beyond the pleading stage, it appears to be in cases where the enforceability of the contract is in dispute. *See, e.g., Sentinel Prods. Corp. v. Mobile Chem. Co.*, 2001 WL 92272, at *1 (D. Mass. Jan. 17, 2001) (letting unjust enrichment claims go forward alongside breach of contract at summary judgment stage because contract alleged to be flawed).

But this case is no longer at the pleading stage. Furthermore, the parties agree that the nondisclosure agreement is valid and enforceable, and covers the exchange of information between the parties. That contract therefore makes available an adequate remedy at law. It is true that the parties dispute whether the information provided was confidential and therefore whether SiOnyx's breach of contract claim will ultimately succeed, but that goes to the viability, not the availability, of the claim. In other words, the scope of the contract covers the exchange even of nonconfidential information, as the parties expressly agreed as to what would constitute confidential information and what the allowed and prohibited uses of confidential and nonconfidential information were. And surely if the information is not confidential, there was nothing unjust about HPK using it.

HPK's motion for partial summary judgment on SiOnyx's unjust enrichment claim will therefore be granted.

### 2. The Claim of Harvard against HPK

HPK further contends that partial summary judgment should be granted on Harvard's claim for unjust enrichment because (1) Harvard cannot show that it enriched HPK and (2) Harvard has an adequate remedy at law by way of its patent license agreement with SiOnyx.

It is undisputed that Harvard never itself entered into a nondisclosure agreement with HPK. Rather, Harvard is the assignee of one of the patents asserted in this case, of which SiOnyx is the exclusive licensee. (*See* ECF 342 Ex. G). SiOnyx argues that Harvard nonetheless had an interest in the confidential information provided by SiOnyx to HPK (because

it was the same technology that was covered by the patent), and that HPK was unjustly enriched when it misappropriated that information.

Harvard, however, has not provided any evidence that it had any interest in that confidential information separate and apart from its interest in the patents licensed to SiOnyx. It points to some evidence tending to show that Mazur was present at the first meeting between SiOnyx and HPK, and that he had collaborated with Carey on the architectures shared with HPK. (ECF 342 Ex. E at 335:3-336:22; ECF 380-2 at 149:18-152:16). Mazur was affiliated with both Harvard and SiOnyx at that time. He stated in his deposition that he represented both Harvard and SiOnyx at the initial meeting. (ECF 380-2 at 149:18-23). But he could only represent Harvard to the extent that Harvard had an interest in the technology conveyed. Harvard has not presented any evidence that Mazur's involvement alone would give them an interest. And the only intellectual-property agreement between Harvard and SiOnyx appears to be the patent-license agreement.[11]

Harvard is correct that the patent-license agreement does not provide a remedy for foreign sales of products developed through misuse of the confidential information provided to HPK or for reputational harm from wrongful use of its intellectual property. (ECF 379 at 4). But that is because Harvard did not bargain for that. Even assuming that the confidential information shared by SiOnyx was developed jointly with Harvard, and that Harvard therefore had some right to determine how it was used, Harvard did not contractually retain that right. If it had wanted SiOnyx to keep information confidential or to use it for only certain purposes, it

---

[11] Assume Harvard does have an unjust enrichment claim, and a jury finds that HPK was unjustly enriched and awarded damages equal to the profits it made on its foreign sales. SiOnyx's contract claim and Harvard's unjust enrichment claim are linked—it is one disclosure of confidential information, allegedly owned by them both. Therefore, damages would be owed to both. But how would those damages be split? There is no agreement defining the degree to which the confidential information is owned by SiOnyx as opposed to Harvard.

should have included that in its agreement with SiOnyx. It did not do that. Instead it granted SiOnyx the exclusive right to use the technology covered by the patents according to certain conditions stated in the license. In other words: either the allegedly misused confidential information at issue here is within the scope of the exclusive license agreement (in which case Harvard's rights to it are governed by that license agreement), or it is not covered by the agreement (in which case there is no evidence that Harvard has any right to it at all).

