UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SIONYX, LLC, and <br> PRESIDENT AND FELLOWS OF <br> HARVARD COLLEGE, <br><br> Plaintiffs, <br><br> v. <br><br> HAMAMATSU PHOTONICS K.K., <br> HAMAMATSU CORP., and <br> OCEAN OPTICS, INC., <br><br> Defendants. | Civil Case No. <br> 15-13488-FDS |

## ORDER ON PLAINTIFFS' RENEWED MOTION TO COMPEL DISCOVERY

SAYLOR, J.

This is a case for correction of inventorship, patent infringement, and breach of a nondisclosure agreement. Plaintiffs SiOnyx, LLC and President and Fellows of Harvard College have moved to compel certain discovery responses from defendants Hamamatsu Photonics K.K ("HPK") and Hamamatsu Corporation ("HC"). For the following reasons, that motion will be granted in part and denied in part.

### I. Background

The factual background for this case is extensively documented in the Court's summary judgment orders.

Briefly, SiOnyx and Harvard assert (1) claims for breach of contract and unjust enrichment related to certain confidential information they allegedly provided to HPK; (2) claims for patent infringement; and (3) claims for correction of inventorship on certain of HPK's patents (the "Disputed Patents").

SiOnyx and HPK entered into a mutual nondisclosure agreement in 2007 in order to explore a possible business relationship related to laser-textured, infrared-sensing silicon photonic devices. (Pl. 1st Mot. to Compel Ex. 1). That agreement required that any confidential information disclosed was to be used "solely for the limited purpose of <u>EVALUATING APPLICATIONS AND JOINTS [sic] DEVELOPMENT OPPORTUNITIES OF PULSED LASER PROCESS DOPED PHOTONIC DEVICES</u> and for no other purposes whatsoever." (*Id.* Ex. 1). SiOnyx used its proprietary laser technology to texture the surfaces of some HPK test devices and returned those devices to HPK for further processing. (Pl. 1st Mot. to Compel Ex. 4). The parties worked together to test the infrared absorption properties of those devices, which showed that the laser-textured devices worked at least somewhat better than the control devices. (*Id.* Ex. 5 at HPK001411). HPK terminated its relationship with SiOnyx, but kept the test devices. (*Id.* Ex. 6 at 84:5-10). HPK continued to develop textured silicon photonic devices. An HPK slide presentation shows that at some point in 2008, HPK was visually comparing the texture on silicon wafers it was able to create with the texture on the devices it retained from SiOnyx. (*Id.* Ex. 6 at 131:13-142:7; Pl. Mot. for Summ. J. Ex. M at 145:4-9).

Starting in 2009, HPK began to apply for patents directed to similar technology. It was ultimately awarded nine U.S. patents relating to silicon photodetectors with a textured surface that improves absorption of near-infrared light.

In March 2014, SiOnyx was issued U.S. Patent No. 8,680,591. The '591 patent claims a "photosensitive imager device" including a "textured region," among other things. *See* U.S. Patent No. 8,680,591 col. 18 ll. 33-45 (filed Sept. 17, 2010).

SiOnyx and Harvard propounded their first set of interrogatories and requests for documents on November 23, 2016. (Pl. 1st Mot. to Compel Exs. 8-11). Among other things,

they requested documents (1) "sufficient to identify each HPK Product and/or Other Infrared/Near-Infrared Enhanced Device"; (2) "sufficient to show process flow, traveler, recipe, or routing specifications for the manufacture of HPK Products, Other Infrared/Near-Infrared Enhanced Devices, and/or creation of texture, black silicon, roughness, surface features, surface irregularity, surface asperity, or similar"; (3) "sufficient to show methods of fabrication, including processing specifications, doping profiles, silicon and metal layers, annealing procedures and specifics, electrical transfer components, and infrared/near-infrared enhancement, laser or otherwise, including, but not limited to, the creation of texture, black silicon, roughness, surface features, surface irregularity, surface asperity, or similar for all HPK Products and/or Other Infrared/Near-Infrared Enhanced Devices"; and (4) "sufficient to describe testing and validation reports associated with the process design and manufacture of any infrared/near-infrared enhancement, including, but not limited to, texture, black silicon, MEMS structures, roughness, surface features, surface irregularity, surface asperity, or similar, as well as operating characteristics for all HPK Products and/or Other Infrared/Near-Infrared Enhanced Devices." (*Id.* Ex. 11).

