UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SIONYX, LLC, and <br> PRESIDENT AND FELLOWS OF <br> HARVARD COLLEGE, <br><br> Plaintiffs, <br><br> v. <br><br> HAMAMATSU PHOTONICS K.K., <br> HAMAMATSU CORP., OCEAN OPTICS, <br> INC., and DOES 1-10, <br><br> Defendants. | Civil Case No. <br> 15-13488-FDS |

## ORDER ON PLAINTIFFS' MOTION FOR EQUITABLE RELIEF

**SAYLOR, J.**

Plaintiffs have filed a post-trial motion seeking multiple forms of injunctive relief that they seek to incorporate in the final judgment.[1]

### 1. Ownership of the Disputed Patents

First, plaintiffs seek an injunction awarding ownership of the nine disputed patents to SiOnyx, and directing HPK to take any steps necessary to perfect that ownership.[2] SiOnyx asserted a claim for correction of inventorship under 35 U.S.C. § 256 as to the disputed patents, contending that Dr. James Carey should have been listed as the inventor (or a co-inventor). The

---

[1] Plaintiffs also filed a motion seeking pre-judgment and post-judgment interest and an accounting. (Docket No. 780). The issue of an accounting, which is a form of equitable relief, is addressed in this memorandum and order.

[2] The term "disputed patents" refers to the following United States Patents: No. 9,614,109; No. 9,293,499; No. 9,190,551; No. 8,994,135; No. 8,916,945; No. 8,884,226; No. 8,742,528; No. 8,629,485; and No. 8,564,087.

jury was asked both to render a verdict as to that claim (it found for SiOnyx) and specifically to find whether Dr. Carey was the sole inventor or a co-inventor of those patents (it found that he was a co-inventor). The jury also found for SiOnyx on the breach of contract claim, which was based on the non-disclosure agreement between SiOnyx and HPK.

The request for injunctive relief arises out of section 5 of the non-disclosure agreement, which provides that "the Disclosing Party" (that is, SiOnyx) "claims ownership of the Confidential Information disclosed by the Disclosing Party and all *patent* . . . and other intellectual property rights in, or *arising from*, such Confidential Information." (Ex. 11 § 5) (emphasis added). Essentially, plaintiffs contend that (1) because the jury found that HPK breached the non-disclosure agreement, (2) it necessarily found that HPK used plaintiffs' confidential information in obtaining the disputed patents, (3) those patents therefore "arose from" that confidential information, and (4) the patents are therefore owned by SiOnyx pursuant to section 5 of the agreement.

There appears to be no doubt, based on the jury's verdict, that the disputed patents arose, at least in part, from the use of plaintiffs' confidential information. There was substantial evidence that HPK employees used the confidential information in the course of developing the technology that resulted in the patents, and it is difficult to construe the verdict reasonably in any other way. The jury also specifically found that Dr. Carey was a co-inventor, not the exclusive inventor, of the technology in those patents. The question is whether those conclusions can be reconciled with Section 5 of the agreement: that is, if Dr. Carey was only a co-inventor, can SiOnyx nonetheless claim exclusive ownership of the patents?

The answer to that question appears to be "yes." It is clear that "issues of patent ownership are distinct from questions of inventorship." *Israel Bio-Engineering Project v.*

*Amgen, Inc.*, 475 F.3d 1256, 1263 (Fed. Cir. 2007). The jury here concluded, in substance, that HPK took Dr. Carey's inventive ideas, added other inventive ideas to it, and obtained the disputed patents as a result.[3] HPK should not be deemed a joint *owner* of the disputed patents simply because the jury concluded it was a joint *inventor*; to do so would treat section 5 of the agreement as a nullity.

It is true that "where inventors choose to cooperate in the inventive process, their joint inventions may become joint property without some express agreement to the contrary." *Ethicon, Inc. v. U.S. Surgical* Corp, 135 F.3d 1456, 1466 (Fed. Cir. 1998). Here, however, there is such an express agreement. Again, that agreement specifically provided that SiOnyx "claim[ed] ownership" of "all patent[s]" that "ar[ose] from" its confidential information. And rather than cooperating in the inventive process with SiOnyx, HPK instead took confidential information SiOnyx had entrusted to it and used it for its own gain. Because section 5 makes clear that SiOnyx owns any patents that arose from the use of its confidential information, and because the disputed patents clearly arose from the information, the Court concludes that SiOnyx is the owner of the disputed patents.

Defendants further contend that because the confidentiality obligation in the non-disclosure agreement expired in seven years (that is, on January 11, 2015), the provision in section 5 likewise expired and cannot be enforced. Nothing in the agreement, however, suggests that any patent rights of SiOnyx arising out of the confidential information would expire in 2015, or that HPK would get a free pass for misappropriating such information after 2015. Indeed, that would be an irrational interpretation of the agreement; the fact that the confidentiality restrictions

---

[3] For the sake of simplicity, the Court will refer to HPK as the "inventor," rather than the assignee of the actual inventors.

expired in 2015 did not mean that HPK could misappropriate that confidential information in 2008, use it to acquire patents without the knowledge of SiOnyx, and avoid any consequence after 2015. The fact that the information at issue may no longer be confidential does not mean that the ownership of the patents did not vest in SiOnyx at the time they were obtained.