Harvard argues that even if the patent-license agreement provides for an adequate remedy at law, it should be allowed to maintain its unjust-enrichment claims in parallel. While Harvard is correct that courts sometimes allow legal and equitable claims to proceed in parallel at the pleadings state, that is not appropriate here. Again, unjust enrichment is a quasi-contractual claim that can arise when there is no enforceable contract governing the conduct at issue. *Broderick v. PNC Mortg. Corp.*, 2013 WL 1187111, at *3 (D. Mass. Mar. 20, 2013). Here, there is no dispute that Harvard's contract with SiOnyx is valid and enforceable. That contract sets out Harvard's rights with respect to the technology at issue, and there is no basis for recovery under a theory of quasi-contract.

HPK's motion for partial summary judgment on Harvard's unjust-enrichment claim will therefore be granted.

### 3.    The Claim of SiOnyx and Harvard against HC

HC has moved for summary judgment on plaintiffs' unjust-enrichment claim on the ground that it did not receive any benefit from the plaintiffs—only HPK did. As to Harvard's claim against HC, summary judgment will be granted for the same reasons summary judgment was granted as to Harvard's unjust-enrichment claim against HPK. As to SiOnyx's claim against HC, summary judgment will be denied.

HC points primarily to *Blake v. Professional Coin Grading Service*, 898 F. Supp. 2d 365

(D. Mass. 2012), to support its position that to make out a claim for unjust enrichment, the benefit must be conferred *directly* by the plaintiff.  In that case, the plaintiff had disclosed his confidential coin-grading system to the marketing director of Numismatic Guaranty Corporation of America, a coin-grading company, which in turn disclosed the information to Professional Coin Grading Service, another coin-grading company.  *Id.* at 375-76.  The *Blake* court held that the complaint had failed to state a claim for unjust enrichment against Professional Grading because it "fail[ed] to state that the benefit was 'conferred upon the defendant *by the plaintiff*.'" *Id.* at 390 (citing *Mass. Eye & Ear*, 412 F.3d at 233-34).  The court contrasted an unjust-enrichment theory of recovery (which is available as an equitable remedy where there is no enforceable contract between the parties) with a theory based on misappropriation of trade secrets (which allows recovery from a third party who knowingly benefits from a wrongfully obtained secret).  *Id.*  The court concluded:  "Any alleged interaction regarding the confidential information took place between Numismatic and [plaintiff].  Professional Grading is too far removed from this exchange to warrant liability on an unjust enrichment theory."  *Id.* at 390-91.

HC reads *Blake* too narrowly.  *Blake* explained that unjust enrichment is a quasi-contract theory developed to provide relief in situations normally governed by contract law; it is not an available remedy against third parties that never had a quasi-contractual relationship with a plaintiff.  *See also Taylor Woodrow Blitman Constr. Corp. v. Southfield Gardens Co.*, 534 F. Supp. 340, 347 (D. Mass. 1982) (explaining that a plaintiff may have an unjust-enrichment claim against one who would arguably have had the status of a third-party beneficiary under the non-existent or unenforceable contract).  Here, however, HC is not an independent third party; it is the U.S. sales arm of HPK, and wholly owned, albeit indirectly, by HPK.  HC is the vehicle through which HPK sells its products in North America, and those very products are alleged to

be made from SiOnyx's confidential information.  An HC employee even signed the nondisclosure agreement on behalf of HPK.  SiOnyx has raised a genuine question of material fact as to whether the relationship between HPK and HC is close enough for HC to be bound, as a matter of equity, by the confidentiality agreement signed by HPK.

HC's motion for partial summary judgment will therefore be granted as to Harvard's claim for unjust enrichment and denied as to SiOnyx's claim for unjust enrichment.