The request for documents defined "HPK Products" in part as "all image sensors and/or photoelectric devices manufactured or developed by HPK that include infrared/near-infrared enhancement and/or textured silicon, black silicon, MEMS structures, roughness, surface features, surface irregularity, surface asperity, or similar." (*Id.*). It defined "Other Infrared/Near-Infrared Devices" as "any and all image sensors and/or photoelectric devices, whether being designed, developed, or manufactured, that include infrared or near-infrared enhancement including, but not limited to textured silicon, black silicon, MEMS structures, roughness, surface features, surface irregularity, surface asperity, or similar." (*Id.*; *see also id.*

3

Ex. 10 (similar request to HC), Exs. 8, 9 (interrogatories to HC and HPK)).

HC and HPK took the position that only products infrared-enhanced by laser processing were relevant. (Pl. 1st Mot. to Compel Exs. 12, 14). Despite SiOnyx and Harvard's insistence that they were entitled to discovery on non-laser-textured devices falling within the definitions they had specified, HPK continued to refuse to provide such discovery until plaintiffs "properly accuse[d] specific non-laser products in their initial Infringement Contentions" or in any timely supplements to those contentions. (*Id.* Exs. 16-19).

With regard to the '591 patent, plaintiffs' initial infringement contentions accused "sensors, and end products that use sensors, that include infrared/near-infrared enhancement and/or textured silicon, black silicon, MEMS structures, roughness, surface features, surface irregularity, surface asperity, or similar, whether created by laser processing or another means, including, but not limited to, chemical etching." (Pl. 1st Mot. to Compel Ex. 20 at 5). Plaintiffs provided a list of "non-limiting example" products including photodiodes, avalanche photodiodes, and charge-coupled devices, and provided a representative claim chart comparing claims 1-5, 7-9, 11, 13-21, and 23-26 of the '591 patent to HPK product no. S11510-1106, a charge-coupled device product. (*Id.* Ex. 20 at 12-59).

Following these initial infringement contentions, the parties continued to dispute the relevance of non-laser-textured, infrared-enhancing devices. On March 16, 2017, counsel for HPK represented that "HPK (and as a result, HC) has never sold any products that include infrared/near-infrared enhancement via texture created by means other than laser processing. We therefore believe there is no discovery to conduct on any such products." (Pl. 1st Mot. to Compel Ex. 23).

On October 18, 2017, after this Court construed the term "photosensitive imager device"

4

as a "device that converts incident radiation into a digital image," SiOnyx and Harvard withdrew their contention that individual photodiode and avalanche-photodiode products infringed the '591 patent. (Mem. & Order on Claim Construction at 29; Def. 1st Opp. Ex. K). Their amended contentions continued to accuse charge-coupled devices and additionally accused "an array of photodiodes or avalanche photodiodes that are used convert [sic] incident radiation into a digital image." (*Id.* Ex. K at 10).

At depositions of HPK employees that took place in November and December 2017, SiOnyx contends that it discovered for the first time that HPK was also making a type of infrared-enhanced device called a multi-pixel photon counter ("MPPC") that includes an "irregular asperity" formed by non-laser means. (Pl. 1st Mot. to Compel Ex. 26 at 10:6-12). SiOnyx demanded discovery as to those MPPCs. (Pl. 1st Mot. to Compel Ex. 28-30). HPK did not provide that discovery; instead, it responded that it has only two MPPC products—one that does not have any texturing at all, and one that is still in development. (Def. 1st Opp. Ex. N at 36:17-20, 38:4-6; Pl. 1st Mot. to Compel Ex. 29). The product still in development is textured without using a laser and has not been sold anywhere. (Pl. 1st Mot. to Compel Ex. 29). However, HPK, through HC, sent two free samples to a U.S. technology company in August 2017 for evaluation of their usefulness in a specific application of another company. (Pl. 1st Mot. to Compel Ex. 25 at 70:14-71:19, 75:12-20, 160:22-161:25, Ex. 29; Def. 1st Opp. Ex. N at 26:19-25, Ex. T). It appears that HPK developed the textured MPPC specifically because that U.S. company required improved performance in the near-infrared range for its particular application. (Pl. 2d Mot. to Compel Ex. 4 at 53:20-54:9). Furthermore, as of January 2018, HC expected that if the U.S. company was satisfied with the new MPPC, it would make that MPPC a standard component of its application going forward. (*Id.* Ex. 4 at 60:17-61:7).