Accordingly, the Court will issue an injunction granting ownership of the disputed patents to SiOnyx. The Court will not, however, grant plaintiffs' request to direct HPK to take steps necessary to perfect that ownership. As phrased, that request is unduly vague and would not permit the Court to enter a clear and enforceable injunction.

### 2. **Injunctive Relief for Breach of Contract**

Second, plaintiffs seek an injunction prohibiting defendants "from making, using, offering for sale, selling, or importing the accused products and/or products practicing the disputed patents as a remedy for the breach of contract."

Again, SiOnyx has established that it owns the disputed patents in question, pursuant to contract. Furthermore, Section 9 of the non-disclosure agreement states explicitly that "any breach of [defendant's] obligations under this Agreement will cause irreparable harm to [SiOnyx]." (Ex. 11 § 9). While such a stipulation may not be dispositive, it is entitled to considerable weight. The evidence at trial indicated that the principal assets of SiOnyx consisted of its intellectual property; it is common sense that the misuse of its confidential information, and the obtaining of patents based on that information, would constitute irreparable harm to the company. Any monetary damages awarded fail to compensate plaintiffs for the entirety of the business opportunities lost due to the use of their confidential information. Moreover, defendants themselves testified that the accused products only constitute an "insignificant" amount of its overall business, and the public interest is not disserved by enjoining HPK from

4

continuing to sell the products.

Accordingly, HPK will be enjoined, as a remedy for breach of contract, from making, using, offering for sale, selling, or importing the accused products and/or products practicing the disputed patents.

3.  **<u>Injunctive Relief for Patent Infringement</u>**

Third, plaintiffs also seek an injunction as a remedy for infringement of U.S. Patent No. 8,080,467 ("the '467 patent") prohibiting HPK from "making, using, offering for sale, selling, or importing the accused products" or, in the alternative, that the Court should "grant an ongoing royalty to Plaintiffs under 35 U.S.C. § 283."

In addition to succeeding on the merits, a party seeking a permanent injunction based on patent infringement must demonstrate:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of the hardships between the [parties], a remedy in equity is warranted; and (4) that the public interest will not be disserved by a permanent injunction."

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 390 (2006).

As to the merits, the jury specifically concluded that HPK willfully infringed the '467 patent. There is some question as to whether plaintiffs have shown ongoing irreparable harm damages arising from HPK's infringement of the '467 patent; as plaintiffs acknowledge, "SiOnyx does not currently make CCD image sensors, photodiodes, or avalanche photodiodes." (Pl. Mem. at 13). Nonetheless, SiOnyx does make laser-processed CMOS image sensors, and those sensors (according to the trial testimony) are competitive products with CCD sensors. Furthermore, and in any event, direct competition with an infringer is not necessary for a permanent injunction to issue. *See Mytee Prods. v. Harris Research, Inc.*, 439 Fed. Appx. 882,

5

887 (Fed. Cir. 2011) (non-precedential).  Under the circumstances, principles of equity weigh in favor of granting an injunction.

It is highly doubtful that money damages are adequate to compensate plaintiff for the harms caused by the infringement.  SiOnyx was a small startup, competing against a large foreign manufacturer, and it is impossible to quantify the full extent of the harms, including such things as loss of market share, lost business opportunity, and harm to reputation.  The balance of hardship weighs heavily in favor of an injunction, as SiOnyx is a tiny company relying on a single type of technology, whereas HPK is a large company with a broad and diversified range of products.  Finally, the public interest would not be disserved by the issuance of an injunction.

Accordingly, plaintiffs have satisfied the *eBay* factors required to obtain a permanent injunction as to infringement of the '467 patent.

### 4. Accounting

Finally, plaintiffs seek an order requiring defendants to provide an "accounting of [their] revenues and profits" from the sales of accused products during the period between April 5, 2019, and whatever future date that defendants have shown compliance with any injunction prohibiting them from selling the accused products as a remedy for the breach of contract.  "A damages award for pre-verdict sales of the infringing product does not fully compensate the patentee because it fails to account for post-verdict sales . . . ." *Fresenius USA, Inc. v. Baxter Intern., Inc.*, 582 F.3d 1288, 1303 (Fed. Cir. 2009).  Accordingly, in order to ensure that plaintiffs are appropriately compensated, the Court will order defendants to provide an accounting of revenues and profits from the sale of the accused products between April 5, 2019, and July 25, 2019.

5. **Conclusion**

For the foregoing reasons, plaintiffs' motion for equitable relief and motion for an accounting are GRANTED in part and DENIED in part, as follows:

1. The final judgment will include an injunction awarding and transferring ownership of the disputed patents to SiOnyx, LLC.
2. The final judgment will include an injunction prohibiting HPK and HC from making, using, offering for sale, selling, or importing products practicing the disputed patents.
3. The final judgment will include an injunction prohibiting HPK and HC from making, using, offering for sale, selling, or importing products infringing the '467 patent.
4. The final judgment will require defendants to provide an accounting of sales of any products practicing the disputed patents between April 5, 2019, and July 25, 2019.

**So Ordered.**

Dated: July 25, 2019

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
United States District Judge