### D.     Consequential Damages

SiOnyx contends that HPK is liable for the damages it lost when its deal with Godzilla fell through, because those damages were a reasonably foreseeable consequence of HPK's breach of the nondisclosure agreement and procurement of patents using SiOnyx's confidential information.  HPK contends that SiOnyx cannot prove that it lost the business deal *because of* HPK's patents, and therefore summary judgment should be granted in its favor as to that issue.

The most direct evidence that it was HPK's patents that caused the business relationship to break down is Saylor's testimony that an "executive officer" at Godzilla told him so at an in-person meeting in Japan sometime in the first quarter of 2015.[12]  HPK contends that the statement is inadmissible hearsay.

"'Hearsay' means a statement that:  (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c).  "It is black-letter law that hearsay evidence cannot be considered on summary judgment."  *Dávila v. Corporación de P.R. Para La Difusión Pública*, 498 F.3d 9, 17 (1st Cir. 2007).

---

[12] Mazur's and Carey's statements rely on Saylor's, and therefore the admissibility of their testimony depends in the first instance on the admissibility of Saylor's.  Fed. R. Evid. 805 ("Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule.").

SiOnyx is offering Saylor's testimony that the executive made the statement that "the deal is off because of HPK's patents" in order to prove that the *reason* the deal was terminated was HPK's patents. It contends that this statement falls under the state-of-mind exception to the hearsay rule. Rule 803(3) provides:

> A statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will.

Fed. R. Evid. 803(3). The out-of-court statement must be one made essentially contemporaneously with the state-of-mind sought to be proved. *United States v. Rivera-Hernández*, 497 F.3d 71, 81 (1st Cir. 2007) ("To be admissible under the state-of-mind exception, 'a declaration . . . must mirror a state of mind, which, in light of all the circumstances, including proximity in time, is reasonably likely to have been the same condition existing at the material time.'" (quoting *Colasanto v. Life Ins. Co. of N. Am.*, 100 F.3d 203, 212 (1st Cir. 1996))).

The First Circuit has squarely held that testimony of this kind is admissible in *Packgen v. Berry Plastics Corp.*, 847 F.3d 80 (1st Cir. 2017). There, the plaintiff, who sold catalyst containers, alleged that the failure of their newly designed containers was due to a faulty plastic coating, and sued the supplier of that coating. *Id.* at 84. The plaintiff sought to prove that they lost sales because of the faulty coating, and its president and sales manager were allowed to testify that decision-makers at 37 refineries had told them, before there were problems with the containers, that they would purchase containers from the plaintiff the next time they needed them. *Id.* at 90. The First Circuit explained that "[o]ut-of-court statements by a customer or employee may be admissible under Rule 803(3) to show intent or motive," and affirmed the admission of that testimony. *Id.* (citing *Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676, 694-95

(7th Cir. 2011); *Callahan v. A.E.V., Inc.*, 182 F.3d 237, 252 (3d Cir. 1999)).[13]

Defendant argues that Godzilla's motivations are the very thing sought to be proved, and that SiOnyx would use the state-of-mind exception to completely vitiate the hearsay rule when the motivation of an out-of-court declarant is at issue. But the rule, by its terms, expressly allows out-of-court statements made to show motivation. Defendant is correct that, when used to show intent or an emotional condition, the state of mind exception "has been held not to allow more expansive statements elaborating upon the underlying reasons for the declarant's state of mind." *United States v. Alzanki*, 54 F.3d 994, 1008 (1st Cir. 1995). But that means that Rule 803 cannot be used to show causation of the declarant's state of mind; here, it means Rule 803 could not be invoked to allow testimony about the declarant's reasons for believing that HPK's patents posed a problem. Furthermore, out-of-court statements are routinely admitted pursuant to Rule 803 to show intent, even where intent is the very thing sought to be proved. *United States v. Ouimette*, 753 F.2d 188, 191-92 (1st Cir. 1985).