5

SiOnyx moved to compel discovery on the MPPCs on February 6, 2018. The Court denied that motion without prejudice in April. SiOnyx renewed its motion on May 17, 2018.

SiOnyx and Harvard have proffered evidence suggesting that the same engineers worked on developing the MPPC products and the other infrared-enhanced devices it accused more specifically. (Pl. 1st Mot. to Compel Exs. 35, 36). They have also produced evidence that, even if the output of an MPPC is not an image but a single value at any given time and location, the values over time are routinely aggregated into an image in the particular application for which the U.S. company wants them. (Pl. 2d Mot. to Compel. Exs. 2, 10).

HPK and HC have proffered (1) evidence that Dr. Carey, a founder of SiOnyx, does not consider himself as having contributed to the invention of "irregular asperity" formed by any process other than laser-texturing (Def. 1st Opp. Ex. C at 304:19-305:6) and (2) images tending to show that the texture of the MPPCs is significantly different from the confidential texture on SiOnyx's devices (*compare* Def. 2d Opp. Nagano Decl. ¶ 3 *with* Pl. Mot. for Summ. J. Ex. Q at HPK0024515).

## II. <u>Legal Standard</u>

"Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).

## III. <u>Analysis</u>

Plaintiffs contend that the MPPC discovery they request is relevant and proportional to both its patent infringement claims and its breach of contract/unjust enrichment claims.

A.      **Patent Infringement**

With respect to patent infringement, plaintiffs contend that the textured MPPCs may infringe the '591 patent, despite the fact that they are not made with a laser process, because the '591 patent does not require the texturing to be applied by a laser.[1]  The Court previously denied the motion on the ground that plaintiff's showing of relevance was "tenuous in the face of the specific, supported contention by defendants that the output of the MPPC is a single value, and not a digital image," as required by the Court's claim construction.

In their renewed motion, plaintiffs put forth additional evidence that the MPPCs, at least when incorporated into the type of system in which the U.S. recipient intends to use it, do create a digital image as required by the '591 patent claims.  That evidence includes some of HPK's own documents explaining the utility of MPPCs for that application and showing examples of the type of images created.  (Pl. 2d Mot. to Compel Ex. 1 at 70:14-75:20, Ex. 2 at 3, 38-40, Ex. 11 at 24).  It also includes a declaration from plaintiffs' expert explaining that, even if each MPPC has a single output at a given time, it can still be used to create a digital image by aggregating outputs that change over time.  (*Id.* Ex. 10 ¶¶ 12-21).

Defendants do not dispute that point.  Rather, they contend that plaintiffs' motion is untimely because plaintiffs had all of the information on which it is based as of the end of 2017.  That is somewhat disingenuous.  Plaintiffs filed their initial motion in February 2018, after it became clear that defendants would not produce the requested information voluntarily, and they renewed their motion less than a month after the Court denied it without prejudice.  Defendants also complain that plaintiffs' infringement contentions and expert reports do not contain detailed

---

[1] Plaintiffs concede that the MPPCs cannot infringe their other asserted patent, U.S. Patent No. 8,080,467, because that patent requires laser texturing (*see* U.S. Patent No. 8,080,467 col. 22 ll. 39-49 (filed May 10, 2010)), and the parties have stipulated to dismissal of claims involving U.S. Patent No. 7,884,446 (ECF 422).

allegations as to the MPPCs. But the Court has already held that plaintiffs' infringement contentions do (at least facially) include MPPCs as accused products. Those contentions allege direct and induced infringement of the '591 patent. And plaintiffs' expert included in his report a preliminary statement about MPPCs when used in the particular application at issue and reserved the right to further supplement his opinion upon receiving the discovery plaintiffs seek. (Def. 2d Opp. Ex. D ¶¶ 63-64). The Court cannot expect plaintiffs to have a detailed opinion and full infringement contentions prior to *any* discovery as to the internal structure of those devices.[2]

Furthermore, plaintiffs have made an adequate showing that the U.S. company to whom the free samples were provided in January has the potential to become a significant customer if the products work for the intended application.