The Court does not find Saylor's inability to identify the individual declarant by name or occupation to be fatal. It appears that there is enough information to infer that whoever spoke had the authority to speak for the company; was, if not a decisionmaker himself, privy to the company's decision-making process; and that he (there is no dispute that it was a man) believed that the reason Godzilla decided to terminate its business relationship was based on HPK's patents. *See Callahan v. A.E.V., Inc.*, 182 F.3d at 252 n.11 (explaining that "the fact that the declarants are not specifically identified" was not "relevant for determining whether their statements fall within the Rule 803(3) hearsay exception" because "[t]he relevance of their

---

[13] Note that the district court did not allow those witnesses to testify as to "why those thirty-seven refineries subsequently did not make purchases," and that issue was not addressed by the First Circuit. *Packgen*, 847 F.3d at 85.

statements depends only on the fact that they were the plaintiffs' customers, not their particular identities."); *see also Packgen*, 847 F.3d at 91 ("Packgen's witnesses knew the declarants and testified that all declarants were decision-makers at their respective refineries."). The statement was made at a meeting attended by the entire Godzilla team of about a dozen people, possibly including a senior vice president or general manager, and presumably went uncontradicted by any other Godzilla representatives. (ECF 388-1 at 45:9-47:24). The fact that Saylor cannot remember the name or title of the person who actually said it to him—even though it was only two years ago and Godzilla represented a multimillion dollar business deal that abruptly halted— is certainly an avenue open for cross-examination, and may ultimately affect the credibility of the testimony. But a sufficient foundation has been laid from which a reasonable juror could infer that the statement reflected the motivation of Godzilla, the corporation.

Furthermore, other evidence tends to bolster the reliability of the statement. SiOnyx has provided evidence that Godzilla canceled a meeting by e-mail because of an "IP related issue" in March 2015. That e-mail was addressed to at least nine Godzilla employees. Godzilla was a customer of HPK around the time that it terminated its talks with SiOnyx, and a senior manager of HPK testified that he spoke to customers about HPK's patents and showed a graph from a patent to thousands of people at the Photonics Fair. No other patents concerning the technology at issue have materialized as candidates for the "IP related issue" that allegedly scared away Godzilla. And it was around this time that SiOnyx apparently became aware of HPK's patents and started pursuing this lawsuit. (*See* ECF 388-3 (August 2015 standstill agreement)).

HPK's motion for partial summary judgment on plaintiffs' claim for consequential damages will therefore be denied.

### E.     Co-Inventorship

Finally, HPK has moved for partial summary judgment as to Counts 1-14 and 21-24 on

the ground that Mazur is not a co-inventor on any of HPK's patents.

The courts are granted the authority to order the Director of the Patent and Trademark Office to correct a patent "[w]henever through error a person is named in an issued patent as the inventor, or through error an inventor is not named in an issued patent." 35 U.S.C. § 256. Inventorship is a question of law based on underlying fact findings. *Gen. Elec. Co. v. Wilkins*, 750 F.3d 1324, 1329 (Fed. Cir. 2014). "The general rule is that a party alleging misjoinder or non-joinder of inventors must meet the heavy burden of proving its case by clear and convincing evidence." *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1358 (Fed. Cir. 2004). "Conception is the touchstone of inventorship," and it is "'the formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice.'" *Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40 F.3d 1223, 1227-28 (Fed. Cir. 1994) (quoting *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 803 F.2d 1367, 1376 (Fed. Cir. 1986)). Where an invention is the work of several inventors, "each person claiming to be a joint inventor must have contributed to the conception of the invention," and "must show that he made 'a contribution to the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention, and [did] more than merely explain to the real inventors well-known concepts and/or the current state of the art.'" *Acromed Corp. v. Sofamor Danek Grp., Inc.*, 253 F.3d 1371, 1379 (Fed. Cir. 2001) (alteration in original) (quoting *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1351 (Fed. Cir. 1998).