Under the circumstances, plaintiffs have demonstrated that certain discovery as to the MPPCs is relevant and proportional to their claim for infringement of the '591 patent.

### B. **Breach of Contract and Unjust Enrichment**

Plaintiffs argue that they are also entitled to discovery to determine whether the MPPCs were developed using their confidential information, on the theory that the use of their confidential information to direct development efforts toward a known, successful result would be a breach of the nondisclosure agreement even if HPK ultimately created that texture through different means. The Court previously denied the motion as to the breach-of-contract claims because plaintiffs had not put forth sufficient evidence to show that HPK was using SiOnyx's laser-textured confidential samples to develop its non-laser-textured MPPCs.

---

[2] Defendants argue that plaintiffs received discovery that discussed MPPCs and the application at issue as early as February 28, 2017. (Def. 2d Opp. at 5). As proof, they point to a single document (written in Japanese). (*Id.* Ex. E). But defendants represented to plaintiffs in March 2017 that they did not make *any* non-laser-textured, enhanced-IR devices. The Court will not punish plaintiffs for relying on that representation and waiting to file their motion to compel as to non-laser-textured devices until after they learned at depositions in November and December 2017 that HPK did in fact have such a product in development that they planned to sell to a U.S. customer.

In their renewed motion, plaintiffs offer the following evidence to show that their confidential information was used to develop the MPPCs: the same engineers worked on the SiOnyx-HPK information exchange, the MPPC products, and the Disputed Patents; HPK had access to SiOnyx's confidential information while it was developing the MPPCs; and the MPPCs could be covered by the Disputed Patents, which SiOnyx claims Carey invented.

The principal problem is that the texture of the MPPCs appears to be quite different from the confidential texture shared by SiOnyx. The MPPCs somewhat resemble the Pyramids at Giza, whereas the SiOnyx texture more resembles South Dakota badlands. (*compare* Def. 2d Opp. Nagano Decl. ¶ 3 *with* Pl. Mot. for Summ. J. Ex. Q at HPK0024515). The fact that those textures are so different belies an inference that HPK was attempting to create SiOnyx's texture by a different method, and all of the evidence of copying from the parties' summary judgment motions revolves around HPK's attempt to recreate SiOnyx's *laser* conditions. Indeed, plaintiffs do not even argue that the texture of the MPPCs is similar to SiOnyx's confidential texture—they argue that it is a texture that could be covered by the Disputed Patents and that their employees are the true inventors of those patents. But whether or not Carey is the true inventor of the Disputed Patents has no bearing on whether HPK actually used SiOnyx's confidential textures to develop the MPPCs.

Under the circumstances, the Court again concludes that plaintiffs have not succeeded in establishing a basis for discovery as to the breach-of-contract and unjust-enrichment claims. The motion to compel will therefore be denied as to those claims.

## IV.     Conclusion

For the foregoing reasons, plaintiffs' motion to compel is DENIED as to the breach-of-contract and unjust-enrichment claims. It is GRANTED in part as to the patent-infringement claim, as follows:

1. Because the motion to compel is granted as to the claim for patent infringement only, it appears that only U.S. imports or sales of the device are relevant.

2. Because Ocean Optics is not alleged to have purchased any textured MPPCs, it need not supplement its responses as a result of this order.

3. Because there appears to be a single product at issue, the Court expects that the required discovery will be relatively limited. The Court also expects that the parties will move as quickly as possible and do their utmost to resolve discovery differences among themselves.

4. HPK and HC are hereby ordered to supplement their discovery responses in accordance with this order within 30 days, or by September 19, 2018.

5. The Court will address any follow-up issues (such as, for example, updated infringement contentions or expert reports) at a later stage in the proceeding.

**So Ordered.**

Dated: August 20, 2018

/s/ F. Dennis Saylor
F. Dennis Saylor, IV
United States District Judge