"[T]he case law is unequivocal that an inventor's testimony respecting the facts surrounding a claim of derivation or priority of invention cannot, standing alone, rise to the level of clear and convincing proof." *Price v. Symsek*, 988 F.2d 1187, 1194 (Fed. Cir. 1993). Rather, "[t]he inventor must prove his conception by corroborating evidence, preferably by showing

contemporaneous disclosures." *Univ. of Pittsburgh v. Hedrick*, 573 F.3d 1290, 1298 (Fed. Cir. 2009); *Burroughs Wellcome*, 40 F.3d at 1228 ("Because it is a mental act, courts require corroborating evidence of a contemporaneous disclosure that would enable one skilled in the art to make the invention.").[14]

The Federal Circuit has "provided considerable guidance on the standards by which to judge whether or not an inventor's testimony has been sufficiently corroborated." *Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344, 1350 (Fed. Cir. 2001). Contemporaneous documentary or physical evidence is the most reliable, because "the risk of litigation-inspired fabrication or exaggeration is eliminated." *Id.* at 1351. Post-invention oral testimony of someone other than the inventor may corroborate, but such testimony is "more suspect, as there is more of a risk that the witness may have a litigation-inspired motive to corroborate the inventor's testimony." *Id.*

> [The Federal Circuit] has articulated the following illustrative factors that may be useful in guiding the determination of whether a witness' testimony provides sufficient corroboration: 1) the relationship between the corroborating witness and the alleged [prior inventor]; 2) the time period between the even and trial; 3) the interest of the corroborating witness in the subject matter in suit; 4) contradiction or impeachment of the witness' testimony; 5) the extent and details of the corroborating testimony; 6) the witness' familiarity with the subject matter of the patented invention and the prior [invention]; 7) probability that a prior [invention] could occur considering the state of the art at the time; and 8) impact of the invention on the industry, and the commercial value of its practice.

*Id.* The Federal Circuit has also acknowledged that "[c]ircumstantial evidence about the inventive process, alone, may also corroborate." *Id.* (citing *Knorr v. Pearson*, 671 F.2d 1368, 1373 (C.C.P.A. 1982)).

---

[14] Notably, this is an exception to the basic principle that an affidavit based on personal knowledge is sufficient to establish a material fact for purposes of summary judgment. Fed. R. Civ. P. 56(c)(1), (4).

Both Mazur and Carey testified that they together came up with the architectures sent to HPK in January 2007. (ECF 353 Ex. A at 336:14-22; ECF 353 Ex. B at 176:8-177:23). As they are both seeking to be named as inventors on HPK's patents, their testimony must be corroborated in some way. They both testified that there was no contemporaneous document tending to corroborate their joint invention. (ECF 353 Ex. A at 335:10-15; ECF 353 Ex. B at 177:19-23).

Plaintiffs primarily point to Carey's January 17, 2007 email showing the architectures and referring to "past experiments" as documentary evidence corroborating the testimony that he and Mazur jointly conceived of those architectures. (ECF 337-3). But there is no indication, either in that email or in the testimony to be corroborated, that those "past experiments," whatever they were, involved Mazur—indeed, the testimony suggests only that there were "discussions" about the architectures, not experiments.

Plaintiffs argue that both Mazur and Carey testified that Saylor was involved in the architecture conversations, and therefore Saylor could testify as to Mazur's involvement. Apart from the fact that Saylor is another SiOnyx employee and therefore not exactly disinterested (although not seeking to be named as an inventor), SiOnyx has not put forth any actual testimony by Saylor on this point. Because Saylor has not submitted a sworn statement, the Court cannot consider his hypothetical testimony as part of this summary judgment proceeding. Fed. R. Civ. P. 56(c).

Absent any direct corroboration of Mazur's conception of the confidential architectures, plaintiffs present a hodgepodge of circumstantial evidence tending to show that Mazur was contributing to SiOnyx. First, plaintiffs present evidence that Mazur was the alleged inventor of black silicon in the 1990s and that HPK understood him to be the original inventor of laser-

processed black silicon. They further point to evidence that Mazur was affiliated with SiOnyx as an owner and advisory-board member, that he consulted with the company during the period the nondisclosure agreement was in force, and that he presented information on black-silicon technology at the first meeting between SiOnyx and HPK. But plaintiffs do not attempt to show that Mazur (or Carey) contributed to the particular laser texturing that is included in the patents; nor does it argue in its opposition that a contribution to the particular laser texturing disclosed in the patents would, on its own, be sufficient to constitute joint inventorship. Rather, plaintiffs base their inventorship argument on the transmission of the confidential architectures (in particular, the idea that the textured surface should be opposite the light-incident surface).[15] Thus, Mazur's contributions to black-silicon technology (some of which has long been in the public domain) do not speak to the question of whether he in fact conceived of the architectures in question.

Finally, the fact that HPK copied Mazur on the 2009 emails does not show that HPK thought Mazur was an inventor of the architectures. Mazur had a prior relationship with HPK, was the person to introduce Carey to HPK, and was still affiliated with SiOnyx—copying him on the email could not be viewed by a reasonable jury as corroboration that he conceived of the architectures with Carey.

Even taken together, a reasonable jury could not find that evidence to be clear and

---

[15] This is in contrast to SiOnyx's arguments under its breach-of-contract theory, in which SiOnyx does allege that HPK breached the nondisclosure agreement by misusing its proprietary texturing.

As part of the preliminary-injunction hearing, Dr. Carey testified that in addition to the device architecture showing a laser-textured surface opposite the incident light, there were aspects of the laser-texturing process that were confidential. (ECF 337-40 at 21:2-22:1). Specifically, he testified that the publicly available information about "black silicon associated with Harvard or pretty much anywhere . . . involves very, very large structures" and that SiOnyx had learned that there was a preferred size which had the benefits of improved IR optical response without disadvantageous materials properties. (*Id.*). But that testimony does not mention Mazur, or suggest that he was involved in the further refinement of the laser-texturing process.

convincing proof that Mazur is a co-inventor.[16]  Therefore, HPK's motion for partial summary

judgment that Mazur is not a co-inventor of HPK's patents will be granted.

## IV.    Conclusion

For the foregoing reasons:

- HPK and HC's motion for partial summary judgment that SiOnyx's and

    Harvard's claims for breach of contract and unjust enrichment are barred by the

    statute of limitations is DENIED;

- SiOnyx and Harvard's motion for leave to amend the second amended complaint

    is DENIED as moot;

- SiOnyx's motion for partial summary judgment that HPK breached the non-

    disclosure agreement is DENIED;

- HPK's motion for partial summary judgment on SiOnyx's unjust enrichment

    claim is GRANTED;

- HPK's motion for partial summary judgment on Harvard's unjust enrichment

    claim is GRANTED;

- HC's motion for partial summary judgment on SiOnyx's and Harvard's unjust

    enrichment claims is GRANTED as to the claim of Harvard and otherwise

    DENIED;

- HPK's motion for partial summary judgment on SiOnyx's claim for consequential

---

[16] SiOnyx argues that once it has put forth some evidence that Mazur was a co-inventor, the burden of production should shift to HPK to show that he was not, and that HPK has put forth no evidence to show that the named inventors on the patents are the true inventors.  *See Safeco Prods. Co. v. Welcom Prods., Inc.*, 799 F. Supp. 2d 967, 988 (D. Minn. 2011) (shifting the burden of production where alleged co-inventor provided corroborated, *prima facie* evidence sufficient for a jury to find that he was an inventor).  But SiOnyx has the ultimate burden to show by clear and convincing evidence that Mazur was an inventor.  It cannot do so without corroboration of Mazur's testimony.  The inventors listed on an issued patent are presumed to be correct, and HPK has no burden to produce evidence to support the status quo.

damages is DENIED;

- HPK's motion for partial summary judgment that Mazur is not a co-inventor is GRANTED.

**So Ordered.**

/s/  F. Dennis Saylor
F. Dennis Saylor, IV
Dated:  July 24, 2018                          United States District Judge